**Joshua M. Sasaki, P.C.**, OSB No. 964182
josh.sasaki@millernash.com
**Steven G. Liday**, OSB No. 075975
steven.liday@millernash.com
**Christopher Riley**, OSB No. 211614
christopher.riley@millernash.com
MILLER NASH LLP
US Bancorp Tower
111 SW Fifth Ave, Ste 3400
Portland, OR 97204
Telephone: 503.224.5858
Facsimile: 503.224.0155

Attorneys for Plaintiffs
State of Montana; Western Energy Alliance;
Pacific Propone Gas Association; Idaho
Petroleum Marketers and Convenience Store
Association, Inc.; and Christensen, Inc.

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| STATE OF MONTANA; WESTERN ENERGY ALLIANCE, a Colorado nonprofit corporation; PACIFIC PROPANE GAS ASSOCIATION, a Washington nonprofit corporation; IDAHO PETROLEUM MARKETERS AND CONVENIENCE STORE ASSOCIATION, INC., an Idaho nonprofit corporation; and CHRISTENSEN, INC., a Washington Corporation, | CASE No.   3:23-cv-00219<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(Violation of the Commerce Clause of the United States Constitution; Preemption; Violation of Substantive Due Process) |
| Plaintiffs,<br><br>v.<br><br>CITY OF PORTLAND,<br><br>Defendant. | |

Page 1 -   **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

Plaintiffs, State of Montana ("Montana"), Western Energy Alliance ("Alliance"), Pacific Propone Gas Association ("PPGA"), Idaho Petroleum Marketers and Convenience Store Association, Inc. ("IPM&CS"), and Christensen, Inc. ("Christensen") (collectively, "Plaintiffs"), bring this action against the City of Portland (the "City"), and allege as follows:

## NATURE OF THE ACTION

1. Starting in 2015, the City enacted binding policies to block the transportation of fuel through its borders. In furtherance of these policies, the City adopted and readopted zoning code amendments in 2016, 2019, and 2022 that prohibit the construction or expansion of transportation infrastructure that could be used to export fuel out of the region or country. The City has repeatedly avowed, however, that its own citizens will not be harmed by this prohibition. Accordingly, the code amendments do not affect the continued operation of existing terminals—which are dedicated to the supply of fuel to the City and region—as well as allow new infrastructure that delivers fuel to users within the City. Because the code amendments serve political purposes, they do not resolve the issues they purportedly target, but actually undermine those goals. The code amendments impose a flat prohibition on new fuel-export infrastructure in all parts of the City and cover virtually all types of combustible fuel, including fuel designated as clean or renewable under state and federal law. Thus, the code amendments block infrastructure needed for the transition to cleaner and renewable fuels, prevent the construction of more modern, safer facilities, and freeze the decades-old existing terminals within an earthquake liquefaction zone.

2. As set out below, these policies and zoning regulations intentionally discriminate in favor of local users, unreasonably burden interstate commerce, interfere with

Page 2 -   **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

intermodal/rail transportation, and serve no legitimate local purpose. Accordingly, they violate the Dormant Commerce Clause, Foreign Commerce Clause, and Due Process Clause of the United States Constitution and are preempted by federal statutory law. Plaintiffs therefore bring this action pursuant to 42 USC § 1983 for declaratory and injunctive relief.

## PARTIES

3.      Montana is a sovereign state of the United States of America. It is represented by and through Attorney General Austin Knudsen, the state's chief legal officer, who has the duty and authority to represent the state in federal court. Montana sues in both its proprietary capacity (as a consumer of fuel) and in its sovereign capacity as *parens patriae* for all Montana citizens.

4.      Western Energy Alliance is a Colorado nonprofit association with its principal place of business in Denver, Colorado. The Alliance is a trade association that represents 200 member companies engaged in all aspects of environmentally responsible exploration and production of oil and natural gas in the West.

5.      PPGA is a Washington nonprofit corporation with its principal place of business in Lansing, Michigan. PPGA is a trade association composed of businesses that produce, distribute, sell, or transport propane in the states of Alaska, Hawaii, Washington, or Oregon. Among other things, PPGA represents its members' interests in legislative, regulatory, and code issues related to the propane industry.

6.      IPM&CS is an Idaho nonprofit corporation and trade association with its principal place of business in Boise, Idaho. It protects and advances its members' legislative and regulatory interests at the state and federal levels.

Page 3 -    **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

7.      Christensen, Inc. ("Christensen") is a Washington corporation with its principal place of business in Richland, Washington. Christensen is one of the largest distributors of fuels, lubricants, and propane on the West Coast, serving over 10,000 retail fuel, commercial, industrial, and fleet customers.

8.      The City is a municipal corporation created under the laws of Oregon and a political subdivision of the state.

## JURISDICTION AND VENUE

9.      The Court has subject-matter jurisdiction under 28 USC § 1332. There is complete diversity among the parties, and the amount in controversy exceeds $75,000.

10.     The Court also has subject-matter jurisdiction pursuant to 28 USC § 1331 because all claims in this action arise under federal law.

11.     The Court is authorized to grant the relief requested in this case under 42 USC § 1983, 28 USC § 1651(a), and the Declaratory Judgment Act, 28 USC §§ 2201, 2202.

12.     The Court has personal jurisdiction over the City because it is located in the state of Oregon.

13.     Venue is proper in this judicial district because the City is located in this district and a substantial part of the acts or omissions giving rise to the claims occurred and continue to occur in this judicial district. 28 USC §§ 1391(b)(2), 1391(e)(1).

## FACTS COMMON TO ALL CLAIMS

### Existing and Proposed Transportation Infrastructure in the City

14.     The City has the fourth-largest port on the west coast, located at the confluence of the Columbia and Willamette Rivers, with deep-water port access to the Pacific

Page 4 -    **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

Ocean, at the end of rail and barge passage through the Cascade Mountains, and at the intersection of the I-5 and I-84 corridors. Portland's industrial districts contain Oregon's largest deep-water seaport, rail hub, and truck distribution centers.

15.     The City is the western terminus for BNSF and Union Pacific railway mainlines that cover two-thirds of the western United States, including the oil- and gas-producing states of Montana, North Dakota, Colorado, Wyoming, and Utah. Connections to the BNSF and Union Pacific mainlines provide railway access to the rest of the United States and Canada.

16.     The City is a key hub for petroleum and natural-gas pipelines, the most important being the 400-mile Olympic Pipeline that connects Puget Sound refineries with a cluster of ten petroleum terminals in the City. The City is also the north terminus of the Kinder Morgan pipeline, which distributes fuel products from the City to Eugene, Oregon, and surrounding Willamette Valley. An additional pipeline runs from the City's fuel terminals to the Portland International Airport.

17.     The City's existing fuel infrastructure is dedicated almost exclusively to receiving fuel from outside the region and then distributing it to the Portland metropolitan area, as well as the Oregon and southern Washington markets. The fuel terminals in the City provide approximately 90 percent of fuel for Oregon and southwest Washington.

18.     Around 2010, however, the significant increase of production of oil and natural gas in North Dakota and other Midwestern states resulted in proposals for new transmodal export terminals in and around the City to provide access to Asian markets via marine transportation.

Page 5 -   **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

19.    In 2014, the Canadian company Pembina Pipeline Corporation ("Pembina") announced plans to construct a propane-export terminal within the City. The proposed terminal was to receive propane from Canada by train for subsequent loading onto ocean tankers and shipment across the Pacific Ocean to customers in Asia. The $500 million project was initially supported unequivocally by City officials, touted as the largest private investment in the City's history. For example, the City's mayor, Charlie Hales, issued a press release stating: "This is great news[.] * * * We welcome this investment and these jobs in Portland. The city is committed to growing our economy on the land we already have, and holding industry to very high environmental and public safety standards. This proposal meets these goals."

20.    In response to political opposition, however, the mayor and City reversed course in 2015 and blocked the project by withholding a small zoning amendment that had been endorsed by planning staff and approved by the City's planning commission.

### 2015-2016: Adoption of Policies Targeting Fuel-Export Infrastructure

21.    In further reaction to political opposition to the Pembina project, the City adopted new policies to categorically block future proposals for fuel-export facilities.

22.    In 2015, the City passed Resolution No. 37168 that adopted a binding policy to "[o]ppose expansion of infrastructure whose primary purpose is transporting or storing fossil fuels in or through Portland or adjacent waterways" (the "2015 Resolution"). The 2015 Resolution was passed in conjunction with Resolution 37164 that adopted "a policy opposing all project proposals that would increase the amount of crude oil being transported by rail through the City of Portland and the City of Vancouver, Washington." Also passed in 2015

Page 6 -    **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

was Resolution 37135 adopting the City's "2015 Climate Action Plan." In the list of actions to be completed by 2020 was the item "Fossil Fuel Exports—Establish a fossil fuel export policy that considers lifecycle emissions, safety, economics, neighborhood livability and the environment; at the state level, oppose exports of coal and oil through Oregon."

23.    The 2015 Resolution directed the City's Bureau of Planning and Sustainability (BPS) to develop zoning code changes to implement the new policies opposing the export of fuel through the City. To ensure that a ban on fuel-export infrastructure did not harm local industry and consumers, however, the 2015 Resolution included an exception for "the provision of services directly to end users[.]" BPS was also directed as part of this process to "undertake an analysis of the economic impacts of any proposed Code changes * * * with a particular focus on potential impacts to local blue-collar jobs[.]"

24.    In June 2016, the City adopted a new comprehensive zoning and development plan, titled the "2035 Comprehensive Plan." In line with the 2015 Resolution, the 2035 Comprehensive Plan includes a binding policy that overtly discriminates against infrastructure for the interstate and international transportation of fuel. Plan Policy 6.48 states that the City will "[l]imit fossil fuel distribution and storage facilities to those necessary to serve the regional market."

*2016: First Adoption of Fuel-Terminal Amendments*

25.    On December 14, 2016, City Council passed Ordinance No. 188142 adopting zoning code amendments (the "Amendments") that prohibit new infrastructure that could be used for the interstate or international transportation of fuel (the "2016 Ordinance").

Page 7 -    **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

26.    The Amendments created a new land use category called "Bulk Fossil Fuel Terminals." Under the amended zoning code, new Bulk Fossil Fuel Terminals were prohibited, and existing terminals were designated "limited land uses" that could not be expanded. To selectively target only those fuel terminals that would be used for interstate or international transportation, the Amendments defined "Bulk Fossil Fuel Terminals" as facilities with over two million gallons of fuel-storage capacity or transloading equipment allowing transfer of fuel from one mode of transportation to another. The capacity threshold was explicitly set by the City to cover terminals that could unload and store the volume of fuel from a "unit train," i.e., the standard size of single-commodity trains used to transport oil. The prohibition on transloading equipment—regardless of storage capacity—was adopted to avoid new export terminals that transferred fuel directly from one transportation mode to another without the need for intermediary storage. Although ostensibly targeting only traditional fossil fuels, the ban applied to transportation infrastructure for virtually all types of combustible fuel, including those deemed as renewable and/or clean fuel under state and federal law.

27.    The Amendments did not apply to existing fossil fuel terminals, which serve the Portland and regional market almost exclusively. Thus, by targeting only new or expanded infrastructure, the code operates to prevent export facilities without impacting local supply.

28.    To further protect local interests, the definition of "Bulk Fossil Fuel Terminals" included several exceptions for local consumers and industry. These included:

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

- "Gasoline stations and other retail sales of fossil fuels";

- "Distributors and wholesalers that receive and deliver fossil fuels exclusively by truck";

- "Industrial, commercial, institutional, and agricultural firms that exclusively store fossil fuel for use as an input"; and

- "The storage of fossil fuels for exclusive use at an airport, surface passenger terminal, marine, truck or air freight terminal, rail yard, or as part of a fleet vehicle servicing facility are accessory to their use."

29.     These exceptions are intended and in fact operate to throttle the supply of fuel end users outside the City, while protecting identical local entities. For example, airports, marine terminals, and vehicle fleets within the City could increase their supply/use of fuels following adoption of the Amendments by building new storage or intermodal infrastructure, but consumption of fuel by identical operations outside City limits—which must rely on a supply of fuel through one of the City's terminals—would be constricted by the ban.

30.     The City made no attempt to conceal this discriminatory purpose and effect of the Amendments, but instead highlighted the intent to target only export facilities while protecting local interests.

31.     For example, the very first finding in the 2016 Ordinance explains that the Amendments were being adopted because of "the rapid development of fossil fuel resources in the western U.S. and Canada [that had] resulted in numerous facility and infrastructure projects proposed to transport coal * * * fossil fuels through the West Coast[.]" In other findings, the City

Page 9 -   **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

emphasized that the Amendments were meant to block these new facilities. The official report on

the Amendments explained:

> The energy distribution market in the Pacific Northwest is changing.
> Production of crude oil and natural gas, particularly from North Dakota, has
> substantially increased in the U.S. since 2009 * * *. In turn, several large new
> fuel distribution terminals have been proposed in the Pacific Northwest to
> access West Coast and export markets * * *. Similar trends have occurred in
> Alberta and British Columbia.
>
> This project is proposing a prompt, focused response to these market changes.

32.     The 2016 Ordinance also states that the Amendments are meant to

implement the 2015 Resolution, Plan Policy 6.48, and the requirement for a "fuel export policy"

in the 2015 Climate Action Plan—each of which explicitly state the City's intent and binding

policies to block infrastructure for the international and interstate transportation of fuel, while

avoiding harm to local consumers and businesses.

33.     The City also expressly stated its discriminatory intent in the official code

commentary. For example, the official commentary for the code definition of "Bulk Fossil Fuel

Terminals" states that "[t]he 2-million-gallon threshold is sized to include facilities that are large

enough to unload unit trains. Functionally, these terminals tend to be regional gateway facilities,

where fossil fuels enter and exit the region." In explaining the purpose of the exceptions to the

definition, the commentary provides: "[the 2015 Resolution] lists a specific exception to not

restrict service directly to end users. At a small scale, services to end users include retail gasoline

filling stations, natural gas access lines in street right-of-way to residential and business

customers, and heating oil tanks at home sites. Larger scale end users with fossil fuel storage and

access infrastructure also include manufacturers, jet fuel facilities for PDX Airport, vessel fuel

facilities on Portland Harbor, and others, where fossil fuels are used as an input."

Page 10 -  **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

34.    Similarly, the commentary for the new prohibition (set out in

PCC 33.140.100) states that the "Regulation of Bulk Fossil Fuel Terminals implements policy

direction in City of Portland Resolution 37168 (adopted November 2015) and

2035 Comprehensive Plan Policy 6.48 * * *"—both of which adopt binding policies to block

fuel-export infrastructure without harming local interests.

35.    During the hearings on the Amendments, City Council members and BPS

openly and repeatedly highlighted the discriminatory purpose of the Amendments. For example,

in introducing the Amendments, the mayor stated:

> The rapid development of fossil fuel resources in the western part of our
> country and Canada has put a lot of pressure on Portland and other cities and
> has sought to transport and move huge quantities of fossil fuels through and
> into our communities. As we all experienced with the [P]embina proposal last
> year, the zoning code actually allows fossil fuel terminals as a warehouse and
> freight movement use in our zoning code today without any limit on the size
> of these terminals. We, of course, passed [the 2015 Resolution] saying we're
> going in a different direction and today is the proposal to put that into city
> law, into our code.

36.    Following their adoption, the 2016 Ordinance and Amendments were

appealed to the Oregon Land Use Board of Appeals (LUBA), subsequently reviewed by the

Oregon Court of Appeals, and ultimately remanded to the City for further proceedings.

37.    The remand was based on noncompliance with state and local land use

laws and policies. Specifically, LUBA found, and the Court of Appeals of affirmed, that (a) the

City had not adequately supported its determination that the regional demand for fuel would not

increase in the future (i.e., the City had failed to show that the City and surrounding region

already served by the City's terminals would not experience fuel shortages because of the freeze

on infrastructure), and (b) the City had not sufficiently demonstrated or explained how the ban

Page 11 -  **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

on new intermodal facilities for transportation of fuel was consistent with the City's comprehensive plan policies related to support of local industry and freight-transportation infrastructure.

### *2019: City Readopts Fuel-Terminal Amendments*

38.    On December 18, 2019, the City passed Ordinance No. 189807 (the "2019 Ordinance") to readopt the Amendments and attempt to address the issues raised in LUBA's remand order.

39.    The only substantive change to the Amendments was the imposition of a complete ban on the storage of coal, including at existing terminals—a type of fuel that is not used in the region to produce energy, but only transported through the City for export to other states and countries.

40.    The primary difference between the 2016 and 2019 legislation was the adoption of additional findings and analysis. While the 2019 Ordinance and staff report on the Amendments were substantially the same as the 2016 versions, the 2019 Ordinance adopted approximately 160 pages of supplementary findings and included a new staff report analyzing the regional demand for fuel and concluding that it was unlikely to increase in the future.

41.    In other words, throughout the new supporting materials, the City declared that the Amendments would accomplish its discriminatory goal: the prohibition on new or expanded fuel-transportation infrastructure would block the export of fuel, but local interests would not be harmed because "fossil fuel storage capacity at the existing [fuel terminals] is sufficient to support the regional economy."

Page 12 -  **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

42.     Following their adoption, the 2019 Ordinance and Amendments were appealed to LUBA. Once again, LUBA remanded the Amendments to the City for further proceedings because the City had not adequately supported its findings that the prohibition was consistent with the City's comprehensive plan policies.

### *2022: City Adopts Fuel-Terminal Amendments for Third Time*

43.     On August 24, 2022, the City passed Ordinance No. 190978 (the "2022 Ordinance") to adopt the Amendments for a third time.

44.     As in 2019, the primary difference in the 2022 Ordinance was the adoption of significantly more findings and incorporation of new analysis to support its determinations that the existing fuel-transportation infrastructure subject to the ban in the Amendments could meet future regional supply and that the prohibition would not harm local industry or consumers.

45.     To that end, City staff prepared another memo analyzing future demand for fuel in the region. Further, the City hired a consultant to examine the demand for natural gas and corresponding need for additional infrastructure to meet that demand. Both reports concluded that the Amendments were unlikely to cause shortages of fuel in the region.

46.     In other words, the City further emphasized that the Amendments would accomplish its discriminatory goal to block the transportation of fuel outside the City without harming local interests—and hired consultants to prove this discriminatory effect.

47.     For example, the 2022 Ordinance findings state that "the City Council finds that there is no compelling evidence that the demand for petroleum will outpace the historic peak consumption in Oregon and there is a surplus of system capacity to meet the expected

Page 13 -  **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

demand. As such, Council finds that the amendments properly limit storage to what is necessary

to serve the regional market." Similarly, based on the report from its consultant, the

2022 Ordinance states that "City Council finds the natural gas storage tank capacity that exists

today in Portland is adequate to serve the future regional market." The City also found that the

projected increase in demand for aviation fuel was not a concern because the "code includes

specific exceptions to the storage tank capacity limits" for fuel to be used at the Portland airport.

48.     To explain how the exceptions in the definition of "Bulk Fossil Fuel

Terminals" protect local interests, the 2022 Ordinance states:

> The description of a Bulk Fossil Fuel Terminal use includes exceptions to
> clarify that these regulations apply to the largest, multimodal facilities.
> Distributors and wholesalers that receive and deliver fossil fuels exclusively
> by truck are not Bulk Fossil Fuel Terminals, as well as gasoline service
> stations and other retail sales of fossil fuels are not Bulk Fossil Fuel
> Terminals. Also, fossil fuel storage where it is used as a manufacturing input,
> rather than a fuel, is not considered a Bulk Fossil Fuel Terminal. A key
> provision is an exception for the storage of fossil fuels for exclusive use at an
> airport, surface passenger terminal, marine, truck or air freight terminal,
> drydock, ship or barge servicing facility, rail yard, or as part of a fleet vehicle
> servicing facility. This exclusive use exception was included to specifically
> address a forecasted increase in demand for jet fuel.

49.     In finding compliance with Plan Policy 6.48, the 2022 Ordinance includes

the finding:

> Policy 6.48 provides direction to limit fossil fuel terminals to what is
> necessary to serve the regional market. * * * [M]ost (66%) of the increased
> consumption of petroleum in 2050 can be attributed to the 25,000 billion BTU
> increase in jet fuel consumption. New storage tank capacity can be built to
> accommodate the increased consumption of jet fuel under an exception in the
> code amendments. Also, storage tank capacity can be added for non-fuel
> petroleum products. * * * Therefore, the City Council finds the liquid fossil
> fuel storage tank capacity that exists today in Portland, with the allowed
> exceptions, is adequate to serve the future regional market. * * *

Page 14 -  **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

50.    Finally, the 2022 Ordinance includes a new finding explaining that even if there is an increase in fuel demand in the region, the City will not be impacted by its ban on new fuel-transportation infrastructure. The City explains that the Amendments will accomplish their purpose of forcing the transportation of that additional fuel through other jurisdictions:

1. Increased demand in Eastern Oregon could be met through increased truck deliveries from the fuel terminal in Pasco, Washington, which has a pipeline connection to refineries in Salt Lake City. This option would increase truck traffic in Eastern Oregon – which is beyond the jurisdiction of the City of Portland.

2. Increased demand in Southern Oregon could be met through increased deliveries from the fuel terminal in Chico, California. This option would increase truck traffic in Southern Oregon – which is beyond the jurisdiction of the City of Portland.

3. Increased demand in the Willamette Valley and the Northern and Central Oregon Coast are likely to be met either through increased deliveries to an Olympic Pipeline terminal in Vancouver, Washington; increased barge deliveries to another port on the Lower Columbia River or the Oregon Coast; or via rail. Deliveries to the Oregon Coast or via rail would not result in increased truck traffic in Portland because those deliveries could serve regional submarkets directly without having to pass through Portland.

51.    In short, the 2022 Ordinance adds even more detailed analysis and evidence that the Amendments will accomplish their discriminatory purpose of blocking infrastructure for the international and interstate transportation of fuel while shielding local interests from the consequences of this ban.

## FIRST CLAIM FOR RELIEF

### Violation of Dormant Commerce Clause—Discrimination

52.    Plaintiffs incorporate the paragraphs above.

53.    The Commerce Clause of the United States Constitution states that "Congress shall have Power * * * [t]o regulate Commerce * * * among the several States."

Page 15 -  **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

US Const Art I, § 8, cl 3. "Though phrased as a grant of regulatory power to Congress, the

Clause has long been understood to have a 'negative' aspect that denies the States the power

unjustifiably to discriminate against or burden the interstate flow of articles of commerce."

*Oregon Waste Sys., Inc. v. Department of Envtl. Quality of State of Or.*, 511 US 93, 98,

114 S Ct 1345, 128 L Ed 2d 13 (1994).

      54.    Discrimination "means differential treatment of in-state and out-of-state

economic interests that benefits the former and burdens the latter." *Rocky Mountain Farmers

Union v. Corey*, 730 F3d 1070, 1087 (9th Cir 2013) (quoting *Oregon Waste Sys.*, 511 US at 99).

A statute is discriminatory if it "impose[s] commercial barriers or discriminate[s] against an

article of commerce by reason of its origin or destination out of State." *C & A Carbone, Inc. v.

Town of Clarkstown*, 511 US 383, 390, 114 S Ct 1677, 128 L Ed 2d 399 (1994).

      55.    Discrimination benefitting local users and consumers violates the Dormant

Commerce Clause to the same extent as discrimination in favor of local producers. *New England

Power Co. v. New Hampshire*, 455 US 331, 339, 102 S Ct 1096, 71 L Ed 2d 188 (1982); *Brown-

Forman Distillers Corp. v. New York State Liquor Auth.*, 476 US 573, 580, 106 S Ct 2080,

90 L Ed 2d 552 (1986); *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 US 564,

578, 117 S Ct 1590, 137 L Ed 2d 852 (1997); *Hughes v. Oklahoma*, 441 US 322, 339,

99 S Ct 1727, 60 L Ed 2d 250 (1979); *Sporhase v. Nebraska ex rel. Douglas*, 458 US 941, 944,

102 S Ct 3456, 73 L Ed 2d 1254 (1982); *Pennsylvania v. West Virginia*, 262 US 553, 592,

43 S Ct 658, 67 L Ed 1117, *aff'd*, 263 US 350 (1923).

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

56.     In this case, the Amendments and the binding policies they implement (the 2015 Resolution and Plan Policy 6.48) discriminate against interstate commerce on their face, in their purpose, and in their practical effect in numerous respects.

57.     The 2015 Resolution and Plan Policy 6.48 enact binding policies that facially discriminate against out-of-state fuel users. The 2015 Resolution states that it is the binding policy of the City to "oppose expansion of infrastructure whose primary purpose is transporting or storing fossil fuels in or through Portland or adjacent waterways[,]" but "not restrict * * * the provision of service directly to end users[,]" in the City. Likewise, Plan Policy 6.48 (titled "fossil fuel distribution") adopts a binding planning policy to "[l]imit fossil fuels distribution and storage facilities to those necessary to serve the regional market."

58.     The Amendments are also facially discriminatory. First, the Amendments repeatedly state that they were designed and enacted to implement the two facially discriminatory policies above. Second, the Amendments facially discriminate against interstate users and consumers of fuel by expressly excluding their local counterparts from the prohibition on new fuel-transportation infrastructure. Thus, an airport or a manufacturer that uses fuel as an input located in the City can increase their fuel supply by building new storage or intermodal facilities, while the supply of fuel for identical entities outside the City is limited by the current capacity of fuel terminals. This targeting of interstate transportation infrastructure has been repeatedly found to violate the Dormant Commerce Clause. *H. P. Hood & Sons, Inc. v. Du Mond*, 336 US 525, 526, 69 S Ct 657, 93 L Ed 865 (1949); *West v. Kansas Nat. Gas Co.*, 221 US 229, 249, 31 S Ct 564, 55 L Ed 716 (1911); *Western Oil & Gas Ass'n v. Cory*, 726 F2d 1340, 1345 (9th Cir 1984), *aff'd*, 471 US 81, 105 S Ct 1859, 85 L Ed 2d 61 (1985); *American*

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

*Trucking Ass'ns v. Whitman*, 437 F3d 313 (3rd Cir 2006); *Kassel v. Consolidated Freightways Corp. of Del.*, 450 US 662, 677-78, 101 S Ct 1309, 67 L Ed 2d 580 (1981).

59.    As further facial discrimination, the code commentary officially adopted as part of the City's zoning code explains that the code should be interpreted and applied to block new interstate facilities while protecting local interests from the ban. For example:

a.    The commentary for the use restriction in PCC 33.140.100 and 33.920.300 expressly state that the "Regulation of Bulk Fossil Fuel Terminals implements policy direction in City of Portland Resolution 37168" (the 2015 Resolution) and Plan Policy 6.48, which require the City to block infrastructure used to export fuel outside the region while not impacting local users.

b.    The commentary for PCC 33.920.300, the code provision defining Bulk Fossil Fuel Terminals subject to the prohibitions, states that the "2-million-gallon threshold [for being subject to the prohibition] is sized to include facilities that are large enough to unload unit trains. Functionally, these terminals tend to be regional gateway facilities, where fossil fuels enter and exit the region."

c.    As guidance for interpreting the exceptions to the restrictions, the PCC 33.920.300 commentary states:

Resolution 37168 lists a specific exception to not restrict service directly to end users. At a small scale, services to end users include retail gasoline filling stations, natural gas access lines in street right-of-way to residential and business customers, and heating oil tanks at home sites. Larger scale end users with fossil fuel storage and access infrastructure also include manufacturers, jet fuel facilities for PDX Airport, vessel fuel facilities on Portland Harbor, and others, where fossil fuels are used as an input.

Page 18 -  **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

60.    The Amendments, the 2015 Resolution, and Plan Policy 6.48 also violate the Dormant Commerce Clause because they have a discriminatory purpose. The City makes no attempt to conceal, but repeatedly avows its intent to target and block new interstate/export facilities, while protecting infrastructure that distributes fuel to local users from the restrictions. As set forth above, these statements of discriminatory purpose are replete throughout the 2022 Ordinance findings, the text of the Amendments, the policies implemented by the Amendments, and numerous statements of public officials.

61.    The Amendments are also discriminatory in their effect. The Amendments block infrastructure that would serve interstate users of fuel while protecting expansion of facilities for distribution of fuel to local users through several mechanisms, each of which have been found to violate the Dormant Commerce Clause in similar cases. These methods include:

a.    Applying the prohibition on only those terminals with infrastructure primarily used in export activities. *Island Silver & Spice, Inc. v. Islamorada*, 542 F3d 844 (11th Cir 2008).

b.    Prohibiting only additional terminals in order to freeze the current infrastructure that is already dedicated to and sufficient to satisfy the demand of its citizens. *West Lynn Creamery, Inc. v. Healy*, 512 US 186, 205, 114 S Ct 2205, 129 L Ed 2d 157 (1994); *Du Mond*, 336 US at 526.

c.    Including exceptions to the definition of "Bulk Fossil Fuel Terminals" that exclude local users and operations from the prohibition altogether. *Raymond Motor Transp., Inc. v. Rice*, 434 US 429, 445-47, 98 S Ct 787, 54 L Ed 2d 664 (1978).

Page 19 -  **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

62.    The Amendments also violate the Dormant Commerce Clause because they block additional "unwanted commerce" (i.e., the transportation of fuel through the City) except as necessary to meet the needs of citizens. *City of Philadelphia v. New Jersey*, 437 US 617, 628, 98 S Ct 2531, 57 L Ed 2d 475 (1978); *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Res.*, 504 US 353, 363, 112 S Ct 2019, 119 L Ed 2d 139 (1992); *Chemical Waste Mgmt., Inc. v. Hunt*, 504 US 334, 337, 112 S Ct 2009, 119 L Ed 2d 121 (1992); *Environmental Tech. Council v. Sierra Club*, 98 F3d 774, 778 (4th Cir 1996); *In re Southeast Ark. Landfill, Inc.*, 981 F2d 372, 373 (8th Cir 1992). In fact, the 2022 Ordinance expressly declares the Amendments to be consistent with City policy because increased regional demand for fuel will have to be transported through other jurisdictions.

63.    The Amendments do not advance a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. In fact, the Amendments do not advance their stated goals at all. By prohibiting new or expanded fuel terminals, the Amendments essentially lock the terminals within a liquefaction zone, eliminate the economic justification for updating or replacing the old storage tanks, and create ambiguity as to whether infrastructure improvements are allowed under the new code. Further, the strict limit on storage expansion and over-expansive definition of "fossil fuel" blocks the additional infrastructure necessary for transition to renewable and cleaner fuels. Prohibiting infrastructure for expanded use of the Olympic Pipeline and the City's marine port facilities will also force fuel to be distributed by less-efficient means, including truck delivery from farther away, thus undercutting the City's stated concern for safety and reduction in emissions. Likewise, prohibiting new export facilities with access to the City's deep-sea ports (such as Pembina's propane-terminal proposal)

Page 20 -  **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

obstructs other countries' transition to cleaner fuels. Moreover, obstructing the flow of interstate commerce in order to impede the production and use of fuel in other states and countries is not a legitimate local purpose.

64.    Even if the Amendments' prohibition on fuel-transportation infrastructure actually served a legitimate local purpose, there is no justification for its discriminatory nature. All of the stated goals of the City could be accomplished by nondiscriminatory means.

65.    Plaintiffs are and will continue to be irreparably harmed by the Amendments, the 2022 Ordinance, the 2015 Resolution, and Plan Policy 6.48. The Amendments and the binding policies they implement are intended to and will throttle the transport of fossil fuel to and from other states and countries. Thus, the Amendments will result in inadequate fuel supply for end users outside the City, causing higher prices and fuel shortages, which is the City's expressly stated goal: to reduce the consumption of fuel in other areas by cutting off fuel supply. The Amendments will also harm Plaintiffs' members that produce, transport, or sell/distribute fuel by targeting the transportation infrastructure necessary to access markets outside the region or country. This is particularly injurious because of the important port, rail, and road infrastructure within the City. Moreover, this injury is compounded by similar policies that have either been adopted or proposed in other west coast cities with significant port and rail facilities. Finally, the Amendments also harm Plaintiffs' members that currently have fuel-transportation terminals within the City by blocking their ability to relocate, replace storage tanks, or build new tanks that are necessary to blend and otherwise transition to cleaner fuels as mandated by state and federal law.

Page 21 -  **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

66.     Plaintiffs therefore seeks a declaration stating that the Amendments, 2022 Ordinance, 2015 Resolution, and Plan Policy 6.48 discriminate against interstate commerce in violation of the Dormant Commerce Clause, and request an injunction prohibiting the City from taking further action to enforce or implement these policies and regulations.

## SECOND CLAIM FOR RELIEF

### Violation of Dormant Commerce Clause—Undue Burden on Interstate Trade

67.     Plaintiffs incorporate the paragraphs above

68.     Even if a local regulation is not discriminatory, it still violates the Dormant Commerce Clause if "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 US 137, 142, 90 S Ct 844, 25 L Ed 2d 174 (1970).

69.     The Amendments constitute an undue burden on interstate commerce in violation of the Dormant Commerce Clause.

70.     Even a facial evaluation of the Amendments demonstrates that the prohibition on new infrastructure for the interstate transportation of fuel does not advance a legitimate local benefit. The primary local interest the City has identified is the danger of a natural disaster affecting the fossil fuel infrastructure. The City fails to explain how categorically banning new, modern terminals, regardless of location within the City, addresses the safety issues with the existing terminals. In fact, if anything, the Amendments undermine the City's safety objective by locking the fuel terminals within a liquefaction zone, and removing the economic incentive for replacing the old storage tanks, i.e., increased capacity. Moreover, the Amendments do not prohibit mono-modal terminals with less than two million gallons or address

Page 22 -  **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

terminals of any size that store volatile fuels not covered by the prohibition. The City does not explain in the 2022 Ordinance or Amendments how several smaller terminals or storage of equally volatile fuels advance its safety goals. Further, the ban on multimodal terminals without significant intermediary storage is at best unrelated and at worst undermines the very goal of reducing the storage of fossil fuels within the City.

71.     The City's stated goal of reducing carbon emissions by reducing the use of fossil fuels in other states and countries through the obstruction of interstate commerce is not a legitimate *local* interest for Dormant Commerce Clause purposes.

72.     Conversely, the FFT Amendments' impact on interstate trade is substantial. The City is the fourth largest port on the West Coast, located at the intersection of nationwide railway lines, the Columbia and Willamette Rivers—with access to the Pacific Ocean—the I-5 and I-84 freeway corridors. Even if the City itself was not itself as critical to international and interstate commerce, the Amendments would still violate the Dormant Commerce Clause because the extent of the burden on commerce is determined by considering a hypothetical where every other jurisdiction adopted the same regulation. In such a scenario, interstate and international fuel commerce throughout the country would be frozen at its current level, and in its current form. This is more than a hypothetical. Many west coast local jurisdictions have or are proposing to restrict fuel distribution through local code, including but not limited to Vancouver, Washington; King County, Washington; Whatcom County, Washington; and Richmond, California.

73.     Plaintiffs are and will continue to be irreparably harmed by the Amendments because they block (or, at a minimum, significantly restrict) the transport of fossil

Page 23 -  **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

fuel to and from other states and countries. Thus, the Amendments will result in inadequate fuel supply for end users outside the City, causing higher prices and fuel shortages, which is the City's expressly stated goal: to reduce the consumption of fuel in other areas by cutting off fuel supply. The Amendments will also harm Plaintiffs' members that produce, transport, or sell/distribute fuel by targeting the transportation infrastructure necessary to access markets outside the region or country. This is particularly injurious because of the important port, rail, and road infrastructure within the City. Moreover, this injury is compounded by similar policies that have either been adopted or proposed in other west coast cities with significant port and rail facilities. Finally, the Amendments also harm Plaintiffs' members that currently have fuel-transportation terminals within the City by blocking their ability to relocate, replace storage tanks, or build new tanks that are necessary to blend and otherwise transition to cleaner fuels as mandated by state and federal law.

74.    Plaintiffs therefore seeks a declaration stating that the 2022 Ordinance and Amendments adopted thereby constitute an undue burden on interstate commerce in violation of the Dormant Commerce Clause, and request an injunction prohibiting the City from taking further action to enforce or implement the Amendments.

### THIRD CLAIM FOR RELIEF

### Violation of Foreign Commerce Clause

75.    Plaintiffs incorporate the paragraphs above

76.    The Foreign Commerce Clause of the United States Constitution grants Congress authority to "regulate Commerce with foreign Nations" and limits the power of States or municipalities to regulate international trade. U.S. Const. Art. I, § 8, cl. 3. Specifically, the

Page 24 -  **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

Foreign Commerce Clause prohibits states and local governments from contravening congressional intent in regard to international trade.

77.    The Amendments are inconsistent with the policies of Congress set out in multiple federal laws.

78.    First, the Amendments directly contravene "the continuing policy of the Federal Government in the national interest to foster and encourage private enterprise in (1) the development of economically sound and stable domestic mining, minerals, metal and mineral reclamation industries, (2) the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help assure satisfaction of industrial, security and environmental needs * * * " where "minerals" includes "oil, gas, coal, oil shale and uranium." 30 USC § 21a. Similarly, Congress has long expressed its policy for the expansion of exports of coal mined in the United States. 42 USC § 13367.

79.    As set out in detail in the fourth claim for relief, the Interstate Commerce Commission Termination Act (ICCTA), 49 USC § 10501(a), prohibits local code that regulates or substantially interferes with rail transportation. Transloading facilities used in connection with railways constitute rail transportation for purpose of the ICCTA. The Amendments attempt to block international commerce in fossil fuels by prohibiting new transloading connections to railways is inconsistent (and in fact, preempted) by the ICCTA, and thus violates the Foreign Commerce Clause.

80.    The Amendments' prohibition on new fuel terminals connected to the deep-sea ports located within the City is also in conflict with the Congressional policies set out in the Shipping Act of 1984 (the "Shipping Act"), 46 USC § 40101, which include the objectives to

Page 25 -  **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

"ensure an efficient, competitive, and economical transportation system in the ocean commerce

of the United States," and to "promote the growth and development of United States exports

through a competitive and efficient system for the carriage of goods by water in the foreign

commerce of the United States, and by placing a greater reliance on the marketplace."

81.    The Amendments also block new infrastructure for the export of fuels that

the federal government has designated as clean, renewable, and/or biofuel in direct conflict with

the policies set out in 42 USC § 13214, 42 USC § 17052, 42 USC § 7545, and 42 USC § 17321.

The Amendments blanket prohibition on the storage of coal at export facilities also contravenes

the express policy of the United States to export clean coal and related technology. 42 USC

§ 13367.

82.    Plaintiffs are and will continue to be irreparably harmed by the

Amendments, the 2022 Ordinance, the 2015 Resolution, and Plan Policy 6.48. The Amendments

and the binding policies they implement are intended to and will throttle the transport of fossil

fuel to and from other states and countries. Thus, the Amendments will result in inadequate fuel

supply for end users outside the City, causing higher prices and fuel shortages, which is the

City's expressly stated goal: to reduce the consumption of fuel in other areas by cutting off fuel

supply. The Amendments will also harm Plaintiffs' members that produce, transport, or

sell/distribute fuel by targeting the transportation infrastructure necessary to access markets

outside the region or country. This is particularly injurious because of the important port, rail,

and road infrastructure within the City. Moreover, this injury is compounded by similar policies

that have either been adopted or proposed in other west coast cities with significant port and rail

facilities. Finally, the Amendments also harm Plaintiffs' members that currently have fuel-

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

transportation terminals within the City by blocking their ability to relocate, replace storage

tanks, or build new tanks that are necessary to blend and otherwise transition to cleaner fuels as

mandated by state and federal law.

83.    Plaintiffs therefore seek a declaration stating that the 2022 Ordinance,

Amendments, and the binding policies they implement violate the Foreign Commerce Clause,

and request an injunction prohibiting the City from taking further action to enforce or implement

them.

**FOURTH CLAIM FOR RELIEF**

**Preemption—Interstate Commerce Commission Termination Act of 1995 (ICCTA)**

84.    Plaintiffs incorporate the paragraphs above.

85.    "Congress and the courts long have recognized a need to regulate railroad

operations at the federal level. Congress' authority under the Commerce Clause to regulate the

railroads is well established * * * and the Supreme Court repeatedly has recognized the

preclusive effect of federal legislation in this area * * *. The Interstate Commerce Act, ch. 104,

24 Stat. 379 (1887), which, as amended [by the ICCTA], still governs federal regulation of

railroads, has been recognized as among the most pervasive and comprehensive of federal

regulatory schemes." *City of Auburn v. United States Gov't*, 154 F3d 1025, 1029 (9th Cir 1998)

(as amended Oct. 20, 1998) (internal citations omitted).

86.    The ICCTA amended the Interstate Commerce Act to expand and transfer

regulatory authority over rail transportation from the Interstate Commerce Commission to the

Surface Transportation Board (STB). The ICCTA contains a broad preemption provision that

states:

Page 27 -  **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

(b) The jurisdiction of the Board over--

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 USC § 10501(b).

87.    "This provision of the ICCTA expressly preempts a wide range of state and local regulation of rail activity." *Association of Am. R.R.s v. South Coast Air Quality Mgmt. Dist.*, 622 F3d 1094, 1096-97 (9th Cir 2010). In fact, "[i]t is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations." *City of Auburn*, 154 F3d at 1030 (citation omitted).

88.    "Courts and the STB have recognized two broad categories of state and local actions that are categorically preempted regardless of the context of the action: (1) any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized and (2) state or local regulation of matters directly regulated by the Board—such as the construction, operation, and abandonment of rail lines; railroad mergers, line acquisitions, and other forms of consolidation; and railroad rates and service." *Adrian & Blissfield R.R. Co. v. Village of Blissfield*, 550 F3d 533, 539-40 (6th Cir 2008); *see also Union Pac. R.R. Co. v. Chicago Transit Auth.*, 647 F3d 675, 679 (7th Cir 2011). State or local actions

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

that are not categorically preempted are still invalid if, as applied, they "would have the effect of preventing or unreasonably interfering with railroad transportation." *City of Ozark v. Union Pac. R.R. Co.*, 843 F3d 1167, 1171 (8th Cir 2016).

89.     Intermodal terminals and transloading facilities operated by or for rail carriers constitute rail infrastructure and are within the exclusive jurisdiction of the STB. Accordingly, zoning, environmental, or other types of local regulation that could be used to deny the construction of such facilities or that unreasonably burden their operation are preempted by the ICCTA. *Albany & Eastern R.R. Co. v. Linn Cty.*, No. 6:13-CV-00216-AA, 2013 WL 1900886 (D Or May 4, 2013); *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F3d 150, 158-59 (4th Cir 2010); *Texas Cent. Bus. Lines Corp. v. City of Midlothian*, No. 3:07-CV-1351-N, 2007 WL 9717644 (ND Tex Aug. 24, 2007); *Vermont Ry., Inc. v. Town of Shelburne*, No. 2:16-CV-16, 2016 WL 3629081, at *2-3 (D Vt June 29, 2016).

90.     Here, the Amendments categorically prohibit new intermodal facilities for the transportation of fuel, as well as the expansion of storage capacity at existing fuel terminals—including rail facilities operated by or for rail carriers.

91.     In fact, official code commentary expressly states that the storage threshold for the prohibition was set to interfere with the operation of railroad operations: Commentary for PCC 33.920.300 states that the "2-million-gallon threshold [for being subject to the prohibition] is sized to include facilities that are large enough to unload unit trains."

92.     Thus, the application of the Amendments' prohibition on intermodal facilities and coal storage to rail infrastructure operated by or for rail carriers is preempted by the ICCTA.

Page 29 -  **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

93.     Plaintiffs are and will continue to be irreparably harmed by the 2022 Ordinance and Amendments adopted thereby because they will interfere with the transportation of fuel by railway and interconnected modes through the City. As a direct result, the supply of fuel to end users outside the City will be reduced, causing higher prices and potential fuel shortages—which is the City's expressly stated goal: to reduce the consumption of fuel in other areas by cutting off fuel supply. The Amendments will also harm Plaintiffs' members that produce, transport, or sell/distribute fuel and rely on railway transportation to access both local and interstate markets. This is particularly injurious because of the important port, road, and air-transportation infrastructure that is connected to railway facilities within the City.

94.     Plaintiffs therefore seek a declaration stating that the application of the 2022 Ordinance and Amendments to rail facilities operated by or for rail carriers is preempted by the ICCTA and request an injunction prohibiting the City from applying the Amendments to such facilities and operations.

**FIFTH CLAIM FOR RELIEF**

**Violation of Substantive Due Process**

95.     Plaintiffs incorporate the paragraphs above.

96.     A zoning regulation violates the due process clause of the United States Constitution and is invalid if the ordinance is arbitrary and capricious, irrational, or fails to serve a legitimate purpose.

97.     As set forth above, the 2015 Resolution and Amendments were not adopted to advance the welfare of the public, but for political purposes. The 2014 Pembina

Page 30 -  **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

project that was the impetus for the 2015 Resolution and Amendments was unequivocally praised by City officials when first proposed. The City's mayor, Charlie Hales, issued a press release stating: "This is great news[.] * * * We welcome this investment and these jobs in Portland. The city is committed to growing our economy on the land we already have, and holding industry to very high environmental and public safety standards. This proposal meets these goals." To advance the project, the City's planning department developed, proposed, and recommended adoption of a zoning amendment. After multiple months of enthusiastic support, however, City officials and staff arbitrarily reversed their position when the proposal encountered political opposition. City officials and staff did not provide a reason for this reversal other than political pressure.

98.    The purposes for the 2015 Resolution and Amendments identified by the City are not legitimate and/or not advanced by the Amendments.

99.    Based on the legislative proceedings, comments by public officials, and text of the policies and Amendments, the original and primary purpose for the legislation is to restrict the use of combustible fuel in other countries and states, thereby decreasing global emissions. This extraterritorial purpose is illegitimate because it is not within the City's common-law police powers, as well as ultra vires because it is unauthorized by the City's charter (in force at the time of adoption). *See* City Charter § 2-105(a)(1) (authorizing exercise of police powers for benefit of public within the City), § 2-105(a)(35) (authorizing zoning and building regulations in the City for the benefit of residents and the public). Moreover, the categorical prohibition on all new infrastructure for transportation of combustible fuel, including fuel that is transitional, clean, renewable, and/or results in lower emissions does not advance this

Page 31 -  **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

illegitimate goal. Finally, the Amendments do not lower emissions within the City because the policies intentionally do not limit the distribution and use of fuel within the City and surrounding areas.

100.    The Amendments also have no rational connection to public safety or protection of environmental resources within the City. The categorical block on new, modern terminals and intermodal infrastructure—unquestionably subject to higher safety standards for withstanding earthquakes and other events compared to older facilities—does not reduce risks from the storage of fuel within the City, but in fact prevents reductions thereof. Likewise, the citywide prohibition on new terminals forces the storage of fuel within the City to remain within a liquefaction zone. Much of the City is not in a liquefaction zone, but under the Amendments, the fuel terminals must stay in their current location.

101.    Plaintiffs are and will continue to be irreparably harmed by the Amendments because they block (or, at a minimum, significantly restrict) the transport of fossil fuel to and from other states and countries. Thus, the Amendments will result in inadequate fuel supply for end users outside the City, causing higher prices and fuel shortages, which is the City's expressly stated goal: to reduce the consumption of fuel in other areas by cutting off fuel supply. The Amendments will also harm Plaintiffs' members that produce, transport, or sell/distribute fuel by targeting the transportation infrastructure necessary to access markets outside the region or country. This is particularly injurious because of the important port, rail, and road infrastructure within the City. Moreover, this injury is compounded by similar policies that have either been adopted or proposed in other west coast cities with significant port and rail facilities. Finally, the Amendments also harm Plaintiffs' members that currently have fuel-

Page 32 -  **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

transportation terminals within the City by blocking their ability to relocate, replace storage tanks, or build new tanks that are necessary to blend and otherwise transition to cleaner fuels as mandated by state and federal law.

102.    Plaintiffs therefore seek a declaration stating that the 2022 Ordinance and Amendments violate the Due Process Clause of the United States Constitution and request an injunction prohibiting the City from taking further action to enforce or implement them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment in their favor and against the City that:

1.    Declares the Amendments, the 2022 Ordinance, the 2015 Resolution, and Plan Policy 6.48 are invalid and unenforceable because they:

    a.    Violate the Dormant Commerce Clause by discriminating against interstate commerce;

    b.    Violate the Dormant Commerce Clause by imposing an undue burden on interstate trade;

    c.    Violate the Foreign Commerce Clause by contravening congressional intent and policies concerning international trade;

    d.    Are preempted by the ICCTA; and/or

    e.    Violate the Due Process Clause of the United States Constitution because they are arbitrary and capricious, irrational, or fail to serve a legitimate purpose;

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

2.      Issues a permanent injunction prohibiting the City from taking further action to enforce or implement the 2022 Ordinance, Amendments, 2015 Resolution, and Plan Policy 6.48;

3.      Awards Plaintiffs their costs, expenses, and disbursements, as well as their reasonable attorney fees pursuant to 42 USC § 1988; and

4.      Grants such other relief this Court deems just and equitable.

DATED this 14 day of February 2023.


MILLER NASH LLP


*s/  Joshua M. Sasaki*
Joshua M. Sasaki, P.C., OSB No. 964182
josh.sasaki@millernash.com
Steven G. Liday, OSB No. 075975
steven.liday@millernash.com
Christopher Riley, OSB No. 211614
christopher.riley@millernash.com
Phone: 503.224.5858
Fax: 503.224.0155

Attorneys for Plaintiffs

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204