**Joshua M. Sasaki, P.C.**, OSB No. 964182
josh.sasaki@millernash.com
**Steven G. Liday**, OSB No. 075975
steven.liday@millernash.com
**Christopher J. Riley**, OSB No. 211614
christopher.riley@millernash.com
MILLER NASH LLP
US Bancorp Tower
111 SW Fifth Ave, Ste 3400
Portland, OR 97204
Telephone: 503.224.5858
Facsimile: 503.224.0155

      Attorneys for Plaintiffs
      State of Montana; Western Energy Alliance;
      Pacific Propane Gas Association; Idaho
      Petroleum Marketers and Convenience Store
      Association, Inc.; and Christensen, Inc.

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| STATE OF MONTANA; WESTERN ENERGY ALLIANCE, a Colorado nonprofit corporation; PACIFIC PROPANE GAS ASSOCIATION, a Washington nonprofit corporation; IDAHO PETROLEUM MARKETERS AND CONVENIENCE STORE ASSOCIATION, INC., an Idaho nonprofit corporation; and CHRISTENSEN, INC., a Washington Corporation,<br><br>           Plaintiffs,<br><br>v.<br><br>CITY OF PORTLAND,<br><br>           Defendant. | CASE No. 3:23-cv-000219-YY<br><br>**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>[Oral Argument Requested] |

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................... 1

II.     FACTUAL BACKGROUND ..................................................................................... 4

        A.      The importance of Portland's fuel-transportation infrastructure. .......................... 4

        B.      Adoption of the 2015 resolutions targeting interstate transportation of
                fossil fuels. ............................................................................................................. 5

        C.      Adoption of Policy 6.48. ........................................................................................ 6

        D.      Adoption and readoption of the Amendments. ...................................................... 6

                1.      2016 – Preparation and enactment of the Amendments. .......................... 6

                2.      First appeal and remand of the Amendments. .......................................... 8

                3.      2019 – Readoption of the Amendments. ................................................... 8

                4.      2022 – Second readoption of the Amendments. ....................................... 9

III.    LEGAL AUTHORITY ............................................................................................ 11

        A.      Overview of the dormant Commerce Clause. ..................................................... 12

        B.      The Amendments are discriminatory on their face. ............................................ 13

                1.      The Amendments' exceptions for local entities and facilities are
                        facially discriminatory. ......................................................................... 14

                2.      The Amendments' allowance for additional storage of fuel that
                        will be sold/distributed in Portland constitutes facial
                        discrimination. ....................................................................................... 16

        C.      The Amendments have a discriminatory effect. ................................................. 17

                1.      The Amendments' selective targeting of export facilities in the
                        definition of Bulk Terminals has a discriminatory effect. ..................... 18

                2.      The Amendments' exceptions for local establishment has a
                        discriminatory effect. ............................................................................. 19

                3.      The Amendments fall squarely within two types of regulations that
                        have been found to violate the dormant Commerce Clause. .................. 20

        D.      The Amendments have a discriminatory purpose. .............................................. 25

                1.      The City expressly stated its discriminatory purpose for enacting
                        the Amendments in the official code commentary and ordinance
                        findings. .................................................................................................. 26

                2.      The 2015 Resolution and Policy 6.48 bound the City to have a
                        discriminatory purpose in adopting and readopting the
                        Amendments. .......................................................................................... 28

**TABLE OF CONTENTS**
(continued)

3.    Contemporaneous statements by City officials and staff also demonstrate the discriminatory purpose of the Amendments.................. 29

E.    The City has not offered alternative, less discriminatory means to accomplish its stated safety goals. ........................................................ 30

F.    The 2015 Resolution and Policy 6.48 are facially discriminatory....................... 31

IV.    CONCLUSION............................................................................................................. 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Trucking Ass'n, Inc. v. Whitman*,
    437 F.3d 313 (3d Cir. 2006).................................................................24

*Bacchus Imports, Ltd. v. Dias*,
    468 U.S. 263 (1984)....................................................................25

*Brimmer v. Rebman*,
    138 U.S. 78 (1891)...................................................................13

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
    476 U.S. 573 (1986)..............................................................17, 22

*C & A Carbone, Inc. v. Town of Clarkstown*,
    511 U.S. 383 (1994).........................................................13, 30, 31

*Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*,
    520 U.S. 564 (1997)..................................................................22

*Chem. Waste Mgmt., Inc. v. Hunt*,
    504 U.S. 334 (1992)..............................................................14, 20

*City of Philadelphia v. New Jersey*,
    437 U.S. 617 (1978)..............................................................20, 21

*Columbia Pac. Bldg. Trades Council v. City of Portland*,
    76 Or. LUBA 15 (2017)...............................................................8

*Columbia Pac. Bldg. Trades Council v. City of Portland*,
    LUBA No. 2020-009, 2020 WL 6544130 (Or. LUBA Oct. 30, 2020)....................................9

*Dean Milk Co. v. City of Madison, Wis.*,
    340 U.S. 349 (1951)..................................................................14

*Dep't of Revenue of Ky. v. Davis*,
    553 U.S. 328 (2008)..................................................................12

*Env't Tech. Council v. Sierra Club*,
    98 F.3d 774 (4th Cir. 1996) ..........................................................20

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

*Exxon Corp. v. Governor of Md.*,
  437 U.S. 117 (1978) ................................................................. 17

*Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat. Res.*,
  504 U.S. 353 (1992) ................................................................. 20

*Gen. Motors Corp. v. Tracy*,
  519 U.S. 278 (1997) ................................................................. 13

*H. P. Hood & Sons, Inc. v. Du Mond*,
  336 U.S. 525 (1949) ................................................. 17, 23, 24, 30

*Hughes v. Oklahoma*,
  441 U.S. 322 (1979) ................................................................. 22

*Hunt v. Washington State Apple Adver. Comm'n*,
  432 U.S. 333 (1977) ................................................................. 17

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,
  803 F.3d 389 (9th Cir. 2015) .................................................... 12

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,
  97 F. Supp. 3d 1256 (W.D. Wash.), *aff'd but criticized on other grounds,* 803
  F.3d 389 (9th Cir. 2015) .......................................................... 25

*Island Silver & Spice, Inc. v. Islamorada*
  542 F.3d 844 (11th Cir. 2008) .................................................. 19

*Lewis v. BT Inv. Managers, Inc.*,
  447 U.S. 27 (1980) ................................................................... 17

*New England Power Co. v. New Hampshire*,
  455 U.S. 331 (1982) ................................................................. 22

*Or. Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*,
  511 U.S. 93 (1994) ....................................................... 12, 13, 14

*Pennsylvania v. West Virginia*,
  262 U.S. 553 (1923), *aff'd,* 263 U.S. 350 (1923) ..................... 22

*In re Se. Ark. Landfill, Inc. v. Arkansas*,
  981 F.2d 372 (8th Cir. 1992) .................................................... 20

*Sporhase v. Nebraska ex rel. Douglas*,
  458 U.S. 941 (1982) ................................................................. 22

Page iv

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
  550 U.S. 330 (2007) .........................................................................................13

*W. Lynn Creamery, Inc. v. Healy*,
  512 U.S. 186 (1994) ...................................................................................13, 16

*Waste Mgmt. Holdings, Inc. v. Gilmore*,
  252 F.3d 316 (4th Cir. 2001) ......................................................................23, 25

*West v. Kansas Nat. Gas Co.*,
  221 U.S. 229 (1911) ..............................................................................23, 24, 30

**Statutes**

ORS 197.175, 197.835(7) ...................................................................................6, 28

**Other Authorities**

Federal Rule of Civil Procedure 56 ...........................................................................1

U.S. Const. Art. I, § 8, cl. 3 .............................................................................1, 2, 12

Page v

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

## LOCAL RULE 7-1 CERTIFICATION

Counsel for plaintiffs conferred in good faith with counsel for City of Portland (the "City") through email and video conferences to resolve each claim, defense, or issue that is the subject of this motion, but the parties were unable to resolve their disputes.

## MOTION

In accordance with Federal Rule of Civil Procedure 56, plaintiffs the State of Montana, Western Energy Alliance, Pacific Propane Gas Association, Idaho Petroleum Marketers and Convenience Store Association, Inc., and Christensen, Inc., move for summary judgment on their first claim for relief. Specifically, plaintiffs move the court for judgment declaring that the following City enactments violate the dormant Commerce Clause of the United States Constitution and are thus invalid and unenforceable: (1) the Fossil Fuel Terminal Zoning Amendments, enacted in City Ordinance No. 190978 (the "Amendments"); (2) Policy 6.48 of the City's comprehensive plan, and (3) Resolution 37168, adopting Binding City Policy BCP-ENN-10.02.

This motion is supported by the memorandum of law below, the Declaration of Steven Liday in Support of Opposition to Motion to Dismiss ("Liday Decl."), and the pleadings and records filed with the court. Plaintiffs request oral argument on this motion.

## MEMORANDUM OF LAW

### I.    INTRODUCTION

This action challenges the constitutionality of zoning code amendments that the City enacted in 2022, as well as the underlying policies adopted in 2015 and 2016. The 2022 amendments are the latest in a series of zoning ordinances designed to restrict the storage

Page 1 -   **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

and transportation of fossil fuels in and through Portland, except as necessary to serve local end users of petroleum products. Because the undisputed facts reveal that the 2022 amendments selectively target and burden interstate commerce in a manner that shields local users from the effects of the regulations, plaintiffs seek summary judgment on their first claim for relief for violation of the dormant Commerce Clause of the United States Constitution.

The 2022 amendments have their genesis in 2015, when City officials expressed their concern over "[t]he rapid development of fossil fuel resources in the western U.S. and Canada [that had] resulted in numerous facility and infrastructure projects proposed to transport * * * fossil fuels through the West Coast." ECF 35-10 at 1. Then, like now, the fossil-fuel-transportation infrastructure within Portland was dedicated almost entirely to serving the city and the surrounding region. No export terminals existed.

City officials declared their intent to block the construction of new fuel terminals in Portland, but in a manner that would not restrict the supply of fuel for end users in Portland and surrounding areas. To this end, the City adopted three binding policies in 2015 and 2016 that selectively target large interstate and export fuel terminals.

In 2016, the City implemented these policies by enacting zoning code amendments that prohibited new transportation facilities with infrastructure capable of shipping fuel out of the local area—or as the City described them, "regional gateway facilities, where fossil fuels enter and exit the region." ECF 35-12 at 52. As required by the City's binding policies, the amendments did not interfere with the existing infrastructure that distributed fuel to end users in Portland and the surrounding areas, and they included exceptions for new facilities that served local interests.

Page 2      **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

The City made no attempt to conceal its discriminatory animus to target export terminals in a manner that spared local end users from the effects of the amendments. In fact, City staff prepared analyses attempting to show that freezing the fuel terminal infrastructure at its current level, in conjunction with selectively targeting components of export facilities and providing exceptions for local end users, would block new export terminals without restricting the local fuel supply.

The amendments were appealed to and remanded twice by the Oregon Land Use Board of Appeals (LUBA) because the City had failed to demonstrate that the amendments complied with its comprehensive plan, specifically that the amendments would not result in insufficient fuel supply for the city and surrounding region, nor harm local industry. Both times—most recently, in August 2022—the City readopted the amendments with additional findings and evidence attempting to prove that the prohibition could block new terminal facilities without adversely affecting fuel supply to Portland and the surrounding region or otherwise harming the local industrial base and economy.

As set out below, the policies and amendments discriminate against interstate commerce on their face, in their purpose, and in their effect. They fall squarely within two categories of laws that the United States Supreme Court has declared unlawful under the dormant Commerce Clause: (1) regulations that attempt to limit "unwanted commerce"—here, the storage and transportation of fossil fuels—through regulations that disproportionately impact interstate trade or shelter local citizens from the effects of the restrictions, and (2) laws that benefit local consumers and end users while burdening their out-of-state counterparts.

Page 3     **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

There is no material issue of fact in dispute. The salient facts set forth in this motion are taken from official ordinance findings, documents prepared by the City, or statements of City officials during public hearings. As demonstrated below, plaintiffs are entitled to judgment on their first claim for relief as a matter of law.

## II.      FACTUAL BACKGROUND

### A.      The importance of Portland's fuel-transportation infrastructure.

Portland is one of the largest ports on the West Coast. It lies at the confluence of the Willamette and Columbia rivers, providing deep-water port access to the Pacific Ocean, and is served by two interstate freeways, I-84 and I-5. Portland is also the western terminus for BNSF and Union Pacific railway mainlines. The "combination of [this] geography and [the City's] multimodal freight infrastructure assures Portland's role as a center for goods distribution to and from the Pacific Northwest and throughout the world." ECF 35-18 at 1.

Portland's location and infrastructure are particularly important for the transportation of refined fuels, such as gasoline, diesel, and jet fuel. The city is the southern terminus of the 400-mile Olympic Pipeline that connects the state to the Puget Sound refineries, as well as the origin of the Kinder Morgan pipeline that delivers fuel to Eugene, Oregon. ECF 35-19 at 244. The city's fuel terminals supply 90 percent of the fuel used in Oregon and southwest Washington. *Id*.

Portland is also a key transportation hub for the shipment of crude oil and other fossil fuels from the western United States and Canada. There are no crude-oil pipelines linking these fuel-producing regions to the West Coast. ECF 35-20 at 42. Thus, to avoid transportation over the Cascade Mountains range, oil is transported by rail through Portland (via the Columbia

Page 4        **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

Gorge) to reach West Coast refineries and seaports, including the Port of Portland. ECF 35-20 at 43.

Portland's importance to the interstate fuel-transportation system has significantly increased over the last decade because of the rapid growth and geographical shift of oil production in North America, including the Bakken Shale Formation in North Dakota and Montana. ECF 35-20 at 42-44. As the City repeatedly highlights in the ordinances at issue, this "rapid development of fossil fuel resources in the western U.S. and Canada has resulted in numerous facility and infrastructure projects proposed to transport * * * fossil fuels through the West Coast." ECF 35-10 at 1.

**B.    Adoption of the 2015 resolutions targeting interstate transportation of fossil fuels.**

In November 2015, City Council approved Resolution 37168, which enacted a binding policy that the City will "[o]ppose expansion of infrastructure whose primary purpose is transporting or storing fossil fuels in or through Portland or adjacent waterways[,]" with an exception "for the provision of service directly to end users." (the "2015 Resolution") ECF 35-1. The 2015 Resolution was enacted in conjunction with Resolution 37164, which adopted a binding policy "opposing all project proposals that would increase the amount of crude oil being transported by rail through the City of Portland and the City of Vancouver, Washington." ECF 35-2.

In presenting the 2015 Resolution to City Council, staff from the Portland Bureau of Planning and Sustainability (BPS) explained that the policy was in response to the "number of very large fossil fuel infrastructure projects" proposed for the West Coast and that it is "trying to

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

get at the growth of the fossil fuel industry and Portland's potential role in that." ECF 35-13 at 60.

The 2015 Resolution directed BPS "to develop proposed code changes for Council consideration to advance the policies" set out in the resolution. ECF 35-1 at 3.

### C.    Adoption of Policy 6.48.

At this time, the City was nearing the end of a multiple-year effort to update its comprehensive plan. Following the adoption of the 2015 Resolution, City Council approved the late addition of a policy targeting fuel-export terminals. ECF 35-16.

Accordingly, the City's new comprehensive plan adopted in June 2016 includes Policy 6.48, Fossil Fuel Distribution, which states that the City will "[l]imit fossil fuel distribution and storage facilities to those necessary to serve the regional market." ("Policy 6.48") ECF 35-3; ECF 35-4. Under state law and City code, zoning code amendments must comply with this policy. ORS 197.175, 197.835(7); PCC 33.835.040(A).

### D.    Adoption and readoption of the Amendments.

#### 1.    2016 – Preparation and enactment of the Amendments.

As directed by the 2015 Resolution, BPS prepared code amendments restricting the expansion of fossil-fuel-transportation infrastructure, which it first published in August 2016.

The City adopted the Amendments on December 14, 2016, in Ordinance No. 188142 (the "2016 Ordinance"). ECF 35-5. In short, the Amendments created a new land use category called Bulk Fossil Fuel Terminals ("Bulk Terminals"). PCC 33.920.300. New Bulk Terminals are prohibited, and existing Bulk Terminals are designated "limited uses," which are allowed to continue operations but cannot expand fuel-tank storage capacity. PCC 33.140.100(B)(15). The definition of Bulk Terminals includes multiple exceptions for categories of local firms and

Page 6        **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

facilities, thus shielding them from the prohibition on new/expanded fuel-transportation

infrastructure. PCC 33.920.300(D).

The staff report setting out the amendments, adopted as findings, explained the reason for

the Amendments in the introductory section, stating:

> Production of crude oil and natural gas, particularly from North Dakota, has
> substantially increased In the U.S. since 2009[.] * * * In turn, several large new
> fuel distribution terminals have been proposed in the Pacific Northwest to access
> West Coast and export markets[.] * * *
>
> This project is proposing a prompt, focused response to these market changes.
> ECF 35-6 at 2.

The staff report also explained that the Amendments were designed to implement the

"[n]ew policy directions adopted by City Council in November 2015 and in the 2035

Comprehensive Plan [to] limit fossil fuel distribution and storage facilities to those serving the

regional market[,] and not impact service to end users. ECF 35-6 at 1, 7, 10.

The Amendments target export/interstate terminals by tying the prohibition on fossil-fuel

infrastructure to key facilities at export terminals. ECF 35-6 at 26. The Amendments define Bulk

Terminals subject to prohibition as establishments with "access to marine railroad or regional

pipeline" transportation infrastructure and either have "transloading facilities" for transferring

fuel directly between transportation modes or "storage capacity exceeding 2 million gallons for

fossil fuels." PCC 920.300(A). The official code commentary explains that the "2-million-gallon

threshold is sized to include facilities that are large enough to unload unit trains. Functionally,

these terminals tend to be regional gateway facilities, where fossil fuels enter and exit the

region." ECF 35-6 at 56.

///

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

The Amendments implement the mandate in 2015 to not impact end users "through specific exclusions of end-user facilities" from the definition of Bulk Terminals, including firms that use fossil fuels as inputs and fuel storage for exclusive use at an airport, marine port, and other types of freight terminals. ECF 35-6 at 7.

### 2.    First appeal and remand of the Amendments.

The 2016 Ordinance was appealed to and ultimately remanded by LUBA. In *Columbia Pac. Bldg. Trades Council v. City of Portland*, 76 Or. LUBA 15 (2017), LUBA held that the Amendments violated various land use laws and the dormant Commerce Clause. LUBA found that:

> The net effect is that the city has done all it can, short of an express prohibition on export terminals, to effectively restrict interstate or international commerce in fossil fuels, while at the same time shielding its citizens and local end-users to some extent from the adverse consequences of the restrictions on new or expanded terminals. *Id.* at 69–70.

The City appealed LUBA's decision to the Oregon Court of Appeals, which affirmed LUBA's decision on multiple land use issues, but reversed on the dormant Commerce Clause. 289 Or. App. 739 (2018). The opinion stated that differential treatment favoring in-state consumers over out-of-state producers did not constitute discrimination, *id.* at 747–48, which may be correct but was not a basis for LUBA's holding nor appellants' argument on appeal. The Oregon Supreme Court denied review. 363 Or. 390 (2018).

### 3.    2019 – Readoption of the Amendments.

On December 18, 2019, the City readopted the Amendments in Ordinance No. 189807 (the "2019 Ordinance"). ECF 35-7. In doing so, the City Council declared "that the proposed

Page 8    **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

amendments [were] a continuation of the initial legislative proceeding" described above. ECF 35-8 at 4.

No substantive changes were made to the Amendments. ECF 35-9. Rather, the City submitted additional evidence into the record and adopted hundreds of new findings to address the grounds for LUBA's remand, including that the City had failed to prove—for state-law purposes—that the Amendments would not impact the supply of fuel to the city and surrounding region. To address this issue, BPS submitted into the record a memo analyzing the regional demand for fossil fuels. ECF 35-21. Based on a review of governmental reports and data, BPS concluded that "[t]he existing FFT storage capacity, with the allowed exceptions, is sufficient to serve the region out to a 2050 planning horizon * * *." ECF 35-21 at 1. BPS defined the region at issue "as the State of Oregon and parts of Southwest Washington." ECF 35-21 at 3. City Council adopted the same definition of region and, based on BPS's analysis, found that the Amendments would block export facilities without interrupting the regional supply of fuel. ECF 35-8 at 77–78.

The 2019 Ordinance was appealed to LUBA and the Amendments were again remanded to the City on state-law grounds. *Columbia Pac. Bldg. Trades Council v. City of Portland*, LUBA No. 2020-009, 2020 WL 6544130 (Or. LUBA Oct. 30, 2020).

### 4.    2022 – Second readoption of the Amendments.

On August 24, 2022, the City again adopted the Amendments for a third time (the "2022 Ordinance"), ECF 35-10, which the City stated was "a continuation of the original legislative process that started in 2016." ECF 35-11 at 2.

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

To address LUBA's grounds for remand, the City submitted several new studies and reports into the record, as well as adopted hundreds of pages of findings, in an attempt to show that the Amendments would not harm the local/regional supply of fuel or the city's industrial sector. These included an updated BPS memo on regional demand for fossil fuels, which again concluded that existing infrastructure was sufficient to meet regional demand out to 2050. ECF 35-22 at 2. For its analysis of the Amendments, BPS defined the relevant region as the state of Oregon. ECF 35-22 at 3. The additional 2022 studies also included two reports by Lighthouse Energy Consulting, specifically evaluating infrastructure for natural gas, which Lighthouse determined was sufficient to meet local demand. ECF 35-23; ECF 35-24. Based on this new evidence, the City again concluded that the Amendments would block new interstate/international terminals without restricting the regional supply of fuel or harming the local economy. ECF 35-11 at 19.

The City also made a few revisions in 2022 to the language of the Amendments. First, the City added language to the definition of Bulk Terminals so that the provision now reads that such establishments have marine, rail, or pipeline access and either have "transloading facilities for transferring a shipment between transport modes, or have *transloading facilities and* storage tank capacity exceeding 2 million gallons." PCC 33.920.300(A). On its face, the new language seems to reduce the two categories of Bulk Terminals down to one: those sites that have transloading facilities. Staff claimed during the hearing that this revision was not substantive and there were still two categories of terminals. They testified that the first category still referred to "terminals that could direct transfer between modes[,]" like "a long rail car unit train pulling up to a dock and offloading their product directly into a ship," and that the second category was for

Page 10    **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

multimodal facilities with more than two million gallons of storage capacity. ECF 35-17 at 6–7. This is reflected in the unchanged 2022 code commentary for PCC 33.920.300, which still describes there being two categories of Bulk Terminals, i.e., those establishments with transloading facilities or storage capacity over 2 million gallons. ECF 35-12 at 52. For purposes of this motion, plaintiffs do not challenge the City's characterization.

The City also added a new exception to the prohibition on expansion of fossil-fuel storage at existing terminals. The Amendments now state in PCC 33.920.100(B)(15) that fuel-storage capacity can be expanded at existing Bulk Terminals in order "to comply with the Renewable Fuel Standard (PCC Chapter 16.60 Motor Vehicle Fuels) * * *." These City regulations require that all gasoline sold, dispensed, or distributed in the city contain a minimum blend of 10 percent ethanol, PCC 16.60.020(B), and that all diesel fuel sold, dispensed, or distributed within the city "contain a minimum blend of 15 percent biodiesel or renewable diesel." PCC 16.60.020(A).

The Amendments were again appealed to LUBA and the appeal is still pending (LUBA No. 2022-089). Plaintiffs are not a party to the appeal.

## III.    LEGAL AUTHORITY

Plaintiffs seek summary judgment on the ground that the Amendments violate the dormant Commerce Clause by discriminating against interstate commerce. Plaintiffs do not contend that the City enacted the Amendments to protect or benefit local industry. Rather, plaintiffs challenge the Amendments because they attempt to restrict unwanted commerce—the bulk storage and transportation of fossil fuels—in a manner that targets interstate/international facilities and shields local end users of fossil fuels from the burdens of that restriction. By

Page 11    **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

prohibiting facilities that would permit the export of fossil fuels to other regions while allowing storage and transportation infrastructure necessary to serve the local market, the City is giving preferential treatment to local interests in contravention of the dormant Commerce Clause.

The Amendments fall squarely within two categories of local laws or ordinances that the United States Supreme Court has invalidated under the dormant Commerce Clause for decades: (1) limitations on unwanted commerce that disproportionately affects interstate trade and/or protects local citizens from the restrictions, and (2) preferential access for local consumers/users to goods and resources.

### A.    Overview of the dormant Commerce Clause.

The Commerce Clause of the United States Constitution states that "Congress shall have Power * * * [t]o regulate Commerce * * * among the several States." U.S. Const. Art. I, § 8, cl. 3. "Though phrased as a grant of regulatory power to Congress, the Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Or. Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*, 511 U.S. 93, 98 (1994).

"If a statute discriminates against out-of-state entities on its face, in its purpose, or in its practical effect, it is unconstitutional unless it serves a legitimate local purpose, and this purpose could not be served as well by available nondiscriminatory means." *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 399 (9th Cir. 2015) (internal quotation marks and citation omitted); *see also Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) ("A discriminatory law is virtually per se invalid, and will survive only if it advances a legitimate local purpose that cannot

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

be adequately served by reasonable nondiscriminatory alternatives[.]") (internal quotation marks and citations omitted).

Discrimination "means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys.*, 511 U.S. at 99. A statute is discriminatory if it "impose[s] commercial barriers or discriminate[s] against an article of commerce by reason of its origin or destination out of State." *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994).

"Commerce Clause jurisprudence is not so rigid as to be controlled by the form by which a State erects barriers to commerce. Rather [Supreme Court] cases have eschewed formalism for a sensitive, case-by-case analysis of purposes and effects." *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 201 (1994).

**B.    The Amendments are discriminatory on their face.**

To determine whether a law violates the dormant Commerce Clause, courts "first ask whether it discriminates on its face against interstate commerce." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007). A law is facially discriminatory if it expressly benefits in-state entities over substantially similar entities outside the state. *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997); *Or. Waste Sys.*, 511 U.S. at 99.

A law can be discriminatory even if the differential treatment is not coextensive with the state's or municipalities' borders—i. e., if some of the benefitted parties live outside the jurisdiction that enacted the law in question. If a law disproportionately restricts out-of-state commerce, it is unconstitutional. *Brimmer v. Rebman*, 138 U.S. 78 (1891) (striking down Virginia statute that imposed special inspection fees on meat from animals that had been

Page 13    **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

slaughtered more than 100 miles from the place of sale, even though some in-state producers were also impacted); *Dean Milk Co. v. City of Madison, Wis.*, 340 U.S. 349, 350 (1951) (striking down law in case by an in-state competitor that challenged a city ordinance that made it unlawful to sell pasteurized milk unless it had been processed at a plant "within a radius of five miles from the central square of Madison").

The magnitude of the discrimination is also irrelevant. Even disproportionate fees imposed on commerce because of its interstate character violate the dormant Commerce Clause. *Chem. Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 339–40 (1992) (striking down statute that imposed additional fee on hazardous waste generated outside Alabama and disposed of at Alabama facilities); *Or. Waste Sys.*, 511 U.S. at 99 (striking down Oregon statute, stating "[w]e deem it equally obvious here that Oregon's $2.25 per ton surcharge is discriminatory on its face.").

Here, the Amendments are facially discriminatory because they (1) include exceptions for facilities that serve local end users, and (2) allow additional storage for fuel to be sold in the city.

### 1. The Amendments' exceptions for local entities and facilities are facially discriminatory.

As discussed above, the definition of Bulk Terminals includes a number of exceptions that benefit local interests. PCC 33.920.300(D)(5) states that "[i]ndustrial, commercial, institutional, and agricultural firms that exclusively store fossil fuel for use as an input are not Bulk Fossil Fuel Terminals." Similarly, the "storage of fossil fuels for exclusive use at an airport, surface passenger terminal, marine, truck or air freight terminal, * * * or as part of a fleet vehicle servicing facility are not Bulk Fossil Fuel Terminals." The original staff report confirms that these exceptions include "off-site storage." ECF 35-6 at 25.

Page 14    **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

Thus, an industrial plant or port located in the city can build a terminal with transloading facilities to store and transport fuel for its use at other sites, but an identical terminal could not be built to transport fuel to an identical plant or port outside the area. For example, the Amendments would allow the Port of Portland to build a new 5 million gallon fuel-storage facility to serve ships in the Portland Harbor, but would prohibit a distributor from building an identical facility that supplies fuel to the Port of Longview.[1] Similarly, a natural-gas-fired power plant in Portland (an industrial user) could build a new fuel tank in Portland of any size and with transloading facilities, but an identical terminal would not be allowed to supply a power plant in Clark County, Washington.

BPS staff provided their own examples of the facial discrimination between infrastructure that serves local end users and their counterparts in other areas. During the hearings on the 2015 Amendments, BPS staff stated in response to a question from a commissioner about the meaning of end user:

> So, a moment ago we had an example of whether it's the Portland public schools or another fleet converting to propane or compressed natural gas where they are fueling their vehicles with it. * * * [A] new light manufacturing facility that uses natural gas to power, excuse me, to power whatever, you know, industrial process they are doing, this would allow that because the fuel is being used on-site, either burn to produce energy or as a feed stock, so we're trying to recognize that there are circumstances where that is probably in the interest of the community.
> ECF 35-13 at 74.

But a terminal with identical storage and transloading facilities could not be sited to transport fuel for these uses in other areas. As BPS explained during that same hearing, binding

---

[1] The Commentary to the Amendments explicitly states that "jet fuel facilities for PDX Airport" and "vessel fuel facilities on Portland Harbor" are specifically exempted from the restrictions imposed by the Amendments.

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

policies adopted by the 2015 Resolution, incorporated into the Amendments, would block a "[liquified natural gas] terminal whose purpose is to provide gas to other utilities or other distribution channels, [because] they're not giving it directly to the end user." ECF 35-14 at 44.

The above examples of in-state natural-gas-fired power plants, operators of car fleets, and fossil-fuel-powered industrial plants are all substantially similar entities to their respective out-of-state counterparts. But the Amendments provide preferential treatment to the local firms by exempting them from the strictures of the prohibition on fuel storage and transportation infrastructure. It does not matter that the local exceptions do not include language about the users being "local" or "in Portland." The City's zoning power exists only within its borders. Thus, an exempt facility can only be a facility within the city of Portland.

This differential treatment of in-state and out-of-state entities constitutes facial discrimination that violates the dormant Commerce Clause. The Supreme Court has been particularly critical of these types of exemptions for local interests because "a State's political processes can no longer be relied upon to prevent legislative abuse, because one of the in-state interests which would otherwise lobby against the tax has been mollified by the [exemption]." *W. Lynn Creamery*, 512 U.S. at 200. And, in fact, that is what has occurred here. The exemptions for ports and fleets were in response to a request by the Port of Portland. ECF 35-26 at 1–2.

> ### 2.    The Amendments' allowance for additional storage of fuel that will be sold/distributed in Portland constitutes facial discrimination.

The Amendments are also facially discriminatory because they allow additional storage capacity for fuel that will be used in Portland. PCC 33.920.100(B)(15) states that fuel-storage capacity can be expanded at existing Bulk Terminals in order "to comply with the Renewable Fuel Standard (PCC Chapter 16.60 Motor Vehicle Fuels) * * *." These City regulations require

Page 16    **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

all gasoline and diesel sold, dispensed, or distributed in the city to contain a minimum blend of renewable fuels. PCC 16.60.020. Thus, extra storage capacity can be built at Bulk Terminals for blended fuels that would otherwise fall under the prohibition in the Amendments if, and only if, that fuel will be sold, dispensed, or distributed in the city in furtherance of the City's Renewable Fuel Standard regulations. Capacity for identical fuel to be used elsewhere (and thus unrelated to compliance with these local regulations) is not allowed.

C.    **The Amendments have a discriminatory effect.**

Even if the Amendments were neutral on their face, they would still violate the dormant Commerce Clause because they have a discriminatory effect on interstate commerce. *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333 (1977). As the Court stated in *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 126 n.16 (1978), "[i]f the effect of a state regulation is to cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market * * * the regulation may have a discriminatory effect on interstate commerce."

In determining whether a law has a discriminatory effect, "[t]he principal focus of inquiry must be the practical operation of the statute, since the validity of state laws must be judged chiefly in terms of their probable effects." *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 37 (1980) (citations omitted); *see also Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 583 (1986).

Moreover, where the government officials have stated that a law will operate in a discriminatory fashion, courts presume that the government was correct in its assessment. For example, in *H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 526 (1949), the Supreme Court

Page 17    **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

rejected a state's attempt to disavow its conclusion that its action would discriminate against interstate commerce:

> The State, however, insists that denial of the license for a new plant does not restrict or obstruct interstate commerce, because petitioner has been licensed at its other plants without condition or limitation as to the quantities it may purchase. *** It suggests that, by increased efficiency or enlarged capacity at its other plants, petitioner might sufficiently increase its supply through those facilities.
>
> * * *
>
> But the argument also asks us to assume that the Commissioner's order will not operate in the way he found that it would as a reason for making it. *** In the face of affirmative findings that the proposed plant would increase petitioner's supply, we can hardly be asked to assume that denial of the license will not deny petitioner access to such added supplies.

### 1. The Amendments' selective targeting of export facilities in the definition of Bulk Terminals has a discriminatory effect.

The definition of Bulk Terminals—which defines what facilities are subject to the prohibition—is set out in PCC 33.920.300(A). This provision states that Bulk Terminals are establishments that have marine, rail, or regional pipeline access and either have "transloading facilities for transferring a shipment between transport modes, or have transloading facilities and storage tank capacity exceeding 2 million gallons." PCC 33.920.300(A). The official code commentary for PCC 33.920.300(A) states that the "2-million-gallon threshold is sized to include facilities that are large enough to unload unit trains." EFC 35-12 at 52. Staff explained during the 2022 hearings that the prohibition on sites with transloading facilities was meant to stop "terminals that could direct transfer between modes[,]" like "a long rail car unit train pulling up to a dock and offloading their product directly into a ship[.]" ECF 35-17 at 6–7. The code commentary states that "[f]unctionally, these terminals tend to be regional gateway facilities, where fossil fuels enter and exit the region."

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

In other words, by applying the Amendments to only those facilities that have (a) marine, rail, or regional pipeline access, and (b) either significant bulk storage or transloading facilities, the City is able to block export facilities without explicitly applying the prohibition based on where the fuel is going. This approach, however, violates the dormant Commerce Clause to the same extent as if it had expressly based the prohibition on the destination of the fuel.

In this vein, the Amendments are similar to the ordinance that was struck down in *Island Silver & Spice, Inc. v. Islamorada* 542 F.3d 844, 845 (11th Cir. 2008). In that case, the court concluded that an ordinance that imposed limits on "formula" restaurants and retail establishments—defined as having a "standardized array of services or merchandise, trademark, logo, service mark, symbol, decor, architecture, layout, uniform, or similar standardized feature"—violated the dormant Commerce Clause. Although the ordinance did not expressly prohibit out-of-state chains, the Eleventh Circuit found that the ordinance had the same discriminatory effect because most formula restaurants and retail establishments were out-of-state businesses.

2.    **The Amendments' exceptions for local establishment has a discriminatory effect.**

Even if the local exceptions were not facially discriminatory, they would still violate the dormant Commerce Clause to the same extent because their effect is to excuse local entities from the prohibition on new fossil-fuel-transportation infrastructure. The City's zoning authority only extends to its borders, and thus only entities within Portland are able to benefit from the exemptions. This is why the official code commentary for PCC 33.920.300 refers to the exception for fossil fuel used exclusively at a port in PCC 33.920.300(D)(7) as exempting "jet

Page 19    **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

fuel facilities for PDX Airport, vessel fuel facilities on Portland Harbor" from the prohibitions in the Amendments. EFC 35-12 at 52–53.

### 3. The Amendments fall squarely within two types of regulations that have been found to violate the dormant Commerce Clause.

The City's overarching intent to limit fossil-fuel storage and transportation infrastructure to serve only Portland and the surrounding region falls squarely within two classes of regulations that have consistently been determined to violate the dormant Commerce Clause: (a) limitations on unwanted commerce that disproportionately impacts interstate trade and/or protects local citizens from the restrictions, and (b) preferential access for local consumers/users to goods and resources.

### a. The City's intent to limit unwanted commerce (i.e., fossil-fuel infrastructure) by targeting export facilities, while protecting local users from the restrictions, violates the dormant Commerce Clause.

The Amendments are indistinguishable from the cases holding that states (and their political subdivisions) are prohibited by the dormant Commerce Clause from restricting unwanted commerce in a fashion that disproportionately impacts interstate trade or protects local citizens from the impact of the limitation. *See, e.g.*, *Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat. Res.*, 504 U.S. 353, 362–68 (1992) (invalidating state statute that prohibited landfill owners from accepting waste generated from outside county in which landfill is located unless expressly authorized by county solid-waste plan); *Chem. Waste Mgmt.*, 504 U.S. at 337; *Env't Tech. Council v. Sierra Club*, 98 F.3d 774, 778 (4th Cir. 1996); *In re Se. Ark. Landfill, Inc. v. Arkansas*, 981 F.2d 372, 373 (8th Cir. 1992).

In the seminal case, *City of Philadelphia v. New Jersey*, 437 U.S. 617, 628 (1978), the Court struck down a law prohibiting the disposal of solid waste from outside the state in New

Page 20   **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

Jersey landfills. The Court found that New Jersey had violated the dormant Commerce Clause because it had "overtly moved to slow or freeze the flow of commerce for protectionist reasons." *Id*. By blocking only out-of-state garbage, New Jersey had impermissibly granted its "own inhabitants a preferred right of access" to the scarce landfill capacity. *Id.* at 627. The Court held that a state is not allowed "to isolate itself from a problem common to many by erecting a barrier against the movement of interstate trade." *Id.* at 628.

Like the cases above, the City is attempting, through the Amendments, to limit unwanted commerce within its borders—the storage and transportation of fossil fuels—but it is attempting to impose the burdens of that restriction disproportionately on interstate commerce (i.e., export facilities) while shielding its citizens from the consequences of the regulation. As in *City of Philadelphia*, this preferential treatment of end users in the city and region over end users in other regions and countries constitutes discrimination that violates the dormant Commerce Clause.

In fact, the Portland Bureau of Transportation prepared a memo for BPS demonstrating how the Amendments will force any unexpected increase in regional fuel demand to be primarily met by transportation outside the city. ECF 35-25. BPS incorporated this analysis into its staff report, which was adopted by the City as official findings. The Portland Bureau of Transportation memo and BPS report state that:

> 1. Increased demand in Eastern Oregon could be met through increased truck deliveries from the fuel terminal in Pasco, Washington, which has a pipeline connection to refineries in Salt Lake City. This option would increase truck traffic in Eastern Oregon – which is beyond the jurisdiction of the City of Portland.

> 2. Increased demand in Southern Oregon could be met through increased deliveries from the fuel terminal in Chico, California. This option would increase

Page 21    **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

truck traffic in Southern Oregon – which is beyond the jurisdiction of the City of Portland.

3. Increased demand in the Willamette Valley and the Northern and Central Oregon Coast are likely to be met either through increased deliveries to an Olympic Pipeline terminal in Vancouver, Washington; increased barge deliveries to another port on the Lower Columbia River or the Oregon Coast; or via rail. Deliveries to the Oregon Coast or via rail would not result in increased truck traffic in Portland because those deliveries could serve regional submarkets directly without having to pass through Portland. ECF 35-12 at 18–19; ECF 35-25 at 1.

Rarely is a court provided with such clear evidence from a governmental body of the discriminatory effect of its law.

> **b.    The City's intent to provide preferential treatment to local fuel users over their out-of-state counterparts also violates the dormant Commerce Clause.**

In addition to these "unwanted commerce" cases, laws that favor local consumers'/end users' access to goods and services have repeatedly been held to violate the dormant Commerce Clause. *E.g.*, *Brown-Forman Distillers*, 476 U.S. at 580; *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 578 (1997); *Hughes v. Oklahoma*, 441 U.S. 322, 339 (1979); *Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 944 (1982). This precedent includes local laws that favored in-state end users' access to energy resources over their out-of-state counterparts. For example, in *Pennsylvania v. West Virginia*, 262 U.S. 553, 592 (1923), *aff'd*, 263 U.S. 350 (1923), the Court struck down a West Virginia law that required pipeline operators within the state to give priority to West Virginia citizens in purchasing natural gas obtained from wells within the state. Likewise, in *New England Power Co. v. New Hampshire*, 455 U.S. 331, 339 (1982), the Court struck down a local rule that was "designed to gain an economic advantage for New Hampshire citizens at the expense of New England Power's customers in neighboring states."

Page 22    **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

Particularly relevant here, there is a long line of cases holding that attempts to benefit local consumers through restrictions on the development and use of transportation infrastructure violates the dormant Commerce Clause. For example, in *West v. Kansas Nat. Gas Co.*, 221 U.S. 229, 249 (1911), the Court addressed Oklahoma's refusal to authorize the construction of natural gas pipelines in a state right-of-way if the pipelines would be used to transport natural gas to other states. The Court held that the statute violated the dormant Commerce Clause, rejecting the argument that the restriction on gas pipelines did "not regulate interstate commerce, but only affects it indirectly" because "we think it is undoubted that pipe lines are the only practical means of gas transportation, and to prohibit interstate commerce is more than to indirectly affect it." *Id.*

The Court reached a similar conclusion in *H. P. Hood*. The state of New York had denied a permit sought by a company to expand one of its three in-state facilities on the ground that the additional facility capacity would be used to ship milk outside the state. Like the ordinance in this case, the challenged law: (a) did not constitute a ban on interstate commerce, (b) only impacted transportation infrastructure, and (c) was not a direct regulation of the commodity. Like the City here, the governing authority in *H.P. Hood* did not conceal its attempts to prohibit the facility due to its intended use for transporting a good outside the state. The Court readily held that the denial of the permit for discriminatory purposes violated the dormant Commerce Clause.

The Fourth Circuit's opinion in *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316 (4th Cir. 2001), is similar in many respects to the case here. In *Waste Mgmt. Holdings*, the court held that a law restricting shipment of municipal solid waste in vehicles with four or more axles violated the dormant Commerce Clause because the legislative record indicated that the purpose

Page 23    **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

of the law was to stop the disposal of waste from outside the state, which disproportionately used trucks with four axles. Other courts have reached the same conclusion in a variety of contexts. *E.g., American Trucking Ass'n, Inc. v. Whitman*, 437 F.3d 313, 318 (3d Cir. 2006) (invalidating law that restricted use of non-highway roads to only those trucks with an origin or destination in the state).

The City has expressed in almost every possible way that the Amendments are designed to block the development of fuel-export terminals—which would serve consumers outside the region—while preserving existing terminals and allowing new facilities to serve local consumers. Like the governmental restrictions in *H.P. Hood* and *Kansas Nat. Gas Co.*, the Amendments' targeting export infrastructure bestows on local consumers and end users preferential access to the good at issue.

Indeed, the City has gone to considerable lengths to actually *prove* that the amendments will effectively block export facilities without harming local users or the local economy. In 2016, 2019, and 2022 the City submitted evidence of this fact, including multiple studies by BPS, reports from Lighthouse Energy Consulting on natural gas, and other analysis. ECF 35-21; ECF 35-22; ECF 35-23; ECF 35-24; ECF 35-25. Based on the evidence and analysis that the City marshalled, the City Council stated in its findings supporting the 2022 Ordinance that "Council finds that the amendments properly limit storage to what is necessary to serve the regional market."[2] As in *H. P. Hood*, 336 U.S. at 526, this conclusion is presumed to be true; and regardless, there is little doubt that the Amendments have a discriminatory effect.

---

[2] 2022 Findings of Fact at 172.

Page 24    **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

**D.        The Amendments have a discriminatory purpose.**

Even if the Amendments were not discriminatory on their face and in their effect, they

would still violate the dormant Commerce Clause because of their discriminatory purpose.

In evaluating whether a law has a discriminatory purpose, courts start with the objectives

stated in the legislation. *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 271 (1984). These stated

objectives, however, are not dispositive. Courts also examine direct and circumstantial evidence

probative of discriminatory intent, including the law's context, legislative history, historical

background of the legislation, and contemporary statements by decisionmakers. *Int'l Franchise*

*Ass'n, Inc. v. City of Seattle*, 97 F. Supp. 3d 1256, 1267–68 (W.D. Wash.) (summarizing types of

evidence courts rely on for determining the purpose of legislation), *aff'd but criticized on other*

*grounds,* 803 F.3d 389, 402–03 (9th Cir. 2015) (evaluating the same evidence as the district

court, including context of legislation, emails among decisionmakers, and contemporaneous

statements of mayor and councilmembers); *see also Waste Mgmt. Holdings*, 252 F.3d at 336

(conducting detailed evaluation of law's factual context, legislative history, and

contemporaneous statements by public officials in reaching its holding that law had

discriminatory purpose).

In this case, the stated objectives in the law and other relevant evidence unequivocally

establish that the Amendments and underlying policies were adopted with the express purpose of

blocking the "numerous facility and infrastructure projects proposed to transport * * * fossil

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

fuels through the West Coast" that were the result of "[t]he rapid development of fossil fuel

resources in the western U.S. and Canada[.]"[3]

> 1.    **The City expressly stated its discriminatory purpose for enacting the Amendments in the official code commentary and ordinance findings.**

The starting point for evaluating the purpose of a regulation is the explanation adopted in

the legislation. Here, the 2022 Ordinance findings and official code commentary repeatedly state

that the Amendments were designed to block terminals that would transport "fossils fuels

through the West Coast," which were being proposed as a result of the "rapid development of

fossil fuels in the western U.S. and Canada." ECF 35-10 at 1. The ordinance and findings also

repeatedly state that they accomplish the discriminatory policies in the 2015 Resolution and

Policy 6.48 to (a) block construction of new fossil-fuel-transportation infrastructure with

exceptions for local end users, and (b) limit all fuel-transportation infrastructure to the amount

necessary to serve the region—which BPS, the drafter of the Amendments, and City Council

described as Oregon and southwest Washington. ECF 35-21 at 3; ECF 35-22 at 3; ECF 35-8 at

77–78; ECF 35-11 at 26.

For example, the 2022 Ordinance includes findings stating:

- "The ordinance has been crafted to provide the fossil fuel storage tank capacity, with the allowed exceptions, necessary to serve the future regional market as part of a growing economy (Policy 6.48)." ECF 35-11 at 19.

- "Council finds that the amendments properly limit storage to what is necessary to serve the regional market." ECF 35-11 at 172.

---

[3] 2022 Ordinance at 1.

Page 26    **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

- "City Council finds that there is no compelling evidence that the demand for petroleum will outpace the historic peak consumption in Oregon and there is a surplus of system capacity to meet the expected demand." ECF 35-11 at 149.

In explaining the specific components of the Amendments, the City states in the official code commentary that the definition of Bulk Terminals is meant to stop facilities that could transfer fuel between "transport modes (such as from rail to ship)" and that the "2-million-gallon threshold is sized to include facilities that are large enough to unload unit trains." The commentary explains that "[f]unctionally, these terminals tend to be regional gateway facilities, where fossil fuels enter and exit the region." ECF 35-12 at 52.

The original staff report (adopted as findings for the 2022 Ordinance) confirms the City's discriminatory intent for the exceptions to the prohibition, stating that the Amendments are designed to not impact end users as required by the 2015 Resolution "through specific exclusions of end-user facilities" from the definition of Bulk Terminals. ECF 35-6 at 7.

Although the City does not refer to *local* end users, that is the only end user at issue since its zoning authority extends only to its borders and thus the end users must be nearby. The City emphasizes this operation of the Amendments in official code commentary for PCC 33.920.300, which lists users that can only be located in Portland and explicitly names the PDX Airport and Portland Harbor as "large users" protected by the exceptions:

> [The 2015 Resolution] lists a specific exception to not restrict service directly to end users. At a small scale, services to end users include retail gasoline filling stations, natural gas access lines in street right-of-way to residential and business customers, and heating oil tanks at home sites [which larger scale end users with fossil fuel storage and access infrastructure also include manufacturers, jet fuel facilities for PDX Airport, vessel fuel facilities on Portland Harbor, and others, where fossil fuels are used as an input. ECF 35-12 at 52.

Page 27    **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

2.      **The 2015 Resolution and Policy 6.48 bound the City to have a discriminatory purpose in adopting and readopting the Amendments.**

The City's discriminatory purpose is also evidenced by the binding policies that the Amendments explicitly implemented. In fact, these binding policies mandated that the Amendments have a discriminatory purpose.

As set out above, the legislative process for the Amendments was initiated by the 2015 Resolution adopting a binding policy to "[o]ppose expansion of infrastructure whose primary purpose is transporting or storing fossil fuels in or through Portland or adjacent waterways[,]" with an exception "for the provision of service directly to end users." ECF 35-1 at 3. The 2015 Resolution required City staff to develop code changes that implemented these policies. *Id.* City staff and City Council were mandated to follow the policies in the 2015 Resolution because under PCC 1.07.020 the resolution had "binding effect" in all subsequent City decision-making and procedure.

Moreover, the City's comprehensive plan includes Policy 6.48, which provide that the City will "[l]imit fossil fuel distribution and storage facilities to those necessary to serve the regional market." Under state law and City code, any amendments the City adopts *must* comply with this restriction. ORS 197.175, 197.835(7); PCC 33.835.040(A). In fact, the 2016 and 2019 Ordinances were remanded by LUBA because the City had failed to demonstrate that the Amendments would accomplish this discriminatory objective, i.e., block export facilities without harming the supply of fuel for the city and surrounding areas. In response, the City submitted several studies and government reports in the legislative 2019 and 2022 readoption processes trying to prove that they had shielded local users from the impact of the prohibition on new fossil-fuel-terminal infrastructure. ECF 35-21; ECF 35-22; ECF 35-23; ECF 35-24; ECF 35-25.

Page 28      **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

###### 3.    Contemporaneous statements by City officials and staff also demonstrate the discriminatory purpose of the Amendments.

Statements made by public officials and staff during public hearings for the Amendments and underlying policies also demonstrate the discriminatory purpose of the amendments.

For example, during a hearing on the 2015 Resolution that adopted the binding policy to protect local end users and initiated the FFT Amendment process, staff explained how the exception for end users would allow facilities to serve local users while blocking those same facilities for users in other areas. BPS staff explained that the term "end users" includes "a utility customer, an industrial customer that may use fossil fuels either to burn for energy or as part of the process inputs or as part of even R&D that they're going through, they are using those fuels themselves." ECF 35-14 at 43. In contrast, BPS explained that the 2015 Resolution would block a "[liquified natural gas] terminal whose purpose is to provide gas to other utilities or other distribution channels, [because] they're not giving it directly to the end user." ECF 35-14 at 44.

During these hearings, City Council discussed the 2015 Resolution's disparate treatment of facilities for fuel being used in the city versus fuel being transported through the city for use by others. Mayor Hales opined that:

> [I]t's not the intention, nor will it be the effect of this resolution for the city of Portland to determine people's individual choices about what fuels they use, * * * However, it's a decision about the macro question of, are we going to be part of the large scale infrastructure that expands to move more fossil fuels around the world? ECF 35-13 at 74.

Commissioner Novick disagreed, stating that the 2015 Resolution is "trying to effect people, the choices of individuals[,]"—in other countries—explaining that if as "a result of our actions, less oil goes to India, then that ultimately means fewer people in India will put gas in

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

their cars." ECF 35-13 at 75. Commissioner Novick also pointed out the fundamental hypocrisy of targeting only the interstate transportation of fossil fuel moving through the city:

> [E]very day [we] rely on the transportation of fossil fuels by tanker ship and pipelines because that is how the gasoline we use in our cars get to us. * * * I mean, if we want to ban the import of fossil fuels, then I think that it is okay for us to [ban] any fossil fuels coming through here. But we don't. ECF 35-13 at 101.

BPS staff also explained throughout the hearings on the Amendments that the definition of Bulk Terminals was designed to target export facilities. For example, during the public hearing on the 2022 Ordinance, BPS staff stated that the size limit on Bulk Terminals was meant to stop a facility that could unload a unit train of fossil fuel and that the 2-million-gallon limit was very small compared to what was typically needed for an export facility. ECF 35-17 at 6–7. BPS staff also explained that the prohibition on transloading facilities, regardless of storage, was included to block export "terminals that could direct transfer between modes[,]" like a "a long rail car unit train pulling up to a dock and offloading their product directly into a ship." ECF 35-17 at 6–7.

The evidence above demonstrates the City's clear discriminatory purpose: an intent to prohibit export or interstate facilities that will not serve the city or surrounding area. This intent to block infrastructure based on who it will serve is a discriminatory purpose that violates the dormant Commerce Clause. *West*, 221 U.S. at 249; *H.P. Hood*, 336 U.S. at 526.

### E.    The City has not offered alternative, less discriminatory means to accomplish its stated safety goals.

When a law is found to discriminate against interstate commerce, it is "per se invalid, save in a narrow class of cases in which the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *C & A Carbone*, 511 U.S. at 392. The City cannot do so here.

Page 30    **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

The City states throughout its findings that the Amendments are intended to protect its citizens from harm posed by the bulk storage of fossil fuels, particularly those located in an area that is vulnerable to damages during an earthquake. While public safety may be a legitimate goal, the City cannot demonstrate that the Amendments' selective targeting of export facilities— while allowing additional facilities for local interests—are the only means to accomplish it. *See C & A Carbone*, 511 U.S. at 393 ("Here Clarkstown has any number of nondiscriminatory alternatives for addressing the health and environmental problems alleged to justify the ordinance in question. The most obvious would be uniform safety regulations enacted without the object to discriminate.")

Moreover, the Amendments prohibit transloading facilities without bulk storage. While this is effective in blocking export facilities, it does nothing to advance the City's stated goal to protect its citizens from bulk storage of fuels.

Accordingly, the discriminatory Amendments violate the dormant Commerce Clause and must be struck down.

**F.    The 2015 Resolution and Policy 6.48 are facially discriminatory.**

So, too, must the 2015 Resolution and Policy 6.48 be invalidated. The Resolution and Policy are not mere statements of legislative goals, but have actual, binding effect.

Pursuant to PCC 1.07.020, the 2015 Resolution binds the City to adopt zoning codes prohibiting fossil-fuel-transportation infrastructure and do so in a discriminatory manner with special exceptions for local end users. Moreover, even outside the context of zoning code amendments, the 2015 Resolution mandates that City Council "actively oppose expansion of

Page 31    **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

infrastructure whose primary purpose is transporting or storing fossil fuels in or through Portland or adjacent waterways[,]" subject to the exception for local end users.

Likewise, both city code and state law require the City to satisfy Policy 6.48—to "[l]imit fossil fuel distribution and storage facilities to those necessary to serve the regional market"—to every relevant zoning code amendment, as well as in some types of discrete land use decisions.

Accordingly, because these policies are discriminatory on their face and in purpose, they also violate the dormant Commerce Clause and should be struck down.

## IV.    CONCLUSION

The Amendments and underlying policies violate the bedrock principle under the dormant Commerce Clause that a state or locality may not enact legislation that restricts interstate commerce in a manner that favors its residents. This principle holds true even if the legislation targets the means by which commerce is effectuated rather than the article of commerce itself. However legitimate the City's goals or objectives were in attempting to stem the flow of fossil fuels or in reducing fossil-fuel storage within its borders, it was not entitled to enact an ordinance that imposed the burdens of its restrictions on end users in other states, while exempting its residents from those burdens. Because the Amendments and underlying policies do, in fact, discriminate between similarly situated end users of fossil fuels based solely on their

///

///

///

///

///

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204

location, they violate the dormant Commerce Clause. Plaintiffs therefore request that the court

grant its motion for partial summary judgment and issue an order declaring the Amendments, the

2015 Resolution, and Policy 6.48 unconstitutional and invalid.

DATED this 8th day of August 2023.

MILLER NASH LLP

*s/ Joshua M. Sasaki*
Joshua M. Sasaki, P.C., OSB No. 964182
josh.sasaki@millernash.com
Steven G. Liday, OSB No. 075975
steven.liday@millernash.com
Christopher J. Riley, OSB No. 211614
christopher.riley@millernash.com
Phone: 503.224.5858
Fax: 503.224.0155

Attorneys for Plaintiffs

4873-3349-6950.3

**Page 33    PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
US BANCORP TOWER
111 SW FIFTH AVE, STE 3400
PORTLAND, OREGON 97204