UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

STATE OF MONTANA; WESTERN ENERGY
ALLIANCE, a Colorado nonprofit corporation;
PACIFIC PROPANE GAS ASSOCIATION, a
Washington nonprofit corporation; IDAHO
PETROLEUM MARKETERS AND
CONVENIENCE STORE ASSOCIATION,
INC., an Idaho nonprofit corporation; and
CHRISTENSEN,  INC., a Washington
Corporation,

                    Plaintiffs,

        v.

CITY OF PORTLAND,

                    Defendant.

Case No. 3:23-cv-00219-YY

FINDINGS AND
RECOMMENDATIONS

YOU, Magistrate Judge.

**FINDINGS**

In 2022, defendant City of Portland adopted amendments to the City's land use code that

imposed certain limits on the construction of new or expanded bulk fossil fuel terminals.

Plaintiffs are a collection of entities representing fossil fuel producers, distributors, and retailers

who have brought suit challenging those amendments on a number of grounds, including that

they violate plaintiffs' rights under the dormant Commerce Clause, the Foreign Commerce

Clause, and the Due Process Clause, and that the amendments are otherwise preempted by

federal law regulating railroads.

1 – FINDINGS AND RECOMMENDATIONS

Defendant has moved to dismiss plaintiffs' claims on two overarching grounds. Mot. Dismiss, ECF 17. First, defendant asserts that the suit should be dismissed for lack of subject matter jurisdiction because none of the plaintiffs have established a concrete, actual injury as required to have standing under Article III of the Constitution. Second, defendant asserts that even if the court has subject matter jurisdiction, all of plaintiffs' claims should be dismissed for failure to state a claim. While defendant's motion to dismiss was pending, plaintiffs filed a Motion for Partial Summary Judgment. ECF 34. That motion has been stayed pending resolution of defendant's motion. Order (Oct. 12, 2023), ECF 49.

As explained below, defendant's motion to dismiss for lack of subject matter jurisdiction should be denied because plaintiff Christensen, Inc. has standing based on its alleged loss of property value caused by the amendments. Defendant's motion to dismiss for failure to state a claim should be granted as to all of plaintiffs' claims because the challenged amendments do not discriminate against interstate commerce, are not displaced or preempted by the Foreign Commerce Clause or other federal law, and do not violate plaintiffs' substantive due process rights. Plaintiffs' motion for partial summary judgment, accordingly, should be denied as moot.

## I.    Background[1]

The City of Portland is an important transportation hub in the Pacific Northwest, boasting a large port with deep-water access to the Pacific Ocean and connections to railway lines and

---

[1] The following facts are taken from a variety of materials submitted by both parties, including plaintiffs' Amended Complaint, the briefing on defendant's currently pending Motion to Dismiss, and plaintiffs' Motion for Partial Summary Judgment (ECF 34) and are, unless specifically noted, undisputed. In reviewing defendant's motion, the court found that the broader scope of background facts in these materials was helpful to more fully understanding the nature of the dispute and the context in which it arose. Given that defendant's motion requires the court to at times consider evidence submitted by the parties and at other times constrain its analysis to only those allegations in plaintiffs' Amended Complaint, the background facts here are offered

interstate highways that cover large portions of the western United States.[2] This "combination of geography and multimodal freight infrastructure assures Portland's role as a center for goods distribution to and from the Pacific Northwest and throughout the world."[3]

In 2015, the City Council adopted Resolution No. 37168, the stated purpose of which was to "[o]ppose expansion of infrastructure whose primary purpose is transporting or storing fossil fuels in or through Portland or adjacent waterways."[4] The Resolution detailed the Council's concerns regarding the risks to the environment and climate, public health, and safety posed by fossil fuels, the costs associated with cleaning up accidents involving fossil fuels, along with other local and regional policies, programs, and initiatives that generally supported or encouraged the shift away from reliance on fossil fuels.[5] The Resolution also directed the City's Bureau of Planning and Sustainability "to develop proposed code changes for Council consideration to advance the policies set forth in this Resolution[.]"[6]

The Bureau then proposed, and in December of 2016 the City Council approved, zoning code amendments that created a "new land use category" for "Bulk Fossil Fuel Terminals," which were "characterized by having (1) marine, pipeline or railroad transport access and (2) either trans-loading facilities for transferring a shipment between transport modes (such as from rail to ship) or bulk storage facilities exceeding 2 million gallons of fossil fuels."[7] Several

---

only for the purposes of providing broad context and not as a basis for adjudicating the issues raised by defendant's motion.

[2] *See* Am. Compl. ¶¶ 14–15, ECF 11.

[3] Liday Decl., Ex. 18 at 1 (City of Portland Freight Master Plan, May 10, 2016), ECF 35-18; *id.*, Ex. 19 at 244 (Oregon Department of Energy 2022 Biennial Energy Report), ECF 35-19.

[4] Am. Compl.¶ 22, ECF 11; Sheffield Decl., Ex. 9 at 1, ECF 19-5.

[5] Sheffield Decl., Ex. 9 at 1–3, ECF 19-5.

[6] *Id.* at 3.

[7] *Id.*, Ex. 10 at 56–57 (City of Portland Fossil Fuel Terminal Zoning Amendments as Adopted, Dec. 14, 2016), ECF 19-6.

industry groups appealed the 2016 amendments to the Oregon Land Use Board of Appeals. The case eventually reached the Oregon Court of Appeals, which held, among other things, that the 2016 amendments did not violate the dormant Commerce Clause. *See Columbia Pac. Bldg. Trades Council v. City of Portland*, 289 Or. App. 739, 754 (2018).[8] Several more rounds of amendments and appeals ensued.[9]

Finally, in 2022, the City Council adopted the Fossil Fuel Terminal Amendments ("BFFT Ordinance") that plaintiffs challenge here.[10] This most recent version of the BFFT Ordinance provides, in relevant part:

> Bulk Fossil Fuel Terminals are establishments primarily engaged in the transport and bulk storage of fossil fuels. Terminal activities may also include fuel blending, regional distribution, and wholesaling. Terminals have access to marine, railroad, or regional pipeline to transport fuels to or from the site, and either have transloading facilities for transferring a shipment between transport modes, or have transloading facilities and storage tank capacity exceeding 2 million gallons.

Portland City Code ("P.C.C.") 33.920.300(A).[11] According to defendant, there are currently eleven bulk fossil fuel terminals in Portland, all of which are located "within the state of Oregon's critical energy infrastructure hub ('CEI Hub') in Northwest Portland" along the banks of the Willamette River.[12] The report accompanying the BFFT Ordinance described one of the primary issues regarding fossil fuel storage at the CEI Hub:

> The CEI Hub — built before our current understanding of the region's earthquake risk — sits on unstable soil subject to liquefaction and lateral spreading in an earthquake. The CEI Hub is built on soils that geologists anticipate will be subject

---

[8] *See also* Mot. Dismiss 7–8. ECF 17 (explaining procedural history of LUBA appeal); Mot. Partial Summ. J. 6–8, ECF 34 (same).
[9] *See* Mot. Dismiss 8, ECF 17 (explaining subsequent procedural history of amendments and appeals); Mot. Partial Summ. J. 8–9, ECF 34 (same).
[10] *See* Sheffield Decl., Ex. 7, ECF 19-3.
[11] *See also id.*, Ex. 7 at 53, ECF 19-3.
[12] Armstrong Decl. ¶¶ 3, 6, ECF 18-1. It should be noted, however, that the parties dispute whether plaintiff Christensen's facility in Portland is subject to the BFFT Ordinance. *See* Resp. 19–20, ECF 30; Reply 3–4 n.3, ECF 41.

to liquefaction (when the water table rises during an earthquake and loosens soils making those soils act more like a liquid than a solid) and lateral spreading (when the soils will spread toward the Willamette River). Because the CEI Hub is so close to the Willamette River and the dense urban core in the City of Portland, the risk of an accident, spill, or major infrastructure failure is particularly concerning as the region's earthquake's risks are now well-known and well-documented.
. . .
The existing zoning allows an unlimited increase in storage capacity at FFTs in an area with a high probability of liquefaction in a major seismic event (Figure 4). Large FFTs represent a risk to people, property and the natural environment that is a compelling reason to limit future risk by limiting the size of new facilities and expansion of storage tank capacity at existing facilities.[13]

In passing the BFFT Ordinance, the City Council stated that

The purpose of this ordinance is to limit the risk of damage from a catastrophic Cascadia Subduction Zone earthquake by limiting the expansion of fossil fuel storage tank capacity in an area with high susceptibility to liquefaction, while at the same time allowing the existing terminals to make safety upgrades; to serve future regional needs; and facilitate a transition to cleaner fuels to reduce carbon emissions.[14]

This suit followed shortly thereafter. Plaintiffs here include Christensen, Inc., a Washington corporation that "owns and operates an industrial liquid-storage terminal in north Portland."[15] Christensen asserts that its property has "intermodal infrastructure that is currently used to transfer propane from train to trucks for regional distribution" and thus is subject to the BFFT Ordinance.[16] Other plaintiffs include Pacific Propane Gas Association, Idaho Petroleum Marketers and Convenience Store Association, Inc., and Western Energy Alliance, which are trade association groups representing companies that produce, distribute, or sell fossil fuel such as oil and natural gas.[17] Finally, the State of Montana is also a plaintiff, and it brings claims in

---

[13] Sheffield Decl., Ex. 7 at 10, ECF 19-3.
[14] *Id.*, Ex. 5 at 4, ECF 19-1.
[15] Am. Compl. ¶ 63a, ECF 11.
[16] *Id.*
[17] *Id.* ¶¶ 4–6.

"both its proprietary capacity and in its sovereign capacity as *parens patriae* for all Montana citizens."[18]

Generally speaking, plaintiffs assert that the BFFT Ordinance is discriminatory because it is "designed to restrict the storage and transportation of fossil fuels in and through Portland, except as necessary to serve local end users of petroleum products . . . [and they] selectively target and burden interstate and foreign commerce in a manner designed to shield local users from the impacts of the regulations." Resp. 1, ECF 30. Key to this theory is that the BFFT Ordinance specifically exempts certain local facilities from the definition of "Bulk Fossil Fuel Terminals," thus "shielding them from the prohibition on new/expanded fuel transportation infrastructure." *Id.* at 11. These exceptions include: "Gasoline stations and other retail sales of fuel"; terminals that "receive and deliver fossil fuels exclusively by truck"; "[i]ndustrial, commercial, institutional, and agricultural firms that exclusively store fossil fuel for use as an input"; and "[t]he storage of fossil fuels for exclusive use at an airport, surface passenger terminal, marine, truck or air freight terminal, drydock, ship or barge servicing facility, rail yard, or as part of a fleet vehicle servicing facility[.]" P.C.C. 33.920.300(D).

Plaintiffs assert that the BFFT Ordinance violates the dormant Commerce Clause and the Foreign Commerce Clause because it "block[s] energy companies from siting fuel export facilities at the West Coast's fourth largest port, obstruct[s] transport of fuel to users in other states and countries, and restrict[s] fuel transportation facilities to only that infrastructure necessary to serve its own citizens." Resp. 1–2, ECF 30; Am. Compl. 68–99, ECF 11. Moreover, plaintiffs allege that the BFFT Ordinance is preempted by federal law regulating railroads, specifically the Interstate Commerce Commission Termination Act of 1995, because it

---

[18] *Id.* ¶ 3.

"restrict[s] rail transportation" by "categorically prohibit[ing] new intermodal facilities for the transportation of fuel." Resp. 1, ECF 30; Am. Compl. ¶¶ 105–06, ECF 11. Finally, plaintiffs allege that the BFFT Ordinance violates plaintiffs' substantive due process rights because it is "not rationally related to a legitimate government interest." Resp. 56, ECF 30; Am. Compl. ¶¶ 111–17, ECF 11. Plaintiffs seek a declaration that the BFFT Ordinance violates federal law and an injunction preventing defendant from enforcing it. Am. Compl., Prayer for Relief, ECF 11.

Defendant moves to dismiss for lack of subject matter jurisdiction and for failure to state a claim. Defendant first asserts that none of the plaintiffs have standing to pursue declaratory or injunctive relief—primarily on the basis that none of the plaintiffs have alleged that they have attempted to or imminently plan to engage in activity that would be prohibited by the BFFT Ordinance. *See* Mot. Dismiss 31–33, ECF 17. Alternatively, defendant asserts that, even if one or more plaintiffs has standing to sue, none of plaintiffs' claims are viable as a matter of law and thus should be dismissed. *Id.* at 33.

## II.    Motion to Dismiss for Lack of Subject Matter Jurisdiction

Defendant first moves to dismiss based on lack of subject matter jurisdiction—more specifically, that none of the plaintiffs have sufficiently alleged that they have or will suffer a concrete and particularized injury as a result of the BFFT Ordinance and thus lack standing. Mot. Dismiss 12, ECF 17.

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the court's jurisdiction over the subject matter of the complaint. "The party asserting federal subject matter jurisdiction bears the burden of proving its existence." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). Defendants may challenge subject matter jurisdiction either through a "facial attack" or through a "factual attack." *Leite v. Crane Co.*, 749

F.3d 1117, 1121 (9th Cir. 2014). "A facial attack accepts the truth of the plaintiff's allegations but asserts that they are insufficient on their face to invoke federal jurisdiction." *Id.* (simplified). In contrast, a factual attack "contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." *Id.* When a defendant factually challenges jurisdiction, "no presumptive truthfulness attaches to [the] plaintiff's allegations." *Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012) (simplified).

One of the limits on federal courts' subject matter jurisdiction comes from Article III of the federal Constitution, which empowers federal courts to decide only "cases" or "controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016). This limitation "precludes the exercise of jurisdiction by a federal court unless the plaintiff has suffered some actual injury or faces a threatened injury, and the injury is fairly traceable to the action challenged and is likely to be redressed by a favorable decision." *Culinary Workers Union, Loc. 226 v. Del Papa*, 200 F.3d 614, 617 (9th Cir. 1999) (citing *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472 (1982)). "All of these justiciability limitations are reflected in the doctrines of standing, mootness, and ripeness." *Id.* (citing *Lee v. State of Oregon,* 107 F.3d 1382, 1387 (9th Cir. 1997)).

To have standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 816 (9th Cir. 2017) (quoting *Spokeo*, 578 U.S. at 338). The injury must be both "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 134 (2011) (simplified).

Standing is assessed based on the facts of the case at the time the action was commenced. *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1171 (9th Cir. 2002). "In cases involving multiple plaintiffs, 'at least one plaintiff must have standing to seek each form of relief requested in the complaint.' " *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta*, 33 F.4th 1107, 1120 (9th Cir. 2022) (quoting *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017)); *see also Horne v. Flores*, 557 U.S. 433, 445 (2009) ("Here, as in all standing inquiries, the critical question is whether at least one petitioner has 'alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction.' ") (quoting *Summers v. Earth Island Institute*, 555 U.S. 488, 491–94 (2009)).

The parties first disagree about the proper standard to use in evaluating defendant's motion to dismiss for lack of standing. Defendant asserts its attack is a factual one, and that accordingly, no presumptive truth attaches to plaintiffs' allegations regarding standing. *See* Reply 1–2, ECF 41. Plaintiffs, however, insist that their case is one where the question of subject matter jurisdiction and the merits of their claims are so intertwined that the court will "assume the truth of the allegations in a complaint unless controverted by undisputed facts in the record." Resp. 13, ECF 30 (quoting *Warren v. Fox Fam. Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003)).

The purported "overlap" between the merits of plaintiffs' claims and the jurisdictional question is not as extensive as plaintiffs assert. For one, there is no overlap between the merits of plaintiffs' second and third claims for relief; as explained more fully below, both of those claims turn on a comparison between the BFFT Ordinance and Congress's intent in regulating foreign commerce or in passing the ICCTA, neither of which have any bearing on whether any plaintiff has suffered or will suffer some kind of injury because of the BFFT Ordinance itself. Nor is there

any overlap between plaintiffs' substantive due process claim—which requires examining

defendant's stated purpose in passing the BFFT Ordinance—and any allegation regarding

plaintiffs' injury.

There is one contested point, however, that the court must assume is true for the purpose

of standing. The parties engaged in a spirited exchanged as to whether plaintiff Christensen's

industrial facility in North Portland as currently configured is actually subject to the BFFT

Ordinance at all; plaintiffs insist that it is, while defendant states it is not. *See* Resp. 19–22, ECF

30; Reply 2–4, ECF 41. For standing purposes (and for that purpose only), the court assumes that

Christensen's facility in Portland is subject to the BFFT Ordinance and proceeds accordingly to

evaluate whether Christensen has alleged any concrete injury that could be fairly traced to it. *See*

*Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1162 n.1 (9th Cir. 2018) ("While the parties

dispute whether continued mining required the Forest Service's approval, we must assume that it

did in assessing standing. If the Tribe and Trust are correct that continued mining required

approval, then their injuries are fairly traceable to that approval and could be redressed by setting

it aside.") (internal citations omitted); *see also Equity Lifestyle Props., Inc. v. Cty. of San Luis*

*Obispo*, 548 F.3d 1184, 1189 n.10 (9th Cir. 2008) ("The jurisdictional question of standing

precedes, and does not require, analysis of the merits.").

Plaintiff Christensen alleges that the BFFT Ordinance harms it by restricting the use of its

property, lowering the value and marketability of its property, and by constraining the supply of

fossil fuel, increasing costs, and limiting available types of fuel products that it sells, distributes,

and transports for others. Am. Compl. ¶ 63a, ECF 11; Resp. 17–33, ECF 30. In particular,

Christensen included a declaration from one of its executives stating that the BFFT Ordinance's

"prohibition on the conversion/addition of bulk tanks for storing fossil fuels interferes with

Christensen's planned use of the site, limits the businesses that would have interest in purchasing the property, and lowers the value of the property." This allegation regarding the reduction in the value of Christensen's property is sufficient to establish Christensen's standing. *See Barnum Timber Co. v. U.S. E.P.A.*, 633 F.3d 894, 901 (9th Cir. 2011) (finding plaintiff established standing based on the allegation that government agency "action will lead to the imposition of regulatory restrictions on" plaintiff's property and plaintiff "alleged . . . that its property will decrease in value as a consequence") (citing *Friends of the Earth, Inc. v. Laidlaw Environmental Services,* 528 U.S. 167, 183–84 (2000) (determining a plaintiff's declaration that "her home, which [i]s near [defendant]'s facility, had a lower value than similar homes located farther from the facility, and that she believed the pollutant discharges accounted for some of the discrepancy" was an "affidavit[ ] and testimony presented" properly supporting the plaintiff's claim that the challenged action had "directly affected [her] . . . economic interests"); *Clinton v. City of N.Y.,* 524 U.S. 417, 433 (1998) ("The Court routinely recognizes probable economic injury resulting from governmental actions that alter competitive conditions as sufficient to satisfy the Article III 'injury-in-fact' requirement. . . . It follows logically that any . . . petitioner who is likely to suffer economic injury as a result of governmental action that changes market conditions satisfies this part of the standing test."); *see also Blumenkron v. Hallova*, 568 F. Supp. 3d 1093, 1105 (D. Or. 2021) ("Along with asserting that their property value would increase by $300,000 per acre if included in the UGB, Plaintiffs claim that the *present* value of their property has diminished by $50,000 per acre as a result of the change from undesignated to rural reserve. Plaintiffs' allegations of economic harm due to lost property value is a sufficient injury for purposes of Article III standing.") (internal citations omitted) (citing *Clark v. City of Lakewood*,

259 F.3d 996, 1007 (9th Cir. 2001) (noting that "alleged financial loss is a sufficient injury in fact")).

Because Christensen has established standing, the court does not reach the parties' arguments regarding the standing of the other plaintiffs. *See Town of Chester*, 581 U.S. at 439 (explaining that in a case with "multiple plaintiffs . . . [a]t least one plaintiff must have standing to seek each form of relief requested in the complaint").

## III.    Motion to Dismiss for Failure to State a Claim

Having established that plaintiffs have standing to sue, the next task is to evaluate defendant's motion to dismiss the entirety of plaintiffs' complaint for failure to state a claim.

A motion to dismiss under Rule 12(b)(6) requires the court to examine whether the complaint contains sufficient factual allegations to show that the pleader is entitled to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing Fed. R. Civ. P. 8(a)(2)). While a complaint need not contain detailed factual allegations, "formulaic recitation[s] of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement" are not sufficient. *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)). In the absence of a cognizable legal theory or sufficient facts to support a cognizable legal theory, the claim should be dismissed. *Taylor v. Yee*, 780 F.3d 928, 935 (9th Cir. 2015). To survive a motion to dismiss, the plaintiff must plead facts sufficient for the "court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663.

In evaluating a motion to dismiss, the court must accept the allegations of material fact as true and construe those allegations in the light most favorable to the non-moving party. *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). In addition to the factual allegations in the complaint, the court may consider documents that are attached to or

incorporated by reference in the complaint, where the parties do not contest the authenticity of those documents, as well as matters capable of judicial notice. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

### A.    Dormant Commerce Clause

Plaintiffs' primary claim arises under the dormant Commerce Clause of the Constitution and asserts that the BFFT Ordinance discriminates against or unduly burden interstate commerce because it was "designed to restrict the storage and transportation of fossil fuels in and through Portland, except as necessary to serve local end users of petroleum products." Resp. 1, ECF 30; *see also* Am. Compl. ¶¶ 68–90, ECF 11.

The Constitution grants Congress the power to "regulate Commerce . . . among the several States." U.S. Const. art. I., § 8, cl. 3. The Supreme Court has interpreted the Commerce Clause "not only as an authorization for congressional action, but also, even in the absence of a conflicting federal statute, as a restriction on permissible state regulation." *Hughes v. Oklahoma*, 441 U.S. 322, 326 (1979). The so-called dormant Commerce Clause "implicitly preempt[s] state laws that regulate commerce in a manner that is disruptive to economic activities in the nation as a whole." *Nat'l Pork Producers Council v. Ross*, 6 F.4th 1021, 1026 (9th Cir. 2021), *aff'd,* 598 U.S. 356 (2023). Modern dormant Commerce Clause jurisprudence is "driven by concern about economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013) (simplified).

The dormant Commerce Clause is "not yet a dead letter," though "it is moving in that direction," *Nat'l Pork*, 6 F.4th at 1033, and the Supreme Court has warned courts to use "extreme caution . . . before . . . deploy[ing] this implied authority." *Nat'l Pork Producers*

*Council v. Ross*, 598 U.S. 356, 390 (2023). "Preventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of 'extreme delicacy,' something courts should do only 'where the infraction is clear.' " *Id.* (quoting *Conway v. Taylor's Executor*, 1 Black 603, 634, 66 U.S. 603 (1862)).

Prior to the Supreme Court's decision in *National Pork*, the Ninth Circuit used a two-tiered test for dormant Commerce Clause claims. Under the first tier, the challenged state law is examined to determine whether it discriminates against out-of-state entities on its face, in its purpose, or by its practical effect. *See Rocky Mountain Farmers*, 730 F.3d at 1087. Under the second tier, a state law that is not discriminatory against out-of-state entities can still be struck down under the dormant Commerce Clause if "the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits." *Id.* (simplified) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). In *National Pork*, however, the Supreme Court "criticized the second tier of this test," *Invenergy Thermal LLC v. Watson*, No. 3:22-cv-05967-BHS, 2023 WL 8404048, at *5 (W.D. Wash. Nov. 3, 2023), explaining that it invited courts to erroneously "depart from the antidiscrimination rule that lies at the core of our dormant Commerce Clause jurisprudence." *Nat'l Pork*, 598 U.S. at 377. "While many of our dormant Commerce Clause cases have asked whether a law exhibits 'facial discrimination,' several cases that have purported to apply *Pike,* including *Pike* itself, have turned in whole or in part on the discriminatory character of the challenged state regulations." *Id.* (simplified). "In other words, if some of our cases focus on whether a state law discriminates on its face, the *Pike* line serves as an important reminder that a law's practical effects may also disclose the presence of a discriminatory purpose." *Id.*; *see also Invenergy Thermal*, 2023 WL 8404048 at *5–6 (exploring the effect of *National Pork* on dormant Commerce Clause analysis).

14 – FINDINGS AND RECOMMENDATIONS

With those newly refocused directions in mind, the analysis turns to whether the BFFT Ordinance that plaintiffs challenge here runs afoul of the anti-discriminatory policy at the root of the dormant Commerce Clause. A statutory scheme "can discriminate against out-of-state interests in three different ways: (a) facially, (b) purposefully, or (c) in practical effect." *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 525 (9th Cir. 2009) (simplified). Discrimination in the context of the dormant Commerce Clause means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*, 511 U.S. 93, 99 (1994). "The party challenging the statute bears the burden of showing discrimination." *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 400 (9th Cir. 2015) (quoting *Black Star Farms, LLC v. Oliver,* 600 F.3d 1225, 1230 (9th Cir. 2010)).

The BFFT Ordinance does not facially discriminate between out-of-state entities that wish to operate a bulk fossil fuel terminal and in-state entities that wish to do the same thing. *See Rocky Mountain Farmers*, 730 F.3d at 1087 ("[O]f course, any notion of discrimination assumes a comparison of substantially similar entities.") (quoting *Gen. Motors Corp. v. Tracy,* 519 U.S. 278, 298 (1997). Nor does the BFFT Ordinance discriminate based on, for example, the origin of the fuel to be stored. Instead, the BFFT Ordinance is based on facially neutral characteristics such as whether the fuel storage site has "transloading facilities" or has "storage tank capacity exceeding 2 million gallons." P.C.C. 33.920.300(A); *see also Int'l Franchise*, 803 F.3d at 400 (explaining that classifications "based on the number of employees" and "the business model" were facially neutral); *Rocky Mountain Farmers*, 730 F.3d at 1089 (finding that California's "Low Carbon Fuel Standard" was not discriminatory because it "[did] not base its treatment on a fuel's origin but on its carbon intensity").

Plaintiffs insist that "local consumers/end users" of fossil fuels should be used when evaluating whether the BFFT Ordinance is discriminatory. Resp. 47, ECF 30. That is not an appropriate comparison because plaintiffs are not "consumers/end users" of fossil fuels. Rather, plaintiffs are or represent fossil fuel producers, distributors, wholesalers, and retailers. *See* Compl. 3–7, ECF 11. Thus, the analysis must compare plaintiffs to Oregon-based fossil fuel producers, distributors, or retailers to determine whether the BFFT Ordinance is discriminatory. *See Rocky Mountain Farmers*, 730 F.3d at 1088 ("Entities are similarly situated for constitutional purposes if their products compete against each other in a single market."); *LensCrafters*, 567 F.3d at 525 (finding no discrimination in California law that "treat[ed] out-of-state opticians, such as [the plaintiff], the same as in-state opticians"); *see also Columbia Pac. Bldg. Trades Council v. City of Portland*, 289 Or. App. 739, 747 (2018) (explaining that, in a suit asserting a similar dormant Commerce Clause claim against the same BFFT Ordinance at issue here, "it is inappropriate to compare out-of-state bulk *exporters* of fossil fuels (refineries and distributors of fuel) to in-state end *users* of bulk fossil fuels in a claim of economic discrimination").

Plaintiffs have not identified any similarly situated Oregon competitor that stands to gain an economic advantage over them as a result of the BFFT Ordinance. In fact, plaintiffs seem to concede that the BFFT Ordinance does not engage or result in the type of "economic protectionism" that dormant Commerce Clause jurisprudence is designed to root out: "Plaintiffs do not allege that the Amendments and underlying policies are meant to protect local industry. Rather, these amendments and policies are about commerce that the City does not want: the storage and transportation of fossil fuels." Resp. 45, ECF 30 (citing First Am. Compl. ¶ 73, ECF 11). The Supreme Court in *National Pork* , however, foreclosed that theory, explaining that

"absent discrimination, 'a State may exclude from its territory, or prohibit the sale therein of any articles which, in its judgment, fairly exercised, are prejudicial to' the interests of its citizens." 598 U.S. at 369 (quoting *Guy v. Baltimore*, 100 U.S. 434, 443 (1880)). Similarly, none of the legislative history materials or related statements made in various governmental reports that plaintiffs detailed in the complaint indicate that the purpose of the BFFT Ordinance was to discriminate against out-of-state entities to the benefit of in-state entities. *See, e.g.*, First Am. Compl. ¶¶ 31–32, ECF 11. At best, these statements show that defendant desires to limit infrastructure used to export fuel, but there is nothing in these statements demonstrating that the BFFT Ordinance was passed to give an advantage to or protect from competition in-state entities that export fossil fuels at the expense of out-of-state entities that want to do the same. *Nat'l Pork*, 598 U.S. at 369 ("[T]he Commerce Clause prohibits the enforcement of state laws driven by economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.") (simplified).

Finally, plaintiffs argue that the "burden on interstate commerce outweighs the putative local benefits" because the "local benefits are illusory" and there is a "patent disconnect between the text of the [BFFT Ordinance] and the purported safety benefits of prohibiting additional bulk fuel store within the City." Resp. 50, ECF 30. Those arguments are rejected in light of *National Pork*'s direction that such "policy choices usually belong to the people and their elected representatives" and are not valid grounds to invalidate a state law under the dormant Commerce Clause absent a showing that there is some discriminatory effect on interstate commerce. *Nat'l Pork*, 598 U.S. at 382; *see also Rosenblatt vi City of Santa Monica*, 940 F.3d 439, 452 (9th Cir. 2019) ("*Pike* balancing is required *only* if the challenged law has a discriminatory effect on interstate commerce. And conclusory allegations of disparate impact are not sufficient; to survive

the City's motion to dismiss, the plaintiffs needed to plead specific facts to support a plausible

claim that the ordinance has a discriminatory effect on interstate commerce.") (quoting *Park Pet*

*Shop, Inc. v. City of Chicago*, 872 F.3d 495, 503 (7th Cir. 2017)).

Defendant aptly summarized the problem with plaintiffs' claims here:

[T]he [BFFT Ordinance] would not allow an Oregon entity to build a facility in
Portland that plaintiffs would be prohibited from building. They would not allow
an Oregon entity to import or export fuel through Portland that plaintiffs would be
prohibited from importing or exporting. They would not allow an Oregon entity to
buy or sell fuel in Portland that plaintiffs would be prohibited from buying or
selling. And they would not allow an Oregon entity to store fuel in Portland that
plaintiffs would be prohibited from storing.

Reply 25, ECF 41. Put simply, the BFFT Ordinance "visits its effects equally upon both

interstate and local business," *Rosenblatt*, 940 F.3d at 449 (quoting *CTS Corp. v. Dynamics*

*Corp. of Am.*, 481 U.S. 69, 87 (1987)), and thus does not run afoul of the dormant Commerce

Clause. In sum, because plaintiffs have not alleged that the BFFT Ordinance discriminates

against interstate commerce, plaintiffs fail to state a claim under the dormant Commerce Clause.

**B.    Foreign Commerce Clause**

Defendant also moves to dismiss plaintiffs' third claim for relief, which asserts that the

BFFT Ordinance violates the Foreign Commerce Clause because it is "inconsistent with the

policies of Congress set out in multiple federal laws." First Am. Compl. ¶ 99, ECF 11; *see also*

Mot. Dismiss 45–47, ECF 17.

There is very little authority to guide the court's analysis of the legal sufficiency of

claims under the Foreign Commerce Clause, which expressly grants Congress the power to

"regulate Commerce with foreign Nations, and among the several States, and with the Indian

tribes." U.S. Const. art. I, § 8, cl. 3. "The boundaries of congressional power under the Foreign

Commerce Clause admittedly lack any well-defined parameters." *Indigenous Env't Network v.*

*Trump*, 428 F. Supp. 3d 296, 308 (D. Mont. 2019) (citing *United States v. Baston*, 818 F.3d 651, 667 (11th Cir. 2016)). "Little case law exists on the Foreign Commerce Clause, and the Supreme Court has never 'thoroughly explored [its] scope.' " *Id.* (quoting *Baston*, 818 F.3d at 667). The parties agree, though, that "[t]o prevail on a foreign Commerce Clause claim, a plaintiff must allege that a state or local law contravenes specific indications of congressional intent." Resp. 51, ECF 30 (quoting *Levin Richmond Terminal Corp. v. City of Richmond*, 482 F. Supp. 3d 944, 957 (N.D. Cal. 2020)); *see also* Reply 30, ECF 41.

Plaintiffs assert the following specific indications of Congressional purported intent to preclude defendant's regulation of land use for fossil fuel storage:

- 30 U.S.C. § 21a and 42 U.S.C. § 13367, regarding mining and coal exports;
- 49 U.S.C. § 10501(a), which prohibits local code regulating rail transportation;
- 46 U.S.C. § 40101, regarding "ocean commerce";
- 42 U.S.C. § 13214, 42 U.S.C. § 17052, 42 U.S.C. § 7545, and 42 U.S.C. § 17321, regarding "clean, renewable, and/or biofuel" or "clean coal" exports.

Am. Compl. ¶¶ 94–97, ECF 11.

Plaintiffs rely heavily on a recent case from the Central District of California in which the court found that the plaintiff—the operator of a port and marine terminal in Richmond, California—stated a claim under the Foreign Commerce Clause challenging a local ordinance that banned the "storage and handling" of petroleum coke ("petcoke") and coal. Resp. 51–54, ECF 30 (citing *Levin*, 482 F. Supp. 3d at 957). That case is neither controlling nor persuasive here for several reasons. For one, the court in *Levin* found that a combination of 30 U.S.C. § 21a and 42 U.S.C. § 13367 evidenced "specific indications of Congressional intent to regulate the overseas trade of commodities like coal and petcoke." 482 F. Supp. 3d at 957–58. But a close inspection of those statutes does not reveal any "specific indications" that Congress intended to

displace local land use regulations regarding the storage of fossil fuel such that the BFFT

Ordinance at issue here must be struck down as running afoul of the Foreign Commerce Clause.

30 U.S.C. § 21a was adopted as part of the Mining and Minerals Policy Act of 1970.

*Bohmker v. Oregon*, 903 F.3d 1029, 1036 (9th Cir. 2018). The statute professes a "national

interest to foster and encourage private enterprise" in the "development of economically sound

and stable domestic mining [and] minerals . . . industries," which includes "oil, gas, coal, oil

shale, and uranium." 30 U.S.C. § 21a. "This law declares it the policy of the United States to

foster the development of an 'economically sound and stable domestic mining' industry, but

subject to 'environmental needs,' . . . making clear that 'Congress did not, and does not, intend

mining to be pursued at all costs[.]' " *Bohmker*, 903 F.3d at 1029; *see also United States v.*

*Coleman*, 390 U.S. 599, 602 (1968) ("Under the mining laws Congress has made public lands

available to people for the purpose of mining valuable mineral deposits and not for other

purposes. The obvious intent was to reward and encourage the discovery of minerals that are

valuable in an economic sense."); *S. Dakota Min. Ass'n, Inc. v. Lawrence Cnty.*, 155 F.3d 1005,

1010 (8th Cir. 1998) ("Thus, as shown in the text and structure of the statute, Congress has set

out several purposes and objectives in the Mining Act. These include the encouragement of

exploration for and mining of valuable minerals located on federal lands, providing federal

regulation of mining to protect the physical environment while allowing the efficient and

economical extraction and use of minerals, and allowing state and local regulation of mining so

long as such regulation is consistent with federal mining law."). The Supreme Court has said this

statute presumably preempts state land use laws that prohibit mining on federal lands, *see*

*Bohmker*, 903 F.3d at 1040 (citing *California Coastal Commission v. Granite Rock Co.*, 480 U.S.

572 (1987)), but there is no allegation that any plaintiff here is engaged in mining or that the

BFFT Ordinance conflicts with federal regulations regarding mining on federal lands or any of the other stated purposes of this statute.

As for 42 U.S.C. § 13367, that statute directs the Secretary of Commerce to "submit . . . a plan for expanding exports of coal mined in the United States" to Congress and that the plan should include "an evaluation of existing infrastructure in the United States and any new infrastructure requirements in the United States to support an expansion of exports of coal mined in the United States, including ports, vessels, rail lines, and any other supporting infrastructure[.]" The statute merely envisions a "plan" from the Secretary of Commerce regarding the expansion of coal exports. Again, there is no indication that Congress meant to preempt or displace any local land use law that regulated the storage capacity of tanks for holding fossil fuels, an issue that is at best tangentially related to the export of coal.

Moreover, the present case is distinguishable from *Levin* because the ordinance at issue there completely banned the "storage and handling" of coal and petcoke on all property in the city of Richmond. *Levin*, 482 F. Supp. 3d at 952. Accordingly, that ordinance was arguably more directly in conflict with Congress's intent underlying 30 U.S.C. § 21a and 42 U.S.C. § 13367 in that an outright ban of the "handling" of coal and petcoke could be said to frustrate Congress's goal, for example, of encouraging the development of the mining industry.[19] Here, the BFFT Ordinance does not ban the use or handling of fossil fuels; it merely restricts the overall storage capacity of tanks that may be built in the future. There is no "specific indication" of

---

[19] That proposition, however, is not before the court at this time, and neither an independent review of 30 U.S.C. § 21a and 42 U.S.C. § 13367, nor the reasoning in *Levin*, reveal a strong case that through these statutes, Congress intended to articulate a specific policy requiring uniform local regulation of coal and petcoke export facilities such that the local ordinance in *Levin* was required to give way to the Foreign Commerce Clause. *See Levin*, 482 F. Supp. 3d at 957–58.

congressional intent in either 30 U.S.C. § 21a or 42 U.S.C. § 13667 that precludes this type of regulation.

Plaintiffs cite to a smattering of other federal statutes in support of their Federal Commerce Clause claim, but they offer no specific explanation as to how these statutes evince any "specific indications of Congressional intent" to preempt state laws like the BFFT Ordinance that regulate the use of land for the storage of fossil fuels. *See* Resp. 52–54, ECF 30; First Am. Compl. ¶¶ 95–97. ECF 11. The stated purposes of 46 U.S.C. § 40101 include the promotion of "the growth and development of United States exports through a competitive and efficient system for the carriage of goods by water in the foreign commerce of the United States." In 42 U.S.C. § 13214(a), Congress directed the Secretary of Energy to "promote programs and educate officials and employees of Federal agencies on the merits of alternative fueled vehicles." One purpose of 42 U.S.C. § 17052 was to establish a program for "making grants for providing assistance to retail and wholesale motor fuel dealers or other entities for the installation, replacement, or conversion of motor fuel storage and dispensing infrastructure to be used exclusively to store and dispense renewable fuel blends." 42 U.S.C. § 7545 gives the Administrator of the Environmental Protection Agency authority to regulate fuel additives. *See also* 42 U.S.C. § 7602 (defining "Administrator" for the relevant chapters). 42 U.S.C. § 17321 merely defines terms such as "greenhouse gas." Finally, and as explained more fully below, 49 U.S.C. § 10501(a) establishes the jurisdiction of the Surface Transportation Board over railroads. In short, none of these statutes have any indication, must less a specific one, that Congress intended to displace local land use laws regulating fossil fuel storage.

Because plaintiffs have not shown any specific Congressional intent to preempt or displace local laws like the BFFT Ordinance, plaintiffs have failed to state a claim for relief under the Foreign Commerce Clause.

### C.    Preemption under Interstate Commerce Commission Termination Act of 1995

Defendant moves to dismiss plaintiffs' fourth claim for relief, which asserts that the BFFT Ordinance is preempted by the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), codified at 49 U.S.C. § 10501 *et seq. See* Mot. Dismiss 47–50, ECF 17; First Am. Compl. ¶¶ 100–110, ECF 11. Through the ICCTA, "Congress abolished the [Interstate Commerce Commission], revised the Interstate Commerce Act, and transferred regulatory functions under that Act" to the Surface Transportation Board ("Board"). *DHX, Inc. v. Surface Transp Bd.*, 501 F.3d 1080, 1082 (9th Cir. 2007). One purpose in passing the ICCTA was "expanding federal jurisdiction and preemption of railroad regulation." *Oregon Coast Scenic R.R., LLC v. Oregon Dep't of State Lands*, 841 F.3d 1069, 1072 (9th Cir. 2016).

"[F]or federal preemption to apply under the ICCTA, the activity in question must first fall within the statutory grant of jurisdiction to the [Board], one of several federal agencies charged with railroad regulation." *Id.* (citing 49 U.S.C § 10501(a)). That statutory section provides, in relevant part:

> Subject to this chapter, the Board has jurisdiction over transportation by rail carrier that is—(A) only by railroad; or (B) by railroad and water [under specified circumstances].

49 U.S.C. § 10501(a). "If the Board has jurisdiction under 49 U.S.C. § 10501(a), the question whether jurisdiction is *exclusive*—i.e., whether state regulation is preempted—is a separate question governed by 49 U.S.C. § 10501(b)." *Oregon Coast*, 841 F.3d at 1073 (emphasis in original). That section, in turn, provides in relevant part:

> The jurisdiction of the Board over . . . (1) transportation by rail carriers . . . and (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, is exclusive.

49 U.S.C. § 10501(b); *see also Oregon Coast*, 841 F.3d at 1073. "Courts in the Ninth Circuit find 'guidance on the scope of ICCTA preemption from the decisions of the [Board], to which we owe *Chevron* deference.' " *Lighthouse Res. Inc. v. Inslee*, No. 3:18-cv-05005-RJB, 2018 WL 6505372, at *6 (W.D. Wash. Dec. 11, 2018) (quoting *Ass'n of Am. Railroads v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1097 (9th Cir. 2010)). According to the Board, "to be subject to the Board's jurisdiction and qualify for federal preemption under 49 U.S.C. § 10501(b), the activities at issue must be 'transportation' and must be performed by, or under the auspices of, a 'rail carrier.' " *Valero Ref. Co.,* S.T.B. No. FD 36036 (September 20, 2016), 2016 WL 5904757, at 3.

And it is that last point which dooms plaintiff's ICCTA preemption claim. Plaintiffs' claim here is strikingly similar to that in *Valero*, where the owner and operator of an oil refinery (Valero) sought a land use permit to "install a crude off-loading facility" at its refinery in Benicia, California, that would have been accessible by rail. *Id.* at *1. The local planning commission denied the permit, citing in part the environmental impact of the new facility and the increased rail traffic that may result from it. *Id.* at * 2. Valero challenged the denial before the Board, arguing that the denial of the land use permit was "federally preempted under § 10501(b)[.]" *Id.* The Board found "there is no preemption" because the decision to deny the permit did "not attempt to regulate transportation by a 'rail carrier.' " *Id.* at *3. "The Board's jurisdiction extends to rail-related activities that take place at transloading (or, as here, off-loading) facilities if the activities are performed by a rail carrier, the rail carrier holds out its own service through a third party that acts as the rail carrier's agent, or the rail carrier exerts control

over the third party's operations." *Id.* The Board found no evidence in the record that Valero was

a rail carrier or was "performing transportation-related activities on behalf of UP or any other rail

carrier at its off-loading facility," and thus the land use permit denial was not preempted by the

ICCTA. *Id.*

The same is true here. No plaintiff has alleged that it is a rail carrier or is performing any

activities on behalf of or under the auspices of a rail carrier, and thus plaintiffs' claim for

preemption under the ICCTA fails. *See also Lighthouse Res.*, 2018 WL 6505372 at 6–7 (citing

*Valero* in dismissing preemption claim because plaintiff was not a rail carrier or acting on behalf

of a rail carrier).

## D.    Substantive Due Process

Finally, defendant moves to dismiss plaintiffs' fifth claim for relief, which asserts that

defendant's passage of the BFFT Ordinance violated plaintiffs' substantive due process rights.

Mot. Dismiss 50–52, ECF 17; Am. Compl. ¶¶ 111–17, ECF 11.

"Substantive due process forbids the government from depriving a person of life, liberty,

or property in such a way that shocks the conscience or interferes with the rights implicit in the

concept of ordered liberty." *Corales v. Bennett*, 567 F.3d 554, 568 (9th Cir. 2009) (simplified).

"Substantive due process protection is usually reserved for the vindication of fundamental rights,

such as matters relating to marriage, family, procreation, and bodily integrity." *Merrill v. Cty. of

Madera*, No. 1:05-cv-00195-AWI-SMS, 2013 WL 1326542, at *4 (E.D. Cal. Mar. 29, 2013)

(citing *Albright v. Oliver*, 510 U.S. 266, 272 (1994)). "Substantive due process challenges to

government land use decisions must meet an 'exceedingly high burden.' " *Silver Mountain Dev.,

Inc. v. City of Silverton*, No. 6:21-cv-00809-MK, 2024 WL 68355, at *5 (D. Or. Jan. 5, 2024)

(quoting *Shanks v. Dressel*, 540 F.3d 1082, 1088 (9th Cir. 2008)). "[T]he irreducible minimum

of a substantive due process claim challenging land use action is failure to advance any legitimate governmental purpose." *Shanks*, 540 F.3d at 2088 (simplified). "When reviewing the substance of legislation or governmental action that does not impinge on fundamental rights," the Ninth Circuit does "not require that the government's action actually advance its stated purposes[.]" *Wedges/Ledges of California, Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 66 (9th Cir. 1994). The task is rather to "merely look to see whether the government *could* have had a legitimate reason for acting as it did." *Id.* (emphasis in original); *see also Halverson v. Skagit Cnty.*, 42 F.3d 1257, 1262 (9th Cir. 1994) ("If it is 'at least fairly debatable' that the County's conduct is rationally related to a legitimate governmental interest, there has been no violation of substantive due process.").

As mentioned above, in passing the BFFT Ordinance, the City Council stated that its purpose was "to limit the risk of damage from a catastrophic Cascadia Subduction Zone earthquake by limiting the expansion of fossil fuel storage tank capacity in an area with high susceptibility to liquefaction, while at the same time allowing the existing terminals to make safety upgrades; to serve future regional needs; and facilitate a transition to cleaner fuels to reduce carbon emissions." Sheffield Decl., Ex. 5 at 4, ECF 19-1. Plaintiffs concede that "earthquake safety is a legitimate government interest," but insist that the BFFT Ordinance is not "rationally related to that interest" because the BFFT Ordinance regulates "transloading facilities" and are "not only ineffective, but actually detrimental to [defendant's] stated interest." Resp. 56–57, ECF 30.  It is, at the very least, "fairly debatable" that regulating the amount of fossil fuel storage in an area of the city that is at high-risk of catastrophic damage from an earthquake is rationally related to defendant's interest in promoting earthquake safety. Plaintiffs argue that other policies or approaches would be better suited to or more effective in achieving

that interest, *see* Resp. 57, ECF 30, but such a debate is not sufficient to sustain a claim for violation of plaintiffs' substantive due process rights. *See Halverson*, 42 F.3d at 1262 ("[W]here . . . the plaintiffs rely on substantive due process to challenge governmental action that does not impinge on fundamental rights, 'we do not require that the government's action actually advance its stated purposes, but merely look to see whether the government *could* have had a legitimate reason for acting as it did.' ") (emphasis in original) (quoting *Wedges/Ledges*, 24 F.3d at 66); *Johnson v. Brown*, 567 F. Supp. 3d 1230, 1253 (D. Or. 2021) ("[I]t is not the Court's role to second-guess state conduct simply because Plaintiffs present an alternative method of pursuing the state's interest."). Thus, plaintiffs' substantive due process claim necessarily fails. *See Yagman v. Garcetti*, 852 F.3d 859, 867 (9th Cir. 2017) (explaining that to establish a substantive due process violation, a plaintiff must show government actions were "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare") (citation omitted); *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 124 (1978) ("Appellants' substantive due process argument requires little discussion. . . . [They] may cast some doubt on the wisdom of the statute, but it is, by now, absolutely clear that the Due Process Clause does not empower the judiciary to sit as a superlegislature to weigh the wisdom of legislation.") (simplified).

## RECOMMENDATIONS

Defendant's motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim (ECF 17) should be denied in part and granted in part. Defendant's motion to dismiss for lack of standing should be denied because plaintiff Christensen, Inc. has standing based on its alleged loss of property value caused by the BFFT Ordinance. Defendant's motion to dismiss for failure to state a claim should be granted as to all plaintiffs' claims for the reasons

stated above.  Plaintiffs' motion for partial summary judgment (ECF 34) should be denied as moot.

## SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge.  Objections, if any, are due Monday, March 11, 2024.  If no objections are filed, then the Findings and Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

## NOTICE

These Findings and Recommendations are not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of a judgment.

DATED February 26, 2024.


/s/ Youlee Yim You
Youlee Yim You
United States Magistrate Judge