**Joshua M. Sasaki, P.C.**, OSB No. 964182
josh.sasaki@millernash.com
**Steven G. Liday**, OSB No. 075975
steven.liday@millernash.com
**Christopher J. Riley**, OSB No. 211614
christopher.riley@millernash.com
MILLER NASH LLP
1140 SW Washington St, Ste 3400
Portland, OR 97205
Telephone: 503.224.5858
Facsimile: 503.224.0155

>   Attorneys for Plaintiffs
>   State of Montana; Western Energy Alliance;
>   Pacific Propone Gas Association; Idaho
>   Petroleum Marketers and Convenience Store
>   Association, Inc.; and Christensen, Inc.

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| STATE OF MONTANA; WESTERN ENERGY ALLIANCE, a Colorado nonprofit corporation; PACIFIC PROPANE GAS ASSOCIATION, a Washington nonprofit corporation; IDAHO PETROLEUM MARKETERS AND CONVENIENCE STORE ASSOCIATION, INC., an Idaho nonprofit corporation; and CHRISTENSEN, INC., a Washington Corporation,<br><br>          Plaintiffs,<br><br>     v.<br><br>CITY OF PORTLAND,<br><br>          Defendant. | CASE No. 3:23-cv-00219-YY<br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(Violation of the Commerce Clause of the United States Constitution; Preemption; Violation of Substantive Due Process) |

Page 1 -   **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs, State of Montana ("Montana"), Western Energy Alliance (the "Alliance"),

Pacific Propane Gas Association ("PPGA"), Idaho Petroleum Marketers and Convenience Store

Association, Inc. ("IPM&CS"), and Christensen, Inc. ("Christensen") (collectively, "Plaintiffs"),

bring this action against the City of Portland (the "City"), and allege as follows:

## NATURE OF THE ACTION

1.      This action challenges the constitutionality of zoning code amendments

that the City enacted and reenacted in 2016, 2019, and 2022 that prohibit new fuel transportation

terminals and expansion of fuel storage infrastructure that would be used to ship fuel to other

states and countries (the "Amendments"). Plaintiffs allege that the Amendments and two

preceding City enactments violate the Dormant Commerce Clause of the United States

Constitution because they discriminate against out-of-state consumers and other end users of

fuel, as well as the distributors and resellers of fuel that serve those consumers/end users, by

selectively targeting terminals that would export fuel to other states and countries while shielding

resellers, distributors, consumers, and end users of fuel that are present or operate in the City

from the impact of the regulations.

2.      As explained by the City, the Amendments were adopted in response to

proposals for the construction of new terminals that would transport fuel to destinations outside

the surrounding area. The stated goals for these zoning regulations were to (a) limit fuel-

transportation infrastructure in the City to only those facilities needed to supply fuel to

consumers and businesses in the state, and (b) restrict the use of fossil fuels by consumers and

businesses in other areas by blocking increased supply of fuel to those other states and countries.

Page 2 -    **SECOND AMENDED COMPLAINT FOR DECLARATORY AND**
            **INJUNCTIVE RELIEF**

3.      The City employed three primary mechanisms to selectively target export terminals that would be used to transport fuels to other states and countries. First, the prohibition on fuel-transportation infrastructure is only applied to new terminals and storage tanks because the existing terminals and storage tanks are primarily dedicated to and still needed for supplying fuel to the City and the rest of the state. Second, the Amendments tie the prohibition on new terminals to key components of export facilities. Specifically, only those terminals with access to marine, railroad, or regional pipeline transportation infrastructure that also have either transloading facilities for transferring fuel between transportation modes or fuel storage capacity exceeding 2 million gallons are prohibited. The official code commentary explains that this definition of prohibited terminals is meant to target "regional gateway facilities, where fossil fuels enter and exit the region," that can either store a "unit train" volume of fuel or move fuel from one form of transportation to another without the need for intermediary storage. Finally, to be certain that the prohibition does not harm businesses, consumers, and other end users in the City, the Amendments include several exceptions benefiting local entities and operations. For example, the prohibition does not apply to new terminals/storage tanks for fuel that will be used in a local industrial, agricultural, or commercial operation.

4.      Throughout the legislative process adopting and readopting the Amendments, City officials repeatedly emphasized in written materials and hearing testimony that the Amendments would operate as intended and only restrict the supply of fuel to consumers and end users outside the surrounding metro area and state. In fact, the City conducted multiple studies and hired outside experts to prove that the Amendments, as a result of the three mechanisms described above, would have no impact on the supply of fuel to consumers,

Page 3 -    **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

businesses, and other types of end users in Portland or the rest of the state. The City asserted this fact repeatedly in the findings supporting the ordinances at issue.

5.      The Amendments' overt targeting of terminals that would transport fuel outside the state and protection of local end users are unconstitutional because they discriminate against out-of-state consumers, businesses, and other end users of fuel in their express purpose, on their face, and in effect. These zoning regulations fall squarely within three categories of discriminatory laws that the United States Supreme Court has declared unconstitutional on many occasions: (a) laws that protect or benefit local consumers/end users while burdening their out-of-state counterparts, (b) regulations that attempt to limit "unwanted commerce"—here, the storage and transportation of fossil fuels—through regulations that disproportionately impact out-of-state persons and businesses, and (c) laws that regulate transportation infrastructure or instrumentalities in unequal fashion because the commerce at issue primarily originates from or is going to another state.

6.      As set out below, Plaintiffs and their members are injured by this discrimination against out-of-state end users, as follows: (a) Montana, Christensen, and all members of the other Plaintiffs are end users of fuel that are directly impacted by the Amendments' discrimination against nonlocal end users; (b) Plaintiffs' members include numerous fuel producers that are impacted by the discrimination against out-of-state end users because they lose sales to those end users, must sell their product at lower prices to alternative markets with less demand, incur increased transportation costs when forced to transport fuel through a less-efficient, longer route, and are constrained in their production activities by lower takeaway capacity; (c) Plaintiffs and their members are also distributors and retailers of fuel who

Page 4 -    **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

are harmed by the discrimination against out-of-state end users because they lose sales when unable to obtain sufficient quantities of wholesale fuels to sell to the discriminated-against end users, must pay higher costs to obtain fuel from other terminals due to overall reduced supply of fuel in the wholesale market, and incur higher transportation costs in obtaining fuel from alternative suppliers in less-convenient, distant locations; and (d) Plaintiffs and their members include owners and operators of fuel and lubricant terminals in Portland that are not allowed to expand fuel storage infrastructure, convert existing storage to traditional or blended fuels, relocate, or open other facilities in order to increase shipment of fuel to the discriminated-against end users in other states and countries.

       7.     Even apart from their discriminatory nature, the Amendments violate the Dormant Commerce Clause because they create an undue burden on interstate commerce. The City is one of the largest ports on the West Coast and is a critical hub for the transportation of crude oil and refined fuels. As a result, among other negative impacts, the Amendments block fuel exports to other countries, obstruct the supply of fuel to western Idaho and eastern Washington, resulting in inadequate supply of some fuel products and higher fuel prices in those areas, restrict the transport of crude oil from the western United States to Washington refineries, resulting in inadequate supply and higher prices because of the lack of comparable transportation routes, and prevent new facilities from utilizing the Port of Portland, City train terminals, and other intermodal transportation infrastructure to efficiently transport fuel to other states. Further, the Amendments do not actually accomplish the purported local benefits touted by the City to any meaningful extent, and certainly not enough to justify the Amendments' substantial burden on interstate commerce.

Page 5 -    **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

8.      Accordingly, Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 and request that the Court (a) declare that the Amendments and two related enactments are unconstitutional and unenforceable, and (b) issue a permanent injunction prohibiting the City from enforcing or implementing the unconstitutional Amendments and the related enactments.

## PARTIES

9.      Montana is a sovereign state of the United States of America. It is represented by and through Attorney General Austin Knudsen, the state's chief legal officer, who has the duty and authority to represent the state in federal court. Montana sues in both its proprietary capacity and in its sovereign capacity as *parens patriae* for all Montana citizens, including producers and users of fuels subject to the Amendments. As set out in detail below, Montana is directly harmed by the Amendments because they restrict fuel production activities in Montana by interfering with the transport of oil, natural gas, and other fuels through the City to reach distributors, refineries, utilities, and end users of fuel in other states and countries, resulting in lost sales, higher transportation costs, and decreased production due to inadequate takeaway capacity for those in-state producers, which lowers Montana's severance tax revenue on the production of those fossil fuels. Montana is also directly harmed in its proprietary capacity because the Amendments constrict the supply of refined fuels to eastern Washington and western Idaho, which are part of an overlapping, interrelated fuel market that includes the state of Montana, and will thus pay higher prices for fuel due to the Amendments' intentional interference with the transport of refined fuels to those areas. Montana's citizens are harmed by the Amendments as consumers and producers of fossil fuels for the same reasons described above.

Page 6 -    **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

10.     The Alliance is a Colorado nonprofit association with its principal place of business in Denver, Colorado. It is a trade association that represents 200 member companies engaged in all aspects of environmentally responsible exploration and production of oil and natural gas in Montana, North Dakota, Wyoming, Colorado, New Mexico, Utah, and Nevada. As set out in detail below, the members of the Alliance are harmed by the Amendments because they are restricted in their ability to transport oil, natural gas, and other fossil fuels through the City to reach distributors, refineries, utilities, and end users of fuel in other states and countries resulting in lost sales, higher transportation costs, and decreased production due to inadequate takeaway capacity. Alliance members that own/operate petroleum transportation terminals in the City are harmed by the Amendments because they are not allowed to expand fuel storage infrastructure, convert existing storage at their terminals to traditional or blended fuels, relocate, or open other facilities, and the Amendments lower the property value of their terminals. Many of the Alliance members are also harmed by the Amendments because they are end users of fuel in markets served by Portland's fuel-transportation infrastructure (or in an overlapping market that is impacted by the supply of fuel to those markets served by Portland facilities), and will thus pay higher prices for fuel due to the Amendments' intentional interference with the transport of refined fuels to their states.

11.     PPGA is a Washington nonprofit corporation with its principal place of business in Lansing, Michigan. PPGA is a trade association composed of businesses that produce, distribute, sell, or transport propane in the states of Alaska, Hawaii, Washington, or Oregon. Among other things, PPGA represents its members' interests in legislative, regulatory, and code issues related to the propane industry. As set out in detail below, PPGA members are

Page 7 -    **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

harmed by the Amendments because they are restricted in their ability to transport propane through the City to reach distributors and end users of fuel outside the City, resulting in lost sales and higher transportation costs. Most of the PPGA members are also harmed by the Amendments because they are end users of fuel in markets served by Portland's fuel-transportation infrastructure, and will thus pay higher prices for fuel due to the Amendments' intentional interference with the transport of refined fuels to their states.

12.    IPM&CS is an Idaho nonprofit corporation and trade association of companies with retail or wholesale petroleum marketing operations in the state of Idaho. Its principal place of business is Boise, Idaho. It protects and advances its members' legislative and regulatory interests at the state and federal levels. As set out in detail below, IPM&CS members are harmed by the Amendments because they lose sales when unable to obtain sufficient quantities of some fuel types to meet local demand, must pay higher costs to obtain fuel from other terminals due to overall reduced supply of fuel in the wholesale market, and incur higher transportation costs in obtaining fuel from alternative suppliers in less-convenient, distant locations. Most of the IPM&CS members are also harmed by the Amendments because they are end users of fuel in western Idaho, which is served by Portland's fuel-transportation infrastructure, and will thus pay higher prices for fuel due to the Amendments' intentional interference with the transport of refined fuels to their area.

13.    Christensen, Inc. ("Christensen") is a Washington corporation with its principal place of business in Richland, Washington, and locations throughout the Pacific Northwest, including Portland. Christensen is one of the largest distributors of fuels, lubricants, and propane on the West Coast, serving over 10,000 retail fuel, commercial, industrial, and fleet

Page 8 -    **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

customers. As set out in detail below, Christensen is harmed by the Amendments in its distribution activities in other states because it loses sales when unable to obtain sufficient quantities of some fuel types to meet customer demand, must pay higher costs to obtain fuel from other terminals due to overall reduced supply of fuel in those wholesale markets, and incurs higher transportation costs in obtaining fuel from alternative suppliers in less-convenient, distant locations. Christensen is also harmed by the Amendments as an owner-operator of a regulated terminal in Portland because it is not allowed to expand fuel storage infrastructure, convert existing storage at its terminal to traditional or blended fuels, relocate, or open other facilities, and the Amendments lower the property value of its terminal. Additionally, Christensen is harmed by the Amendments because it uses a significant quantity of fuel in its operations in eastern Washington and western Idaho, which are served by Portland's fuel-transportation infrastructure, and will thus pay higher prices for fuel due to the Amendments' intentional interference with the transport of refined fuels to those areas.

14.     The City is a municipal corporation created under the laws of Oregon and a political subdivision of the state.

## JURISDICTION AND VENUE

15.     The Court has subject-matter jurisdiction under 28 U.S.C. § 1332. There is complete diversity among the parties, and the amount in controversy exceeds $75,000.

16.     The Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because all claims in this action arise under federal law.

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

17.     The Court is authorized to grant the relief requested in this case under 42 U.S.C. § 1983, 28 U.S.C. § 1651(a), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

18.     The Court has personal jurisdiction over the City because it is located in the state of Oregon.

19.     Venue is proper in this judicial district because the City is located in this district and a substantial part of the acts or omissions giving rise to the claims occurred and continue to occur in this judicial district. 28 U.S.C. §§ 1391(b)(2), 1391(e)(1).

## FACTS COMMON TO ALL CLAIMS

### *Existing and Proposed Transportation Infrastructure in the City*

20.     The City has the fourth-largest port on the West Coast, located at the confluence of the Columbia and Willamette Rivers, with deep-water port access to the Pacific Ocean, at the end of rail and barge passage through the Cascade Mountains, and at the intersection of the I-5 and I-84 corridors. Portland's industrial districts contain Oregon's largest deep-water seaport, rail hub, and truck distribution centers.

21.     The City is served by two interstate freeways and is the western terminus for BNSF and Union Pacific railway mainlines that cover two-thirds of the western United States, including the oil- and gas-producing states of Montana, North Dakota, Colorado, Wyoming, and Utah. Connections to the BNSF and Union Pacific mainlines provide railway access to the rest of the United States and Canada. Plaintiffs and others use these freeways and railways to transport oil and gas to and from Portland. As stated in the City's Freight Master Plan, the "combination of [this] geography and [the City's] multimodal freight infrastructure

Page 10 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

assures Portland's role as a center for goods *distribution to and from the Pacific Northwest and throughout the world*"[1] (emphasis added).

22.     The City is a key hub for petroleum and natural-gas pipelines, the most important being the 400-mile Olympic Pipeline that connects Puget Sound refineries with a cluster of ten petroleum terminals in the City. The City is also the north terminus of the Kinder Morgan pipeline, which distributes fuel products from the City to Eugene, Oregon, and surrounding Willamette Valley. An additional pipeline runs from the City's fuel terminals to the Portland International Airport.

### *Portland's Increasing Importance to the Interstate/International Transport of Refined and Unrefined Fuels*

23.     The City's existing fuel infrastructure is dedicated primarily to receiving fuel from outside the region and then distributing it to the Portland metropolitan area, as well as the Oregon and southern Washington markets. The fuel terminals in the City provide approximately 90 percent of fuel for Oregon and southwest Washington.

24.     Around 2010, however, the significant increase of production of oil and natural gas in Canada, Montana, North Dakota and other Midwestern states resulted in proposals for new intermodal export terminals in and around the City to enable interstate and international transport of fuel to locations throughout the West Coast and Asia. New infrastructure is necessary for the safe and efficient transportation of fuel, especially because domestic production of fossil fuel is forecast to increase for the next ten years and be a significant source of energy for at least the next 20 years—even under stringent greenhouse-gas constraints necessary to meet

---

[1] ECF 31-18 at 1.

Page 11 -   **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

global emission-reduction goals.[2] Moreover, the geographical shift in oil and gas production has created a significant need for additional infrastructure along new transportation corridors.

25.    As a result of these market changes, Portland occupies a key location for the interstate and international shipment of crude oil and other fossil fuels from production regions in the western United States and Canada, including Montana, North Dakota, Colorado, and Alberta. There are no crude-oil pipelines linking these fuel-producing regions to the West Coast.[3] Thus, to avoid transportation over the Cascade Mountains range, oil is transported from these areas by rail through Portland (via the Columbia Gorge) to reach West Coast refineries (primarily by rail), as well as other interstate and international locations via the Port of Portland and other seaports in Washington state.[4]

26.    In 2014, the Canadian company Pembina Pipeline Corporation ("Pembina") announced plans to construct a propane-export terminal within the City. The proposed terminal was to receive propane from Canada by train for subsequent loading onto ocean tankers and shipment across the Pacific Ocean to customers in Asia. The $500 million project was initially supported unequivocally by City officials, touted as the largest private investment in the City's history. For example, the City's mayor, Charlie Hales, issued a press release stating: "This is great news[.] * * * We welcome this investment and these jobs in

---

[2] For example, under the International Energy Agency's Sustainable Development Scenario that is aligned with the Paris Agreement, natural gas and oil remain the first- and second-largest providers of U.S. energy in 2040. (Report by the National Petroleum Council (a federal advisory to the Secretary of Energy) to the Secretary of Energy, *Dynamic Delivery, America's Evolving Oil and Natural Gas Transportation Infrastructure* (Dec. 12, 2019) (the "2019 NPC Report").)

[3] ECF 31-20 at 42.

[4] ECF 31-20 at 43.

Page 12 -    **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

Portland. The city is committed to growing our economy on the land we already have, and holding industry to very high environmental and public safety standards. This proposal meets these goals."

27.    In response to political opposition, however, the mayor and City reversed course in 2015 and blocked the project by withholding a small zoning amendment that had been endorsed by planning staff and approved by the City's planning commission.

### *2015-2016: Adoption of Policies Targeting Fuel-Export Infrastructure*

28.    In further reaction to political opposition to the Pembina project, the City adopted new policies to categorically block future proposals for fuel-export facilities.

29.    In 2015, the City passed Resolution No. 37168 that adopted a binding policy to "[o]ppose expansion of infrastructure whose primary purpose is transporting or storing fossil fuels in or through Portland or adjacent waterways" (the "2015 Resolution"). The 2015 Resolution was passed in conjunction with Resolution 37164 that adopted "a policy opposing all project proposals that would increase the amount of crude oil being transported by rail through the City of Portland and the City of Vancouver, Washington." Also passed in 2015 was Resolution 37135 adopting the City's "2015 Climate Action Plan." In the list of actions to be completed by 2020 was the item "Fossil Fuel Exports—Establish a fossil fuel export policy that considers lifecycle emissions, safety, economics, neighborhood livability and the environment; at the state level, oppose exports of coal and oil through Oregon."

30.    The 2015 Resolution directed the City's Bureau of Planning and Sustainability (BPS) to develop zoning code changes to implement the new policies opposing the export of fuel through the City. To ensure that a ban on fuel-export infrastructure did not harm

Page 13 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

local industry and consumers, however, the 2015 Resolution included an exception for "the provision of services directly to end users[.]" BPS was also directed as part of this process to "undertake an analysis of the economic impacts of any proposed Code changes * * * with a particular focus on potential impacts to local blue-collar jobs[.]"

31.    In June 2016, the City adopted a new comprehensive zoning and development plan, titled the "2035 Comprehensive Plan." In line with the 2015 Resolution, the 2035 Comprehensive Plan includes a binding policy that overtly discriminates against infrastructure for the interstate and international transportation of fuel. Plan Policy 6.48 states that the City will "[l]imit fossil fuel distribution and storage facilities to those necessary to serve the regional market." Under state law and City code, zoning code amendments and all other land use decisions must comply with this policy. ORS 197.175; ORS 197.835(7); PCC 33.835.040(A).

### *2016: First Adoption of Fuel-Terminal Amendments*

32.    On December 14, 2016, City Council passed Ordinance No. 188142 adopting zoning code amendments (the "Amendments") that prohibit new infrastructure that could be used for the interstate or international transportation of fuel (the "2016 Ordinance").

33.    The Amendments created a new land use category called "Bulk Fossil Fuel Terminals." Under the amended zoning code, new Bulk Fossil Fuel Terminals were prohibited, and existing terminals were designated "limited land uses" that could not be expanded. To selectively target only those fuel terminals that would be used for interstate or international transportation, the Amendments defined "Bulk Fossil Fuel Terminals" as facilities with access to marine, railroad, or regional pipeline transportation infrastructure that also have

Page 14 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

either transloading facilities for transferring fuel between transportation modes or fuel storage capacity exceeding 2 million gallons are prohibited. The capacity threshold was explicitly set by the City to cover terminals that could unload and store the volume of fuel from a "unit train," i.e., the standard size of single-commodity trains used to transport oil. The prohibition on transloading equipment—regardless of storage capacity—was adopted to avoid new export terminals that transferred fuel directly from one transportation mode to another without the need for intermediary storage. Although ostensibly targeting only traditional fossil fuels, the ban applied to transportation infrastructure for virtually all types of combustible fuel, including those deemed as renewable and/or clean fuel under state and federal law.

34.    The prohibition in the Amendments only applies to new fossil fuel terminals or the expansion of fuel storage at existing facilities. The Amendments do not restrict the operation of existing terminals because they serve the City and state and are still needed to meet all of the City's current and future demand for fuel. Thus, by targeting only new or expanded infrastructure, the code operates to prevent export facilities while limiting any impact on local supply.

35.    To further avoid impacting the local supply and use of fuel in the City, as well as the local and state economy in general, the definition of "Bulk Fossil Fuel Terminals" included several exceptions for local consumers and industry. These included:

- "Gasoline stations and other retail sales of fossil fuels";
- "Distributors and wholesalers that receive and deliver fossil fuels exclusively by truck";

Page 15 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

- "Industrial, commercial, institutional, and agricultural firms that exclusively store fossil fuel for use as an input"; and

- "The storage of fossil fuels for exclusive use at an airport, surface passenger terminal, marine, truck or air freight terminal, rail yard, or as part of a fleet vehicle servicing facility are accessory to their use."

36.     The fuel storage and transportation infrastructure for the above exceptions can be located at a site apart from where the fuel is actually being used.[5] Thus, an industrial plant, port, vehicle fleet operator, or public utility located in the City can build a terminal with transloading facilities to store and transport fuel for its use at any site in Portland, but an identical terminal would not be allowed under the Amendments to transport fuel for use at an identical industrial plant, port, vehicle fleet operator, or public utility that is located outside the City.

37.     These exceptions are intended and in fact operate to throttle the supply of fuel end users outside the City, while protecting identical local entities. For example, airports, marine terminals, and vehicle fleets within the City are allowed to increase their supply/use of fuels following adoption of the Amendments by building new storage or intermodal infrastructure, but consumption of fuel by identical operations outside City limits—which obtain fuel through a terminal in the City—would be constricted by the ban.

38.     In short, by applying the prohibition in the Amendments to only new terminals that have (a) marine, rail, or regional pipeline access, and (b) either significant bulk storage or transloading facilities—as well as enacting several exceptions for the local use of fuel—the City is able to selectively target facilities that would be used to ship fuel to other states

---

[5] ECF 35-6 at 25.

Page 16 -   **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

and countries to the same extent as if it had explicitly tied the prohibition based on where the fuel is going.

39.    The City made no attempt to conceal this discriminatory purpose and effect of the Amendments, but instead highlighted the intent to target only export facilities while protecting local interests.

40.    For example, the very first finding in the 2016 Ordinance explains that the Amendments were being adopted because of "the rapid development of fossil fuel resources in the western U.S. and Canada [that had] resulted in numerous facility and infrastructure projects proposed to transport coal * * * fossil fuels through the West Coast[.]" In other findings, the City emphasized that the Amendments were meant to block these new facilities. The official report on the Amendments explained:

> The energy distribution market in the Pacific Northwest is changing. Production of crude oil and natural gas, particularly from North Dakota, has substantially increased in the U.S. since 2009 * * *. In turn, several large new fuel distribution terminals have been proposed in the Pacific Northwest to access West Coast and export markets * * *. Similar trends have occurred in Alberta and British Columbia.
>
> This project is proposing a prompt, focused response to these market changes.

41.    The 2016 Ordinance also states that the Amendments are meant to implement the 2015 Resolution, Plan Policy 6.48, and the requirement for a "fuel export policy" in the 2015 Climate Action Plan—each of which explicitly state the City's intent and binding policies to block infrastructure for the international and interstate transportation of fuel, while avoiding harm to local consumers and businesses.

42.    The City also expressly stated its discriminatory intent in the official code commentary. For example, the official commentary for the code definition of "Bulk Fossil Fuel

Page 17 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

Terminals" states that "[t]he 2-million-gallon threshold is sized to include facilities that are large

enough to unload unit trains. Functionally, these terminals tend to be regional gateway facilities,

where fossil fuels enter and exit the region." In explaining the purpose of the exceptions to the

definition, the commentary provides: "[the 2015 Resolution] lists a specific exception to not

restrict service directly to end users. At a small scale, services to end users include retail gasoline

filling stations, natural-gas access lines in street right-of-way to residential and business

customers, and heating oil tanks at home sites. Larger scale end users with fossil fuel storage and

access infrastructure also include manufacturers, jet fuel facilities for PDX Airport, vessel fuel

facilities on Portland Harbor, and others, where fossil fuels are used as an input."

43.    Similarly, the commentary for the new prohibition (set out in

PCC 33.140.100) states that the "Regulation of Bulk Fossil Fuel Terminals implements policy

direction in City of Portland Resolution 37168 (adopted November 2015) and

2035 Comprehensive Plan Policy 6.48 * * *"—both of which adopt binding policies to block

fuel-export infrastructure without harming local interests.

44.    During the hearings on the Amendments, City Council members and BPS

openly and repeatedly highlighted the discriminatory purpose of the Amendments. For example,

in introducing the Amendments, the mayor stated:

> The rapid development of fossil fuel resources in the western part of our
> country and Canada has put a lot of pressure on Portland and other cities and
> has sought to transport and move huge quantities of fossil fuels through and
> into our communities. As we all experienced with the [P]embina proposal last
> year, the zoning code actually allows fossil fuel terminals as a warehouse and
> freight movement use in our zoning code today without any limit on the size
> of these terminals. We, of course, passed [the 2015 Resolution] saying we're
> going in a different direction and today is the proposal to put that into city
> law, into our code.

Page 18 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND
        INJUNCTIVE RELIEF**

45.     City officials also expressly stated that the central purpose of the Amendments was to stop the consumption of fuel in other states and countries by blocking the export of fuel from Oregon's most important port and central energy hub. For example, in a press conference following the adoption of the Amendments, the mayor at that time, Charlie Hales, said "[t]his is the first stone in a green wall across the West Coast." Likewise, City Commissioner Steve Novick stated during the hearing that the Amendments would "interrupt the supply" of fuel.

46.     Following their adoption, the 2016 Ordinance and Amendments were appealed to the Oregon Land Use Board of Appeals (LUBA), subsequently reviewed by the Oregon Court of Appeals, and ultimately remanded to the City for further proceedings.

47.     The remand was based on noncompliance with state and local land use laws and policies. Specifically, LUBA found, and the Court of Appeals of affirmed, that (a) the City had not adequately supported its determination that the regional demand for fuel would not increase in the future (i.e., the City had failed to show that the City and surrounding region already served by the City's terminals would not experience fuel shortages because of the freeze on infrastructure), and (b) the City had not sufficiently demonstrated or explained how the ban on new intermodal facilities for transportation of fuel was consistent with the City's comprehensive plan policies related to support of local industry and freight-transportation infrastructure.

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

***2019: City Readopts Fuel-Terminal Amendments***

48.     On December 18, 2019, the City passed Ordinance No. 189807 (the "2019 Ordinance") to readopt the Amendments and attempt to address the issues raised in LUBA's remand order.

49.     The only substantive change to the Amendments was the imposition of a complete ban on the storage of coal, including at existing terminals—a type of fuel that is not used in the region to produce energy, but only transported through the City for export to other states and countries.

50.     The primary difference between the 2016 and 2019 legislation was the adoption of additional findings and analysis. While the 2019 Ordinance and staff report on the Amendments were substantially the same as the 2016 versions, the 2019 Ordinance adopted approximately 160 pages of supplementary findings and included a new staff report analyzing the regional demand for fuel and concluding that it was unlikely to increase in the future.

51.     Throughout the new supporting materials, the City declared that the Amendments would accomplish its discriminatory goal of selectively targeting export facilities. The City repeatedly stated that the prohibition on new or expanded fuel-transportation infrastructure would block the export of fuel, but local interests would not be harmed because "fossil fuel storage capacity at the existing [fuel terminals] is sufficient to support the regional economy."

52.     Following their adoption, the 2019 Ordinance and Amendments were appealed to LUBA. Once again, LUBA remanded the Amendments to the City for further

Page 20 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

proceedings because the City had not adequately supported its findings that the prohibition was consistent with the City's comprehensive plan policies.

### *2022: City Adopts Fuel-Terminal Amendments for Third Time*

53.     On August 24, 2022, the City passed Ordinance No. 190978 (the "2022 Ordinance") to adopt the Amendments for a third time.

54.     As in 2019, the primary difference in the 2022 Ordinance was the adoption of significantly more findings and incorporation of new analysis to support its determinations that the existing fuel-transportation infrastructure subject to the ban in the Amendments could meet future regional supply and that the prohibition would not harm local industry or consumers.

55.     To that end, City staff prepared another memo analyzing future demand for fuel in the region. Further, the City hired a consultant to examine the demand for natural gas and corresponding need for additional infrastructure to meet that demand. Both reports concluded that the Amendments were unlikely to cause shortages of fuel in the region. The City also hired an expert consulting firm to examine the demand for natural gas and corresponding need for additional infrastructure to meet that demand. Both the City's and expert's reports concluded that the Amendments would not cause shortages of fuel in Portland or the nearby region.

56.     Based on this expert analysis, the 2022 Ordinance findings repeatedly state that the Amendments would accomplish the City's discriminatory goal of blocking infrastructure that would supply fuel to other states and countries without harming local interests.

Page 21 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

57.     For example, the 2022 Ordinance findings state that "the City Council finds that there is no compelling evidence that the demand for petroleum will outpace the historic peak consumption in Oregon and there is a surplus of system capacity to meet the expected demand. As such, Council finds that the amendments properly limit storage to what is necessary to serve the regional market." Similarly, based on the report from its consultant, the 2022 Ordinance states that "City Council finds the natural gas storage tank capacity that exists today in Portland is adequate to serve the future regional market." The City also found that the projected increase in demand for aviation fuel was not a concern because the "code includes specific exceptions to the storage tank capacity limits" for fuel to be used at the Portland airport.

58.     To explain how the exceptions in the definition of "Bulk Fossil Fuel Terminals" protect local interests, the 2022 Ordinance states:

> The description of a Bulk Fossil Fuel Terminal use includes exceptions to clarify that these regulations apply to the largest, multimodal facilities. Distributors and wholesalers that receive and deliver fossil fuels exclusively by truck are not Bulk Fossil Fuel Terminals, as well as gasoline service stations and other retail sales of fossil fuels are not Bulk Fossil Fuel Terminals. Also, fossil fuel storage where it is used as a manufacturing input, rather than a fuel, is not considered a Bulk Fossil Fuel Terminal. A key provision is an exception for the storage of fossil fuels for exclusive use at an airport, surface passenger terminal, marine, truck or air freight terminal, drydock, ship or barge servicing facility, rail yard, or as part of a fleet vehicle servicing facility. This exclusive use exception was included to specifically address a forecasted increase in demand for jet fuel.

59.     In finding compliance with Plan Policy 6.48, the 2022 Ordinance includes the finding:

> Policy 6.48 provides direction to limit fossil fuel terminals to what is necessary to serve the regional market. * * * [M]ost (66%) of the increased consumption of petroleum in 2050 can be attributed to the 25,000 billion BTU increase in jet fuel consumption. New storage tank capacity can be built to accommodate the increased consumption of jet fuel under an exception in the

Page 22 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

code amendments. Also, storage tank capacity can be added for non-fuel petroleum products. * * * Therefore, the City Council finds the liquid fossil fuel storage tank capacity that exists today in Portland, with the allowed exceptions, is adequate to serve the future regional market. * * *

60.    Finally, the 2022 Ordinance includes a new finding explaining that even if there is an increase in fuel demand in the region, the City will not be impacted by its ban on new fuel-transportation infrastructure. The City explains that the Amendments will accomplish their purpose of forcing the transportation of that additional fuel through other jurisdictions:

1. Increased demand in Eastern Oregon could be met through increased truck deliveries from the fuel terminal in Pasco, Washington, which has a pipeline connection to refineries in Salt Lake City. This option would increase truck traffic in Eastern Oregon – which is beyond the jurisdiction of the City of Portland.

2. Increased demand in Southern Oregon could be met through increased deliveries from the fuel terminal in Chico, California. This option would increase truck traffic in Southern Oregon – which is beyond the jurisdiction of the City of Portland.

3. Increased demand in the Willamette Valley and the Northern and Central Oregon Coast are likely to be met either through increased deliveries to an Olympic Pipeline terminal in Vancouver, Washington; increased barge deliveries to another port on the Lower Columbia River or the Oregon Coast; or via rail. Deliveries to the Oregon Coast or via rail would not result in increased truck traffic in Portland because those deliveries could serve regional submarkets directly without having to pass through Portland.

61.    In short, the 2022 Ordinance adds even more detailed analysis and evidence that the Amendments will accomplish their discriminatory purpose of blocking infrastructure for the international and interstate transportation of fuel to other states and countries while shielding local interests from the consequences of this ban.

62.    There is one substantive difference in the Amendments adopted in 2022. Because the Amendments' prohibition on transportation infrastructure applies to virtually all types of combustible fuel, including those deemed as renewable and/or clean fuel under state and

Page 23 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

federal law, the City recognized that the prohibition on new storage capacity could undermine compliance with its own renewable fuel standards.[6] Accordingly, the City added a new exception to the Amendments stating that fuel storage capacity can be expanded at existing Bulk Terminals in order "to comply with [Portland's] Renewable Fuel Standard (PCC Chapter 16.60 Motor Vehicle Fuels)." *Id*. Thus, an existing terminal can add storage capacity for fuel that meets Portland's renewable fuel standards and will be sold, dispensed, or distributed in the City—but not similar fuel that will be sold outside Portland.

### *Impact of the Amendments*

63. Energy from fossil fuels is critical to all aspects of the economy (at every level) and daily life: the production and distribution of food and manufactured goods; the construction, furnishing, and heating/cooling of homes; provision and operation of public facilities/infrastructure; emergency-response services; national defense; etc.[7] Fossil fuel is particularly interdependent with transportation.[8] Modern transportation infrastructure is critical for the efficient and safe delivery of unrefined resources to refineries and then distribution of refined products to consumers. In turn, transportation of people and goods is not possible without refined fuel, both now and in the foreseeable future. For these reasons, interruptions with fuel supply and increased prices for fuel products cause significant harm and disruption to economies, public services, and individual lives.

---

[6] These City regulations require all gasoline and diesel sold, dispensed, or distributed in the City to contain a minimum blend of ethanol or renewable diesel. PCC 16.60.020.

[7] Oregon Department of Energy (ODOE), *Energy 101* (2020), https://energyinfo.oregon.gov/oregon-energy-101-2020.

[8] 2019 NPC Report.

Page 24 -   **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

64.     The energy landscape in the United States has changed dramatically since 2008.[9] Over that time, the country has gone from a 60-year low in the production of oil to doubling output in less than ten years, as well as becoming a net exporter of natural gas.[10] In 2021, the United State reached record levels of production for oil and gas.[11]

65.     There has also been a significant geographical shift in the source of oil and natural gas.[12] For example, the production of oil in Alaska has fallen by approximately 50 percent since 2000, which has been more than offset by the increase in oil production from the Bakken Shale Formation in North Dakota and Montana.[13]

66.     As a result of this rapid increase in domestic oil and gas production, existing fuel-transportation infrastructure is operating near maximum capacity.[14] New infrastructure is necessary for the safe and efficient transportation of fuel, especially because domestic production of fossil fuel is forecast to increase for the next ten years and be a significant source of energy for at least the next 20 years—even under stringent greenhouse-gas

---

[9] Alexandra B. Klass & Danielle Meinhardt, *Transporting Oil and Gas: U.S. Infrastructure Challenges*, 100 Iowa L. Rev. 947, 965 (2015).

[10] 2019 NPC Report.

[11] U.S. Energy Information Administration (U.S. EIA), *Short-Term Energy Outlook* (Jan. 2023).

[12] U.S. EIA Report, *PADD 5 Transportation Fuels Markets* (Sept. 2015).

[13] "2020 Biennial Energy Report" by ODOE for the Oregon Legislative Assembly, as required by ORS 469.059.

[14] 2019 NPC Report; Alexandra B. Klass & Danielle Meinhardt, *Transporting Oil and Gas: U.S. Infrastructure Challenges*, 100 Iowa L Rev 947, 965 (2015).

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

constraints necessary to meet global emission-reduction goals.[15] Moreover, the geographical

shift in oil and gas production has created a significant need for additional infrastructure along

new transportation corridors.[16]

      67.    The City cites these economic changes as the underlying impetus for the

2015 Policy and Amendments prohibiting most new fossil fuel-transportation infrastructure. The

first finding in the 2015 Policy and each of the ordinances adopting the Amendments states that

the policy/zone change is necessary because of "[t]he rapid development of fossil fuel resources

in the western U.S. and Canada has resulted in numerous facility and infrastructure projects

proposed to transport * * * fossil fuels through the West Coast." Likewise, Resolution 37164,

opposing all projects "that would increase the amount of crude oil being transported by rail

though the City of Portland and City of Vancouver"—which was passed in tandem with the

2015 Resolution—cites the "significant increase in the transportation of crude oil by rail through

the Pacific Northwest to existing terminals and refineries on the west coast," and the Bakken

region as the source of the oil, as the need for the new policies.

      68.    The City is correct that the Portland area is critically important to the

western United States' fuel-transportation network. Unlike other areas with a history of oil

production, there are no crude-oil pipelines in the Northwest to provide a link between the

Bakken region and the West Coast.[17] Accordingly, the rail transport route from North Dakota

---

[15] For example, under the International Energy Agency's Sustainable Development Scenario that is aligned with the Paris Agreement, natural gas and oil remain the first- and second-largest providers of U.S. energy in 2040. 2019 NPC Report.

[16] 2019 NPC Report.

[17] U.S. EIA Report, *PADD 5 Transportation Fuels Markets* (Sept. 2015).

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

and eastern Montana to Portland provides the most efficient route for (a) delivering crude oil from the Bakken region to the refineries in northwest Washington, and (b) access to a deep-water port for export of the crude oil across the Pacific Ocean.[18]

69.    As the terminus of the Olympic Pipeline connected to the Puget Sound refineries, the City is also a critical transportation hub for refined fuel products. The bulk-fuel terminals in the City receive approximately 90 percent of the fuel used in Oregon from the northwest Washington refineries via the Olympic Pipeline and ocean barge.[19] These refined products are distributed to the City and surrounding areas by truck, as well as via pipeline to the City of Eugene for further distribution by truck to central and southern Oregon. *Id.*

70.    Further, tow boats transport tank barges of petroleum products from the City's fuel hub to terminals in Pasco, Washington, at least 240 times each year.[20] These barges hold between 1.26 million and 2.52 million gallons of fuel each, and according to public statements by the barge operators, each trip transports, on average, 1.7 million gallons. This means that at least 408 million gallons of fuel are transported to the Pasco terminal each year, which would be worth well over $1 billion. For comparison, this quantity of fuel transported to Pasco is around 10 percent of the fuel that the Portland terminals receive via the Olympic Pipeline or half of the fuel delivered by ocean tankers. The fuel transported to the Pasco barge terminal is distributed by truck to communities in eastern Washington, eastern Oregon, and

---

[18] 2020 ODOE Biennial Energy Report.

[19] "2022 Biennial Energy Report" by ODOE for the Oregon Legislative Assembly, as required by ORS 469.059; ODOE, *Oregon Fuel Action Plan* (2017).

[20] Washington Department of Ecology, *Columbia River Vessel Traffic Evaluation and Safety Assessment* (2017); 2022 ODOE Biennial Energy Report.

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

southwest Idaho.[21] Also, according to the U.S. EIA, approximately 10,000 barrels per day (b/d) of transportation fuel are also shipped from the barge-receiving Pasco terminal to markets in Idaho and eastern Washington via the Northwest Products Pipeline.[22]

71.    The stated purpose of the Amendments is to block the use of this transportation network for the transport of fuel outside the City/surrounding area, especially for international export. The prohibition on additional storage at existing terminals and any new fuel-transportation facilities with more than one mode of transportation will accomplish this goal.

72.    This will have a tremendous impact on the ability of producers and refiners of fuel in the United States to export their products to other countries, as well as reach destinations in the western United States. This is because the existing fuel-transportation infrastructure is insufficient in the western U.S. and operating at near maximum capacity elsewhere in North America.[23] The demand for new transportation and export facilities in the City and Northwest will continue to grow because domestic production of fossil fuel is forecast to increase for the next ten years, even under stringent greenhouse-gas constraints necessary to meet global emission-reduction goals.[24] The City is a key location for the transportation and export of fuels produced in the western United States and Canada because it provides the safest

---

[21] 2022 ODOE Biennial Energy Report.

[22] US EIA Report, *Midwest and Rocky Mountain Transportation Fuel Markets* (Mar. 2017).
[23] 2019 NPC Report; Alexandra B. Klass & Danielle Meinhardt, *Transporting Oil and Gas: U.S. Infrastructure Challenges*, 100 Iowa L Rev 947, 965 (2015).

[24] For example, under the International Energy Agency's Sustainable Development Scenario that is aligned with the Paris Agreement, natural gas and oil remain the first- and second-largest providers of U.S. energy in 2040. *See* 2019 NPC Report.

Page 28 -    **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

and most efficient route to reach destinations on the West Coast[25] and other countries across the Pacific Ocean.

73.    The magnitude of the commerce blocked by the prohibition is illustrated by the propane export facility proposed by Pembina that was the impetus for the enactment of the 2015 policies and Amendments—which were all expressly adopted to block similar proposals in the future. The Pembina facility would have initially exported outside Oregon approximately 1.5 million gallons of propane per day, which is almost 570 million gallons of propane per year. Over the last decade, propane has averaged just over $1 per gallon, which means the total exports of just this one facility would have been close to $600 million. According to the City's official findings, the Amendments were necessary to block many future proposals for similar export facilities in the future.

74.    The Amendments will also have significant impacts on the supply and price of fuel throughout the Northwest outside Oregon, such as eastern Washington and western Idaho. For example:

a.    Blocking the infrastructure necessary for the increased shipment of fuel to western Idaho, which will result in reduced supply of some fuel products, especially renewable and blended fuels that require greater storage capacity at terminals than traditional fossil fuels (i.e., due to lower energy production per gallon and the excess tank capacity necessary for blending and segregation of cleaner fuels). Idaho is one of the fastest-growing states with most of that population growth occurring in the western part of the state. This area is dependent on fuel from Portland terminals because there is a

---

[25] ECF 31-20 at 34-47.

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

fixed supply available from the refineries in the Salt Lake City area, which cannot meet all of the demand.[26] Thus, fuel needed to meet the growing demand in Idaho would naturally be met by increased supply from Portland terminals.

        b.      Blocking new multimodal terminals and expansion of existing terminals will block infrastructure for additional capacity for the rail transport of crude oil from the Bakken region through Portland to the Puget Sound refineries—an expressly stated purpose of the Amendments and other binding policies adopted by the City since 2015. This crude oil is increasingly needed for the operation of these refineries because of the significant reduction in Alaskan oil production and the inability to increase imports from Alberta in the near term (the Trans Mountain Pipeline System is operating at maximum capacity).[27] In fact, oil from the Bakken region now accounts for almost 30 percent of the input at the Washington refineries.[28] Obstructing transportation infrastructure to create a chokepoint in Portland will limit transportation of fuel from the Bakken region and, in fact, likely reduce fuel-transportation capacity as existing infrastructure ages (due to need for periodic maintenance/overhauls, replacement, and relocation that is not possible under the Amendments). Even temporary obstructions of supply can cause shortages of refined product throughout the Northwest because the

---

[26] U.S. EIA Report, *Midwest and Rocky Mountain Transportation Fuel Market* (Mar. 2017).
[27] Washington Research Council, *The Economic Contribution of Washington State's Petroleum Refining Industry in 2019* (June 2021) ("2021 WRC Refinery Report"); 2020 ODOE Biennial Energy Report.

[28] 2020 ODOE Biennial Energy Report; 2021 WRC Refinery Report.

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

Puget Sound refineries typically have only a one-week supply of product on hand for distribution, and the Portland terminals operate on a six-day refueling cycle.[29]

        c.      The Olympic Pipeline and marine ports in the City are the only significant routes for refined fuel to enter the state.[30] Eastern Washington and Idaho are also dependent on these fuel sources to supplement the fixed supply available from the refineries in the Salt Lake City area.[31] The Olympic Pipeline and the existing Portland terminals operate at near capacity.[32] Thus, additional fuel-transportation infrastructure is needed for both receiving and shipping refined fuel in and out of the City to respond to (i) population growth in these areas (individually or collectively), (ii) aging/retirement of existing facilities, and (iii) diversification of fuel products (e.g., blended renewables and clean fuels) that require separate storage tanks and distribution infrastructure. The Amendments' prohibition on such infrastructure will cause fuel product shortages, especially in those areas experiencing population growth (southwest Idaho) and markets farther from the City that rely on multimodal terminal infrastructure, such as pipeline to barge (i.e., communities in Idaho, eastern Washington, and eastern Oregon).

        d.      The Northwest is geographically isolated from other U.S. refining centers, such as the Gulf Coast, where over half of U.S. refining capacity is located, as

---

[29] ODOE Oregon Fuel Action Plan; 2022 ODOE Biennial Energy Report.

[30] U.S. EIA Report, *PADD 5 Transportation Fuels Markets* (Sept. 2015); 2022 ODOE Biennial Energy Report.

[31] U.S. EIA Report, *Midwest and Rocky Mountain Transportation Fuel Market* (Mar. 2017).

[32] ODOE Oregon Fuel Action Plan; U.S. EIA Report, *Short-Term Energy Outlook* (Feb. 2023).

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

well as from international refining centers.[33] Moreover, fuel distribution on the West Coast is heavily regulated at the state and local levels, which means specifications for motor gasoline and diesel fuel vary state-to-state and within states, impeding the ability of distributors to cover product shortfall in one area with supply from another in the Northwest. This means an interruption in supply from Washington refineries and/or Portland terminals must at times be covered by fuel from terminals and refineries in distant locations, shipped by inefficient modes of transportation (e.g., long-haul truck). Thus, even if shortages of fuel products in Northwest markets are avoided by accessing an alternative supply, the price of that fuel will be significantly higher because of the Amendments. Further, the limited supply available from the Portland terminals will cause the prices of that fuel to also be higher. Even if distributors and retailers are able to obtain fuel from an alternative terminal located elsewhere, they will incur higher transportation costs and/or higher wholesale prices obtaining fuel from this distant, smaller terminal.

75.     Thus, the Amendments' prohibition on new infrastructure to serve eastern Washington and western Idaho will result in higher fuel prices in those areas because of (a) the lower supply, and (b) the higher wholesale price and transportation costs incurred in obtaining fuel from alternative distant terminals.

76.     On information and belief, the reduction in supply, limit on variety of fuel types, higher wholesale prices from alternative sources, higher costs in transporting fuel from distant and less-efficient alternative sources, and consequential higher retail prices will be

---

[33] 2021 WRC Refinery Report; 2022 ODOE Biennial Energy Report.

Page 32 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

substantial.

77.     For these reasons, the State of Idaho submitted a letter to the City during the 2022 legislative proceedings objecting to the Amendments because its discriminatory limit on infrastructure means Portland will "become a choke point in the national fuel distributions system[,]" which will have negative impacts on Idaho.[34]

78.     Eastern Washington is also served by fuel from the Portland terminals via the same transportation modes (primarily by barge up the Columbia River and then further transport by pipeline or truck). Thus, the imbalance of fuel supply and demand in western Idaho caused by the Amendments will also impact the supply and price of fuel in eastern Washington.

79.     The Amendments will also have significant impacts on the supply and price of crude oil for refineries in Washington state. In fact, the City expressly stated that a goal of the Amendments was to block new multimodal terminals and infrastructure that could transport crude oil from the Western U.S., including the Bakken region, through Portland to the Puget Sound refineries.

80.     This will significantly impact the operations of the Washington refineries as they are increasingly dependent on the crude oil from the Bakken region because of the significant reduction in Alaskan oil production and the inability to increase imports from Alberta (the Trans Mountain Pipeline System is operating at maximum capacity).[35] In fact, oil from the

---

[34] June 30, 2022, letter from Idaho Governor's Office of Energy & Mineral Resources to Portland City Council.

[35] Washington Research Council, *The Economic Contribution of Washington State's Petroleum Refining Industry in 2019* (June 2021) ("2021 WRC Refinery Report"); 2020 ODOE Biennial Energy Report.

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

Bakken region now accounts for almost 30 percent of the input at the Washington refineries.[36]

81.    On information and belief, the Amendments' intentional restriction on the transport of crude oil to the five Washington fuel refineries will cause reduced operations due to inadequate unrefined inputs. Refineries will also be forced to pay a higher price for the crude oil that must be shipped through less-efficient modes and routes.

82.    Obstructing transportation infrastructure to create a chokepoint in the transport of fuel from the western U.S. to Washington refineries will not only impact the refineries, but downstream consumers in Washington and Idaho. Even temporary interruptions with the refinery operations can result in inadequate supplies of some fuels because the Puget Sound refineries typically have only a one-week supply of product.

83.    The above impacts and burdens on interstate trade are directly caused by the Amendments' intentional, discriminatory interference with the transportation of fuel through the City to reach wholesalers, distributors, and end users of fuel in other states and countries. Plaintiffs and the members/citizens they represent are harmed by the Amendments' intentional discrimination against and burdening of interstate fuel transportation and commerce in numerous respects. First, the fuel-producing members of the Alliance and PPGA, and producers in Montana, are harmed because they lose sales to the discriminated-against fuel buyers in other states and countries, must sell their product at lower prices to alternative markets (not reached through Portland) with less demand, incur increased transportation costs when forced to transport fuel through a less-efficient, longer route, and are constrained in their production activities by

---

[36] 2020 ODOE Biennial Energy Report; 2021 WRC Refinery Report.

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

lower takeaway capacity. Second, Montana is directly harmed by these impacts on its in-state fuel producers because it reduces the state's severance tax revenue. Third, Christensen and the fuel-distribution members of the Alliance, PPGA, and IPM&CS are harmed by the Amendments' intentional, discriminatory interference with the transportation of fuel through the City because they lose sales when unable to obtain sufficient quantities of some fuel types to meet local demand, must pay higher costs to obtain fuel from other terminals due to overall reduced supply of fuel in the wholesale market, and incur higher transportation costs in obtaining fuel (for resale in markets outside of Oregon) from alternative terminals in less-convenient, distant locations. Fourth, Christensen and Alliance members that own/operate petroleum transportation terminals in the City are harmed by the Amendments' intentional discrimination against interstate commerce because they are not allowed to expand fuel storage infrastructure, convert existing storage at their terminals to traditional or blended fuels, relocate, or open other facilities to transport/supply fuel to the discriminated-against end users and other buyers of fuel in other states and countries, which also lowers the property value of their terminals. Finally, Montana, its citizens, Christensen, and the members of all other Plaintiffs are harmed by the Amendments' intentional, discriminatory interference with the transportation of fuel because they are end users of fuel in markets served by Portland terminals or are in an overlapping market that is impacted by the supply of fuel to those Portland-served markets, and will thus pay higher prices for fuel.

84.    In addition to all of the transportation and economic burdens/harms described above, the Amendments will have several other negative consequences. For example:

a.    The Amendments' intentional obstruction of the transport of crude oil from the Bakken region through Portland will cause higher greenhouse-gas emissions

Page 35 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

from the transportation fuel used in the Northwest. The three major sources of crude oil used by the Washington refineries are the Alaskan North Slope, Alberta, Canada, and the Bakken region in eastern Montana and western North Dakota.[37] While each source accounts for approximately one-third of the total input, the share of Bakken oil has been increasing significantly in recent years. *Id*. Thus, the Amendments' intended limit on the transportation of Bakken fuel through Portland will cause the Washington refineries to use more oil from Alaska and Alberta. These oil sources, however, have significantly higher lifetime greenhouse-gas emissions.[38] The carbon-equivalent intensity for Alaskan crude oil and Alberta oil sands is 63 percent and 145 percent higher than Bakken oil, respectively. *Id*. In other words, the production, transportation, refinement, and use of Bakken oil instead of an equal split of Alaskan and Alberta oil sands results in 50 percent less carbon emissions.

        b.    The Amendments also increase global emissions from energy generation in other countries by prohibiting new terminals that would export cleaner fuels—such as the proposed Pembina propane terminal—to replace coal and other more carbon-intensive fuel types currently being used in those areas.[39]

---

[37] 2021 WRC Refinery Report; 2020 ODOE Biennial Energy Report.

[38] 2020 ODOE Biennial Energy Report.

[39] 2019 NPC Report; International Energy Agency (IEA), World Energy Outlook special report, *The Role of Gas in Today's Energy Transition*s, https://www.iea.org/reports/the-role-of-gas-in-todays-energy-transitions/.

.

Page 36 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

c.    The Amendments will interfere with the transition and availability of alternative fuels in the City and downstream markets. Additional storage tanks are required to hold clean/renewable fuels—which require higher volumes to match the energy output of traditional fuels—as well as blends of those fuels with traditional gasoline and diesel products to meet the unique fuel specifications of states and local governments and otherwise offer a range of cleaner fuel types.[40] The Amendments block additional storage for these alternative and blended fuel products (many designated clean fuels by Oregon and the United States) because the prohibition on storage applies to all products with more than 5 percent fossil fuel content.

d.    The Amendments' prohibition on expansion of fuel-transportation facilities also interferes with the transition to clean energy because pipeline and other infrastructure can be repurposed for alternative fuels such as hydrogen, renewable methane, renewable diesel, renewable propane, and biofuel, which is generally less expensive and faster than constructing entirely new facilities.[41] The transition of this infrastructure to alternative fuels typically requires modernization and/or alteration that the Amendments either block or render economically unviable.

e.    The Amendments will also unnecessarily cause safety risks in the operation of the fuel terminals within the City. The categorical prohibition on new and

---

[40] Kristi Moriarty, National Renewable Energy Laboratory (national laboratory of the U.S. Department of Energy), *High Octane Fuel: Terminal Backgrounder*.

[41] IEA, *The Role of Low-Carbon Fuels in the Clean Energy Transitions of the Power Sector* (Oct. 2021); Columbia University, Center on Global Energy Policy, *Investing in the US Natural Gas Pipeline System to Support Net-Zero Targets* (Apr. 2021).

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

expanded fossil-fuel-terminal infrastructure will block construction of new facilities, built to modern safety standards, that would be more resilient to earthquakes. Even for facility safety improvements not technically prohibited, the Amendments discourage further investment in the fuel infrastructure within the City and/or restrict the project in such a manner to render it economically unviable. Moreover, the flat prohibition prevents terminals from moving outside the earthquake liquefaction zone.

        f.        Agencies of both the United States and Oregon have recognized the need for better emergency preparedness and resiliency concerning the local and regional fuel transportation and storage system.[42] This requires additional emergency reserves, alternative transportation routes, and geographically diverse facilities with unused operational capacity that can be increased to offset the loss of fuel/energy from other sources. *Id*. The Amendments block each of these resiliency and emergency-preparedness measures, rendering the City and downstream markets vulnerable to extreme fuel shortages and loss of emergency-response services in the event of a natural disaster or attack on the fuel-distribution grid.

        g.        Finally, the prohibition on new infrastructure and expanded facilities thwarts competition among bulk-fuel suppliers and distributors because it blocks existing companies from expanding their operations on site or adding new sites, and prevents new entities from entering the market.

---

[42] ODOE Oregon Fuel Action Plan; 2020 ODOE Biennial Energy Report; U.S. EIA Report, *PADD 5 Transportation Fuels Markets* (Sept. 2015).

Page 38 - **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

*Impact of the Amendments on Plaintiffs*

85.    The Amendments negatively impact plaintiffs for all the reasons above. They also harm each plaintiff in specific fashion as follows.

86.    Christensen is harmed by the Amendments in multiple respects, including but not limited to the following:

a.    Christensen owns and operates an industrial liquid-storage terminal in north Portland. The terminal has intermodal infrastructure that is currently used to transfer propane from train to trucks for regional distribution. Thus, pursuant to the Amendments, the property is a "Bulk Fossil Fuel Terminal" (PCC 33.920.300) that is subject to regulation under the Amendments, including the prohibition on new or expanded tanks for the storage of fossil fuel. (PCC 33.140.100). The Amendments block Christensen's plans and future ability to expand storage at this facility and from siting new operations involving the intermodal distribution of fuel on additional properties, as well as the possibility of relocating the existing terminal. These restrictions interfere with Christensen's current and planned operations and harm the business. The Amendments' interference with Christensen's property rights at the existing terminal property also reduces the property's value.

b.    Christensen sells and distributes multiple fuel products regulated by the Amendments—including gasoline, propane, heating oil, diesel, and biodiesel—to thousands of customers in Portland and the surrounding region. It obtains these products from "Bulk Fossil Fuel Terminals" in the City. Prohibiting the expansion of storage at existing terminals and siting of new terminals constricts the supply of these products,

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

inhibits the introduction of alternative fuel types (due to lack of blending infrastructure and separate tanks for these fuel types), and bars new bulk-fuel suppliers from entering the market, which would create more competition among suppliers and provide distributors with additional options for sourcing fuel. All the above will result in higher prices for the fuel purchased by Christensen, lost sales, lower profits, and other interference with business operations.

c.        Christensen also sells and distributes multiple fuel products to thousands of customers in eastern Oregon, eastern Washington, and western Idaho. It obtains much of these products from terminals in Pasco and Spokane, Washington, which rely on shipments of fuel from Portland terminals, especially marine terminals for shipment by barge. The Amendments' prohibition on new or expanded terminals in Portland (which have critical access to the Olympic pipeline) will limit the supply and the types of fuel products available in the Pasco and Spokane terminals. This means that Christensen will be unable to obtain the types and quantities of fuel it needs, pay higher prices for these products, and/or forced to transport the fuel from terminals outside the area—all of which will harm its financial interests and interfere with its business operations.

d.        Finally, the Amendments' intentional interference with the shipment of oil and gas from the Bakken region to Washington refineries will limit the supply of inputs for those refineries, and at a minimum result in higher prices for crude oil by forcing the Bakken oil to be shipped by less-efficient means or be replaced by oil from other sources at a higher cost. This will lead to higher prices for refined fuel

Page 40 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

products throughout the Northwest, not just the City and downstream markets. These higher prices will result in lower profits for Christensen, as well as lost sales because of the lower demand for fuel at the higher prices.

e.    Christensen also uses large quantities of fuel in its operations. Thus, Christensen will be harmed like other end users of fuel located outside the City as described in the allegations above.

87.    The Amendments specifically impact PPGA's members—which includes Christensen—in numerous ways, including but not limited to the following:

a.    Multiple PPGA members are interstate propane distributors that have storage/distribution facilities in Portland with intermodal infrastructure for transferring propane from train to truck. These facilities are thus "Bulk Fossil Fuel Terminals" as defined in the Amendments (PCC 33.920.300) and subject to the restrictions therein. PCC 33.140.100. These site owners could not install a single new propane tank on the properties, no matter how small, thus interfering with their current operations and future business growth. The Amendments also lower the market value of these properties because of the additional land use restrictions.

b.    Several other PPGA members have operations in and around Portland and rely on train/truck terminals to obtain propane product. The Amendments harm these businesses by restricting the operations of existing propane terminals and prohibiting the siting of new facilities, which limits the supply of propane and types of product available (i.e., renewable propane blends), raising prices and preventing competition in the bulk-supplier market.

Page 41 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

c.      PPGA membership includes companies that produce and distribute propane-related infrastructure, equipment, and vehicles. Restricting the supply and correspondingly increasing the price of propane has a proportional impact on the sale of these propane-related goods.

d.      PPGA members also use large quantities of fuel in their operations. Thus, they will be harmed like other end users of fuel located outside the City as described in the allegations above.

88.      The Amendments harm members of IPM&CS in multiple respects, including but not limited to the following:

a.      Many members of IPM&CS have wholesale and/or retail fuel operations in markets that rely on the bulk terminals in Pasco and Spokane for supply of fuel. As outlined above, the Amendments' prohibition on expanded or new terminals in Portland that transport fuel to these terminals will cause fuel product shortages and higher prices in the markets served thereby. This will negatively impact these member businesses by interfering with their operations, including an inability to obtain the supply and types of fuel they need, as well as cause higher prices and/or incur additional expenses by sourcing the fuel from terminals outside the area.

b.      As explained above, by intentionally obstructing the transportation of crude oil to Washington refineries, the Amendments will likely cause shortages of refined fuel products, or at least higher prices for fuel products throughout the Northwest, including many markets where members of IPM&CS operate.

Page 42 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

c.      The Amendments' prohibition on expanded storage for alternative fuels (above 5 percent fossil fuel content) and fuel blends will result in fewer available fuel types to the members of IPM&CS that obtain fuel directly from or transported through these terminals.

d.      IPM&CS members also use large quantities of fuel in their operations. Thus, they will be harmed like other end users of fuel located outside the City as described in the allegations above.

89.      Many members of the Alliance will be harmed by the Amendments in multiple ways, including but not limited to:

a.      A member of the Alliance owns and operates a large Bulk Fossil Fuel Terminal in Portland. The Amendments will harm this member in multiple respects, including interfering with operations at the site, preventing expansion of the business, limiting the types of products it can sell—interfering with regulatory compliance—by blocking additional storage needed for alternative fuels and blends, as well as lowering the value of the property.

b.      This member and all other Alliance members will be unable to relocate or site new fuel-transportation facilities that utilize more than one mode of transportation (as virtually all do).

c.      Several Alliance members produce oil from the Bakken formation in North Dakota and Montana. The Amendments intentionally constrain the ability of these members to ship the crude oil they produce to the Washington refineries or reach existing marine ports in the City. The Amendments also block new fuel export facilities

Page 43 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

in the City that these companies could use to sell their products in other countries. Further, the Amendments will depress the demand for crude oil in the Northwest by constraining the supply of refined products that are distributed/transported through the City's terminals.

        d.     A member of the Alliance owns and operates a Puget Sound refinery that relies on crude oil shipped by train through Portland. The Amendments' intentional obstruction of train transportation—as well as prohibition on new or expanded terminals for other types of fuel transport (i.e., marine, truck, pipeline)—will limit the member's ability to obtain oil from the Bakken region or at a minimum, result in higher prices and transportation costs for this oil and/or substitute oil from other locations.

        90.     Montana and its citizens will be harmed by the Amendments in multiple respects.

        a.     The western section of the Bakken region is located in eastern Montana, including the counties of Daniels, Dawson, Fallon, Garfield, McCone, Prairie, Richland, Roosevelt, Sheridan, Valley, and Wibaux. Substantial quantities of crude oil and natural gas are extracted from this area by multiple companies.

        b.     Overall, the state is a significant producer of oil, gas, and other fossil fuels.[43] Montana ranks 12th in oil production and 20th in natural-gas production nationally. *Id*. There are over 5,000 active oil wells in the state, which collectively

---

[43] U.S. EIA, *Montana State Energy Profile and Energy Estimates* (Apr. 2023); U.S. Department of Energy, *State of Montana Energy Sector Risk Profile* (Mar. 2021).

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

produce more than 60,000 barrels of oil per day.[44] There are also more than 6,000 active

natural-gas wells that produce more than 5 million MCF[45] of natural gas per month. *Id*.

Moreover, Montana has the largest estimated recoverable coal reserves, accounting for

approximately 30 percent of the U.S. total.[46]

        c.      In 2019, Montana's oil- and gas-extraction industry supported

53,400 total jobs (14,600 direct and 38,800 indirect), provided $3.2 billion to Montana's

labor income, and contributed $6.3 billion to Montana's gross domestic product.[47]

        d.      Montana imposes a severance tax on the extraction/production of

crude oil and natural gas within the state. MCA 15-36-304. In 2022, the state collected

over $70 million in revenue from this severance tax.[48] This money is distributed

throughout the state, including to the counties where the oil and gas production occurs.

        e.      As set out above, oil produced in Montana, which is primarily

from the Bakken region, relies on transportation through Portland to reach Washington

refineries, both by rail and marine terminals. The City's deep seaport also provides the

most efficient route for export of Bakken oil from eastern Montana.

---

[44] Montana Petroleum Association, Quick Facts.

[45] MCF = 1,000 cubic feet.

[46] U.S. EIA, *Montana State Energy Profile and Energy Estimates* (Apr. 2023).

[47] American Petroleum Institute, *New Analysis: Montana-Made Natural Gas and Oil Drives U.S. Economic Recovery, Strengthens All Industries* (July 2021).

[48] Patrick Barkey, University of Montana, *Stories of Growth Around the State*, Montana Business Quarterly, Winter 2022, Issue 60, No 4.

Page 45 -   **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

f.      The Amendments' intentional obstruction of the transportation of Bakken oil through the City and prohibition on new or expanded terminals that could export the oil to other countries and regions purposely interfere with the production of this oil by reducing takeaway capacity. The Amendments' prohibition on new or expanded marine terminals also blocks the transportation of Bakken oil out of the country.

g.      The City's intentional obstruction of the transport of Bakken oil harms the many oil producers within Montana by raising transportation costs, limiting operations by lowering takeaway capacity, blocking access to markets in other countries and regions, and generally interfering with their operations through disruptions to the transportation network. In turn, the Amendments also harm the thousands of employees of these producers, and the thousands more people who holds jobs directly supported by the industry.

h.      The Amendments also harm the state directly by limiting the severance taxes on the production of gas and oil that would be collected except for the Amendments' intentional interference with Bakken oil and gas operations.

## FIRST CLAIM FOR RELIEF

### Violation of Dormant Commerce Clause—Discrimination

91.    Plaintiffs incorporate the paragraphs above.

92.    The Commerce Clause of the United States Constitution states that "Congress shall have Power * * * [t]o regulate Commerce * * * among the several States." US Const Art I, § 8, cl 3. "Though phrased as a grant of regulatory power to Congress, the

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Sys., Inc. v. Department of Envtl. Quality of State of Or.*, 511 U.S. 93, 98 (1994).

93.    Discrimination "means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013) (quoting *Oregon Waste Sys.*, 511 U.S. at 99). A statute is discriminatory if it "impose[s] commercial barriers or discriminate[s] against an article of commerce by reason of its origin or destination out of State." *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994).

94.    Discrimination benefitting local users and consumers violates the Dormant Commerce Clause to the same extent as discrimination in favor of local producers. *New England Power Co. v. New Hampshire*, 455 U.S. 331, 339 (1982); *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 580 (1986); *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 578 (1997); *Hughes v. Oklahoma*, 441 U.S. 322, 339 (1979); *Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 944 (1982); *Pennsylvania v. West Virginia*, 262 U.S. 553, 592, *aff'd*, 263 U.S. 350 (1923).

95.    In this case, the Amendments and the binding policies they implement (the 2015 Resolution and Plan Policy 6.48) discriminate against interstate commerce on their face, in their purpose, and in their practical effect in numerous respects.

96.    The 2015 Resolution and Plan Policy 6.48 enact binding policies that facially discriminate against out-of-state fuel users. The 2015 Resolution states that it is the binding policy of the City to "oppose expansion of infrastructure whose primary purpose is

Page 47 -    **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

transporting or storing fossil fuels in or through Portland or adjacent waterways[,]" but "not restrict * * * the provision of service directly to end users[,]" in the City. Likewise, Plan Policy 6.48 (titled "fossil fuel distribution") adopts a binding planning policy to "[l]imit fossil fuels distribution and storage facilities to those necessary to serve the regional market."

97.     The Amendments are also facially discriminatory. First, the Amendments repeatedly state that they were designed and enacted to implement the two facially discriminatory policies above.

98.     Second, the Amendments facially discriminate against interstate users and consumers of fuel, as well as the distributors and resellers of fuel that serve those consumers and end users, by including exceptions that exclude and protect their local counterparts from the prohibition on new fuel-transportation infrastructure.[49] (This discrimination also impacts out-of-state producers of fuel, including many of plaintiffs' members, because they lose sales to the discriminated-against out-of-state parties, incur increased transportation costs, and are constrained in their production activities by inadequate takeaway capacity.)

a.     For example, the Amendments include an exception for the storage and transportation of fossil fuels that will be used as an input at an "[i]ndustrial, commercial, institutional, [or] agricultural firm[.]" PCC 33.920.300(D)(5). Thus, a large manufacturing plant in the City that uses fossil fuels to power its operations can establish

---

[49] The Supreme Court has been particularly critical of these types of exemptions for local interests because "a State's political processes can no longer be relied upon to prevent legislative abuse, because one of the in-state interests which would otherwise lobby against the tax has been mollified by the [exemption]." *West Lynn Creamery*, 512 U.S. at 200. And, in fact, that is what has occurred here. The exemptions for ports and fleets were in response to a request by the Port of Portland. ECF 35-26 at 1–2.

Page 48 -   **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

a new intermodal fuel terminal with unlimited storage in order to increase its supply of fuel. But the same manufacturing plant that operates in another state would not be able to site identical infrastructure in the City to increase its supply of fuel because the stand-alone facility would not fall under the exception. Similarly, this exception would allow new storage tanks and terminals to serve a natural-gas-fired power plant in the City because that fuel would constitute an input being used in the City. But an identical power plant located in another state or country could not site the same facilities in the City because they would constitute stand-alone fuel terminals that do not fall under the exception.

       b.      Similarly, the Amendments include another exception for "[t]he storage of fossil fuels for exclusive use at an airport, surface passenger terminal, marine, truck or air freight terminal, drydock, ship or barge servicing facility, rail yard, or as part of a fleet vehicle servicing facility * * *." PCC 33.920.300(D)(5). Thus, the Amendments would allow the Port of Portland to build a new 5 million gallon fuel-storage facility to use in its own operations and to dispense to ships in the Portland Harbor, but would prohibit a distributor from building an identical facility that supplies fuel to the Port of Longview.[50] Thus, both the local port and the users of that port are protected from the Amendments in connection with their local operations. But their counterparts in other states and countries could not set up identical infrastructure in the City because it would constitute a stand-alone terminal and not fall under the exception.

---

[50] The Commentary to the Amendments explicitly states that "jet fuel facilities for PDX Airport" and "vessel fuel facilities on Portland Harbor" are specifically exempted from the restrictions imposed by the Amendments.

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

c.      The Amendments also include an exception for new storage capacity for renewable fuel that will be used in Portland. PCC 33.920.100(B)(15) states that fuel-storage capacity can be expanded at existing Bulk Terminals in order "to comply with the Renewable Fuel Standard (PCC Chapter 16.60 Motor Vehicle Fuels) * * *." These City regulations require all gasoline and diesel sold, dispensed, or distributed in the City to contain a minimum blend of renewable fuels. PCC 16.60.020. Thus, extra storage capacity can be built at Bulk Terminals for blended fuels that would otherwise fall under the prohibition in the Amendments if, and only if, that fuel will be sold, dispensed, or distributed in the City in furtherance of the City's Renewable Fuel Standard regulations. Capacity for identical fuel to be used elsewhere (and thus unrelated to compliance with these local regulations) is not allowed.

99.      As further facial discrimination, the code commentary officially adopted as part of the City's zoning code explains that the code should be interpreted and applied to block new interstate facilities while protecting local interests from the ban. For example:

a.      The commentary for the use restriction in PCC 33.140.100 and 33.920.300 expressly state that the "Regulation of Bulk Fossil Fuel Terminals implements policy direction in City of Portland Resolution 37168" (the 2015 Resolution) and Plan Policy 6.48, which require the City to block infrastructure used to export fuel outside the region while not impacting local users.

b.      The commentary for PCC 33.920.300, the code provision defining Bulk Fossil Fuel Terminals subject to the prohibitions, states that the "2-million-gallon threshold [for being subject to the prohibition] is sized to include facilities that are large

Page 50 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

enough to unload unit trains. Functionally, these terminals tend to be regional gateway

facilities, where fossil fuels enter and exit the region."

        c.      As guidance for interpreting the exceptions to the restrictions, the

PCC 33.920.300 commentary states:

> Resolution 37168 lists a specific exception to not restrict service directly to
> end users. At a small scale, services to end users include retail gasoline filling
> stations, natural gas access lines in street right-of-way to residential and
> business customers, and heating oil tanks at home sites. Larger scale end users
> with fossil fuel storage and access infrastructure also include manufacturers,
> jet fuel facilities for PDX Airport, vessel fuel facilities on Portland Harbor,
> and others, where fossil fuels are used as an input.

        100.    The Amendments, the 2015 Resolution, and Plan Policy 6.48 also violate

the Dormant Commerce Clause because they have a discriminatory purpose. The express

objectives set out in the ordinances at issue in this case unequivocally state that the Amendments

and underlying policies were adopted with the express purpose of blocking the "numerous

facility and infrastructure projects proposed to transport * * * fossil fuels through the West

Coast" that were the result of "[t]he rapid development of fossil fuel resources in the western

U.S. and Canada,"[51]—but without harming the supply of fuel to local end users. In other words,

these binding policies and the Amendments were expressly adopted to block fuel-transportation

terminals that would ship fuel to wholesalers, distributors, consumers, and end users in other

states and countries, as well as deprive fuel producers, including Plaintiffs and Plaintiffs'

members, in the western United States from selling their products to these discriminated-against

parties.

---

[51] 2022 Ordinance at 1.

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

101.    Further, the City makes no attempt to conceal, but repeatedly avows its intent to target and block new interstate/export facilities, while protecting infrastructure that distributes fuel to local users from the restrictions. As set forth above, these statements of discriminatory purpose are replete throughout the 2022 Ordinance findings, the text of the Amendments, the policies implemented by the Amendments, and numerous statements of public officials. In fact, as detailed above, the City engaged in extensive analysis and hired an expert consulting firm to demonstrate that the Amendments would block new export facilities without impacting the supply of fuel to local end users. The City repeatedly asserted this fact as a key finding for its decision to adopt the Amendments. For example, the 2022 Ordinance states that "the City Council finds that there is no compelling evidence that the demand for petroleum will outpace the historic peak consumption in Oregon and there is a surplus of system capacity to meet the expected demand[;] [a]s such, Council finds that the amendments properly limit storage to what is necessary to serve the regional market."

102.    Moreover, the City was legally mandated to have a discriminatory purpose in adopting the Amendments by virtue of its enactments of the 2015 Resolution and Policy 6.48. Under state law and local code, the City was required to comply with the binding policies therein to (a) "[o]ppose expansion of infrastructure whose primary purpose is transporting or storing fossil fuels in or through Portland or adjacent waterways[,]" with an exception "for the provision of service directly to end users, and (b) "[l]imit fossil fuel distribution and storage facilities to those necessary to serve the regional market." *See* ORS 197.175, 197.835(7); PCC 33.835.040(A).

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

103.    The Amendments are also discriminatory in their effect. As described above, the City employs three primary mechanisms in the Amendments to accomplish its selective targeting of infrastructure that could be used to ship fuel to other states and countries. First, at the highest level, the City limited the application of the restrictions to only new infrastructure because the existing facilities are primarily dedicated to supplying fuel to the City and state. Second, the prohibition is directed at only those facilities that have particular infrastructure/characteristics that are indispensable components of export facilities, i.e., large storage tanks, transloading facilities to move fuel between two types of transportation modes, and access to regional transportation modes such as rail and water ports. Finally, the Amendments include several exceptions to the prohibition on new terminals and storage infrastructure for local users/distributors of fuel, as well as fuels that will be dispensed in Portland in order to meet the City's renewable fuel standards. Each of these features have been found to violate the Dormant Commerce Clause in similar cases. *See, e.g.*, *Island Silver & Spice, Inc. v. Islamorada*, 542 F.3d 844 (11th Cir. 2008); *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 205 (1994); *H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 526 (1949); *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 445–47 (1978). Combined, the three mechanisms selectively target facilities that Plaintiffs and others would use to ship fuel to other states and countries—while protecting infrastructure that supplies fuel to the City and state of Oregon—to the same extent as if the City had explicitly tied the prohibition to the out-of-state destination of the fuel.

104.    The Amendments fall squarely within three categories of laws that have repeatedly been found to violate the Dormant Commerce Clause.

Page 53 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

105.    First, the Amendments are indistinguishable from the cases holding that

states (and their political subdivisions) are prohibited by the Dormant Commerce Clause from

restricting unwanted commerce in a fashion that disproportionately impacts interstate trade or

protects local citizens from the impact of the limitation.[52] Like these cases, the City is

attempting, through the Amendments, to limit the storage and transportation of fossil fuels in the

City (i.e., unwanted commerce), but is attempting to impose the restriction disproportionately on

consumers and end users of fuel in other states. As in *City of Philadelphia*, the City's attempt to

restrict unwanted commerce to only the amount needed to serve its citizens (and the rest of the

state) violates the Dormant Commerce Clause.

106.    Second, the Amendments are intended and operate to provide the City's

citizens with preferential access to a commodity/good (i.e., fuel), which is a type of law that has

repeatedly been found to violate the Dormant Commerce Clause. *E.g.*, *Brown-Forman Distillers*,

476 U.S. at 580; *Camps Newfound/Owatonna,* 520 U.S. at 578; *Hughes*, 441 U.S. at 339;

---

[52] *See, e.g.*, *City of Philadelphia v. New Jersey*, 437 U.S. 617, 627–628 (1978) (striking down a
law prohibiting the disposal of solid waste from outside the state because New Jersey had
impermissibly granted its "own inhabitants a preferred right of access" to the scarce landfill
capacity, and a state is not allowed "to isolate itself from a problem common to many by erecting
a barrier against the movement of interstate trade."); *Fort Gratiot Sanitary Landfill, Inc. v.
Michigan Dep't of Nat. Res.*, 504 U.S. 353, 362–368 (1992) (invalidating state statute that
prohibited landfill owners from accepting waste generated from outside the county in which a
landfill is located unless expressly authorized by county solid-waste plan); *Chemical Waste
Mgmt., Inc. v. Hunt*, 504 U.S. 334, 337 (1992); *Environmental Tech. Council v. Sierra Club*,
98 F.3d 774, 778 (4th Cir. 1996); *In re Southeast Ark. Landfill, Inc. v. Arkansas*, 981 F.2d 372,
373 (8th Cir. 1992); *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316 (4th Cir. 2001)
(holding that a law restricting shipment of municipal solid waste in vehicles with four or more
axles violated the Dormant Commerce Clause because the legislative record indicated that the
purpose of the law was to stop the disposal of waste from outside the state, which
disproportionately used trucks with four axles).

Page 54 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND
          INJUNCTIVE RELIEF**

*Sporhase*, 458 U.S. at 944; *Pennsylvania*, 262 U.S. at 592 (striking down a West Virginia law that required pipeline operators within the state to give priority to West Virginia citizens in purchasing natural gas obtained from wells within the state); *New England Power Co. v. New Hampshire*, 455 U.S. 331, 339 (1982) (finding a local rule unconstitutional because it was "designed to gain an economic advantage for New Hampshire citizens at the expense of New England Power's customers in neighboring states.").

107.    Third, the Amendments' selective targeting of export terminals is indistinguishable from other regulations that were found to be unconstitutional because they restricted transportation infrastructure or instrumentalities based on the out-of-state origin or destination of the goods being transported thereby. *West v. Kansas Nat. Gas Co.*, 221 U.S. 229, 249 (1911) (holding that Oklahoma's refusal to authorize the construction of natural gas pipelines in a state right-of-way if the pipelines would be used to transport natural gas to other states violated the Dormant Commerce Clause); *Du Mond*, 336 U.S. at 526 (holding that the denial of a permit for a milk terminal because it was intended to be used to ship milk out of the state violated the Dormant Commerce Clause); *American Trucking Ass'n, Inc. v. Whitman*, 437 F.3d 313, 318 (3d Cir. 2006) (invalidating law that restricted use of non-highway roads to only those trucks with an origin or destination in the state).

108.    At bottom, the Amendments violate the Dormant Commerce Clause because they create "barriers . . . against interstate [end users]," "prohibit the flow of interstate goods, place added costs upon them, [and/or] distinguish between in-state and out-of-state companies." *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 126 (1978). Specifically, the Amendments:

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

a.    Create barriers against interstate and international end users by preventing or reducing the flow of petroleum products from Portland to other states and countries;

b.    Interfere with the interstate flow of oil produced in the western United States to Washington refineries via Portland;

c.    Place added transportation costs upon interstate oil and refined fuels that will be used by end users and consumers by forcing them to be transported around Portland through longer and less-efficient routes; and

d.    Distinguish between in-state and out-of-state companies,[53] consumers, and other end users of fuel by "oppos[ing] expansion of infrastructure whose primary purpose is transporting or storing fossil fuels in or through Portland or adjacent waterways" for export out of Oregon but "not restrict[ing] * * * the provision of service directly to end users" in the City.

109.    The Amendments do not advance a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. In fact, the Amendments do not advance their stated goals at all. By prohibiting new or expanded fuel terminals, the Amendments essentially lock the terminals within a liquefaction zone, eliminate the economic

---

[53] The Supreme Court has explained that a preference for business with a local presence is discriminatory regardless of whether the businesses are incorporated or headquartered in another state. *E.g.*, *Granholm v. Heald*, 544 U.S. 460, 475 (2005) (invaliding New York law that required out-of-state businesses to establish a local presence in order to qualify for regulatory exception because "States cannot require an out-of-state firm 'to become a resident in order to compete on equal terms.'") (quoting *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 72 (1963)); *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 42 (1980) (holding that a law violated the Dormant Commerce Clause because it "discriminate[d] among affected business entities according to the extent of their contacts with the local economy.").

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

justification for updating or replacing the old storage tanks, and create ambiguity as to whether infrastructure improvements are allowed under the new code. Further, the strict limit on storage expansion and over-expansive definition of "fossil fuel" blocks the additional infrastructure necessary for transition to renewable and cleaner fuels. Prohibiting infrastructure for expanded use of the Olympic Pipeline and the City's marine port facilities will also force fuel to be distributed by less-efficient means, including truck delivery from farther away, thus undercutting the City's stated concern for safety and reduction in emissions. Likewise, prohibiting new export facilities with access to the City's deep-sea ports (such as Pembina's propane-terminal proposal) obstructs other countries' transition to cleaner fuels. Moreover, obstructing the flow of interstate commerce in order to impede the production and use of fuel in other states and countries is not a legitimate local purpose.

110.    Even if the Amendments' prohibition on fuel-transportation infrastructure actually served a legitimate local purpose, there is no justification for its discriminatory nature. All of the stated goals of the City could be accomplished by nondiscriminatory means.

111.    Plaintiffs are and will continue to be irreparably harmed by the Amendments, the 2022 Ordinance, the 2015 Resolution, and Plan Policy 6.48. As set out in detail above, the Amendments and the binding policies they implement are intended to and will throttle the transport of fossil fuel to and from other states and countries. Thus, the Amendments will result in inadequate supply of fuel products for distributors, retailers, and end users outside the City—including Christensen and other plaintiffs' members—causing higher prices and fuel product shortages, which is the City's expressly stated goal: to reduce the consumption of fuel in other areas by cutting off fuel supply. The Amendments will also harm Plaintiffs' members that

Page 57 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

produce, transport, or sell/distribute fuel by blocking transportation infrastructure necessary to ship crude oil and fuel products to and from Washington refineries, sell their products outside the region or country, and distribute fuel to end users in and outside the region surrounding the City. These harms are significant because of the important port, rail, and road infrastructure within the City. The Amendments harm Christensen and other plaintiffs' members that currently have fuel-transportation terminals within the City subject to the Amendments by blocking their ability to relocate, replace storage tanks, or build new tanks that are necessary to blend and otherwise transition to cleaner fuels as mandated by state and federal law. The Amendments not only interfere with these companies' operations, but are an interference with their property rights, resulting in a reduction of their properties' value. Finally, the Amendments prevent Christensen and other plaintiffs' members from siting new fuel terminals within the City.

112.    Plaintiffs therefore seeks a declaration stating that the Amendments, 2022 Ordinance, 2015 Resolution, and Plan Policy 6.48 discriminate against interstate commerce in violation of the Dormant Commerce Clause, and request an injunction prohibiting the City from taking further action to enforce or implement these policies and regulations.

## SECOND CLAIM FOR RELIEF

### Violation of Dormant Commerce Clause—Undue Burden on Interstate Trade

113.    Plaintiffs incorporate the paragraphs above

114.    Even if a local regulation is not discriminatory, it still violates the Dormant Commerce Clause if "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc*., 397 U.S. 137, 142, (1970).

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

115.     The Amendments constitute an undue burden on interstate commerce in violation of the Dormant Commerce Clause.

116.     Even a facial evaluation of the Amendments demonstrates that the prohibition on new infrastructure for the interstate transportation of fuel does not advance a legitimate local benefit. The primary local interest the City has identified is the danger of a natural disaster affecting the fossil fuel infrastructure. The City fails to explain how categorically banning new, modern terminals, regardless of location within the City, addresses the safety issues with the existing terminals. In fact, if anything, the Amendments undermine the City's safety objective by locking the fuel terminals within a liquefaction zone, and removing the economic incentive for replacing the old storage tanks, i.e., increased capacity. Moreover, the Amendments do not prohibit mono-modal terminals with less than two million gallons or address terminals of any size that store volatile fuels not covered by the prohibition. The City does not explain in the 2022 Ordinance or Amendments how several smaller terminals or storage of equally volatile fuels advance its safety goals. Further, the ban on multimodal terminals without significant intermediary storage is at best unrelated and at worst undermines the very goal of reducing the storage of fossil fuels within the City.

117.     The City's stated goal of reducing carbon emissions by reducing the use of fossil fuels in other states and countries through the obstruction of interstate commerce is not a legitimate *local* interest for Dormant Commerce Clause purposes. Even if it were, the Amendments' intentional interference with the transport of oil from the Bakken region will actually increase carbon emissions in the Northwest by forcing Washington refineries to use a higher proportion of crude oil from Alaska and Alberta that has a much higher lifetime

Page 59 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

greenhouse-gas emission. Moreover, the Amendments' flat prohibition on all export facilities, including those for cleaner and alternative fuels (with more than 5 percent fossil-fuel content) results in higher emissions from other countries that will continue to burn coal instead of the fuel that would have otherwise been supplied by the export terminal (e.g., the Pembina propane proposal).

118.    The FFT Amendments' impact on interstate trade is substantial. The City is the fourth largest port on the West Coast, located at the intersection of nationwide railway lines, the Columbia and Willamette Rivers—with access to the Pacific Ocean—the I-5 and I-84 freeway corridors. It is the primary route for transporting oil from the Bakken region to the Washington refineries that produce almost all fuel for Washington and Oregon, as well as the exclusive transportation hub of that refined fuel to Oregon and southwest Washington, with downstream distribution reaching as far as Idaho and Spokane, Washington. Even if the City itself were not itself so critical to international and interstate commerce, the Amendments would still violate the Dormant Commerce Clause because the extent of the burden on commerce is determined by considering a hypothetical where every other jurisdiction adopted the same regulation. In such a scenario, interstate and international fuel commerce throughout the country would be frozen at its current level, and in its current form. This is more than a hypothetical. Many West Coast local jurisdictions have or are proposing to restrict fuel distribution through local code, including but not limited to Vancouver, Washington; King County, Washington; Whatcom County, Washington; and Richmond, California.

119.    The Amendments will specifically burden end users in Idaho and Washington, which receive fuel via Portland, in the form of reduced supply of petroleum and

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

higher wholesale prices and transportation costs. Like Idaho, southeastern Washington receives fuel from Portland by barge; accordingly, the negative impacts that affect consumers/end users in Idaho will also affect consumers/end users in Washington. In addition, the Amendments will interfere with the supply of crude oil to Washington refineries, which receive over 30 percent of their oil from the Bakken region, by forcing those refineries to pay increased transportation costs to receive that oil through less-efficient means.

120.     Plaintiffs are and will continue to be irreparably harmed by the Amendments, the 2022 Ordinance, the 2015 Resolution, and Plan Policy 6.48. As set out in detail above, the Amendments and the binding policies they implement are intended to and will throttle the transport of fossil fuel to and from other states and countries. Thus, the Amendments will result in inadequate supply of fuel products for distributors, retailers, and end users outside the City—including Christensen and other plaintiffs' members—causing higher prices and fuel product shortages, which is the City's expressly stated goal: to reduce the consumption of fuel in other areas by cutting off fuel supply. The Amendments will also harm Plaintiffs' members that produce, transport, or sell/distribute fuel by blocking transportation infrastructure necessary to ship crude oil and fuel products to and from Washington refineries, sell their products outside the region or country, and distribute fuel to end users in and outside the region surrounding the City. These harms are significant because of the important port, rail, and road infrastructure within the City. The Amendments harm Christensen and other plaintiffs' members that currently have fuel-transportation terminals within the City subject to the Amendments by blocking their ability to relocate, replace storage tanks, or build new tanks that are necessary to blend and otherwise transition to cleaner fuels as mandated by state and federal law. The Amendments not only

Page 61 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

interfere with these companies' operations, but are an interference with their property rights, resulting in a reduction of their properties' value. Finally, the Amendments prevent Christensen and other plaintiffs' members from siting new fuel terminals within the City.

121.    Plaintiffs therefore seeks a declaration stating that the 2022 Ordinance and Amendments adopted thereby constitute an undue burden on interstate commerce in violation of the Dormant Commerce Clause, and request an injunction prohibiting the City from taking further action to enforce or implement the Amendments.

## THIRD CLAIM FOR RELIEF

### Violation of Foreign Commerce Clause

122.    Plaintiffs incorporate the paragraphs above

123.    The Foreign Commerce Clause of the United States Constitution grants Congress authority to "regulate Commerce with foreign Nations" and limits the power of States or municipalities to regulate international trade. U.S. Const. Art. I, § 8, cl. 3. Specifically, the Foreign Commerce Clause prohibits states and local governments from contravening congressional intent in regard to international trade.

124.    The Amendments are inconsistent with the policies of Congress set out in multiple federal laws.

125.    First, the Amendments directly contravene "the continuing policy of the Federal Government in the national interest to foster and encourage private enterprise in (1) the development of economically sound and stable domestic mining, minerals, metal and mineral reclamation industries, (2) the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help assure satisfaction of industrial, security

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

and environmental needs * * * " where "minerals" includes "oil, gas, coal, oil shale and uranium." 30 U.S.C. § 21a. Similarly, Congress has long expressed its policy for the expansion of exports of coal mined in the United States. 42 U.S.C. § 13367.

126.    As set out in detail in the fourth claim for relief, the Interstate Commerce Commission Termination Act (ICCTA), 49 U.S.C. § 10501(a), prohibits local code that regulates or substantially interferes with rail transportation. Transloading facilities used in connection with railways constitute rail transportation for purpose of the ICCTA. The Amendments attempt to block international commerce in fossil fuels by prohibiting new transloading connections to railways is inconsistent with (and, in fact, preempted by) the ICCTA, and thus violates the Foreign Commerce Clause.

127.    The Amendments' prohibition on new fuel terminals connected to the deep-sea ports located within the City is also in conflict with the Congressional policies set out in the Shipping Act of 1984 (the "Shipping Act"), 46 U.S.C. § 40101, which include the objectives to "ensure an efficient, competitive, and economical transportation system in the ocean commerce of the United States," and to "promote the growth and development of United States exports through a competitive and efficient system for the carriage of goods by water in the foreign commerce of the United States, and by placing a greater reliance on the marketplace."

128.    The Amendments also block new infrastructure for the export of fuels that the federal government has designated as clean, renewable, and/or biofuel in direct conflict with the policies set out in 42 U.S.C. § 13214, 42 U.S.C. § 17052, 42 U.S.C. § 7545, and 42 U.S.C. § 17321. The Amendments blanket prohibition on the storage of coal at export facilities also contravenes the express policy of the United States to export clean coal and related technology.

Page 63 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

42 U.S.C. § 13367.

129.    Plaintiffs are and will continue to be irreparably harmed by the Amendments, the 2022 Ordinance, the 2015 Resolution, and Plan Policy 6.48. As set out in detail above, the Amendments and the binding policies they implement are intended to and will throttle the transport of fossil fuel to and from other states and countries. Thus, the Amendments will result in inadequate supply of fuel products for distributors, retailers, and end users outside the City—including Christensen and other plaintiffs' members—causing higher prices and fuel product shortages, which is the City's expressly stated goal: to reduce the consumption of fuel in other areas by cutting off fuel supply. The Amendments will also harm Plaintiffs' members that produce, transport, or sell/distribute fuel by blocking transportation infrastructure necessary to ship crude oil and fuel products to and from Washington refineries, sell their products outside the region or country, and distribute fuel to end users in and outside the region surrounding the City. These harms are significant because of the important port, rail, and road infrastructure within the City. The Amendments harm Christensen and other plaintiffs' members that currently have fuel-transportation terminals within the City subject to the Amendments by blocking their ability to relocate, replace storage tanks, or build new tanks that are necessary to blend and otherwise transition to cleaner fuels as mandated by state and federal law. The Amendments not only interfere with these companies' operations, but are an interference with their property rights, resulting in a reduction of their properties' value. Finally, the Amendments prevent Christensen and other plaintiffs' members from siting new fuel terminals within the City.

130.    Plaintiffs therefore seek a declaration stating that the 2022 Ordinance, Amendments, and the binding policies they implement violate the Foreign Commerce Clause,

Page 64 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

and request an injunction prohibiting the City from taking further action to enforce or implement them.

## FOURTH CLAIM FOR RELIEF

### Preemption—Interstate Commerce Commission Termination Act of 1995 (ICCTA)

131.    Plaintiffs incorporate the paragraphs above.

132.    "Congress and the courts long have recognized a need to regulate railroad operations at the federal level. Congress' authority under the Commerce Clause to regulate the railroads is well established * * * and the Supreme Court repeatedly has recognized the preclusive effect of federal legislation in this area * * *. The Interstate Commerce Act, ch. 104, 24 Stat. 379 (1887), which, as amended [by the ICCTA], still governs federal regulation of railroads, has been recognized as among the most pervasive and comprehensive of federal regulatory schemes." *City of Auburn v. United States Gov't*, 154 F.3d 1025, 1029 (9th Cir. 1998) (as amended Oct. 20, 1998) (internal citations omitted).

133.    The ICCTA amended the Interstate Commerce Act to expand and transfer regulatory authority over rail transportation from the Interstate Commerce Commission to the Surface Transportation Board (STB). The ICCTA contains a broad preemption provision that states:

(b) The jurisdiction of the Board over--

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

Page 65 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b).

134.    "This provision of the ICCTA expressly preempts a wide range of state and local regulation of rail activity." *Association of Am. R.R.s v. South Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1096–97 (9th Cir. 2010). In fact, "[i]t is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations." *City of Auburn*, 154 F.3d at 1030 (citation omitted).

135.    "Courts and the STB have recognized two broad categories of state and local actions that are categorically preempted regardless of the context of the action: (1) any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized and (2) state or local regulation of matters directly regulated by the Board—such as the construction, operation, and abandonment of rail lines; railroad mergers, line acquisitions, and other forms of consolidation; and railroad rates and service." *Adrian & Blissfield R.R. Co. v. Village of Blissfield*, 550 F.3d 533, 539–40 (6th Cir. 2008); *see also Union Pac. R.R. Co. v. Chicago Transit Auth.*, 647 F.3d 675, 679 (7th Cir. 2011). State or local actions that are not categorically preempted are still invalid if, as applied, they "would have the effect of preventing or unreasonably interfering with railroad transportation." *City of Ozark v. Union Pac. R.R. Co.*, 843 F.3d 1167, 1171 (8th Cir. 2016).

136.    Intermodal terminals and transloading facilities operated by or for rail carriers constitute rail infrastructure and are within the exclusive jurisdiction of the STB.

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

Accordingly, zoning, environmental, or other types of local regulation that could be used to deny the construction of such facilities or that unreasonably burden their operation are preempted by the ICCTA. *Albany & Eastern R.R. Co. v. Linn Cty.*, No. 6:13-CV-00216-AA, 2013 WL 1900886 (D. Or. May 4, 2013); *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 158–59 (4th Cir. 2010); *Texas Cent. Bus. Lines Corp. v. City of Midlothian*, No. 3:07-CV-1351-N, 2007 WL 9717644 (N.D. Tex. Aug. 24, 2007); *Vermont Ry., Inc. v. Town of Shelburne*, No. 2:16-CV-16, 2016 WL 3629081, at *2–3 (D. Vt. June 29, 2016).

137.    Here, the Amendments categorically prohibit new intermodal facilities for the transportation of fuel, as well as the expansion of storage capacity at existing fuel terminals—including rail facilities operated by or for rail carriers. These rail facilities are particularly important for the transport of crude oil from the Bakken region to the Washington refineries.

138.    The official code commentary expressly states that the storage threshold for the prohibition was set to interfere with the operation of railroad operations: Commentary for PCC 33.920.300 states that the "2-million-gallon threshold [for being subject to the prohibition] is sized to include facilities that are large enough to unload unit trains." Likewise, Resolution 37164, adopted in tandem with the 2015 Resolution, opposes all projects "that would increase the amount of crude oil being transported by rail though the City of Portland and City of Vancouver."

139.    Thus, the application of the Amendments' prohibition on intermodal facilities and coal storage to rail infrastructure operated by or for rail carriers is preempted by the ICCTA.

Page 67 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

140.    Plaintiffs are and will continue to be irreparably harmed by the 2022 Ordinance and Amendments adopted thereby. As set out in detail above, the Amendments will interfere with the transportation of oil and refined fuel by railway and interconnected modes through the City. As a direct result, the supply of fuel to end users outside the City will be reduced, causing higher prices and potential fuel product shortages—which is the City's expressly stated goal: to reduce the consumption of fuel in other areas by cutting off fuel supply. The Amendments will also harm Plaintiffs' members that produce, transport, or sell/distribute fuel and rely on railway transportation to access both local and interstate markets. This is particularly injurious because of the important port, road, and air-transportation infrastructure that is connected to railway facilities within the City.

141.    Plaintiffs therefore seek a declaration stating that the application of the 2022 Ordinance and Amendments to rail facilities operated by or for rail carriers is preempted by the ICCTA and request an injunction prohibiting the City from applying the Amendments to such facilities and operations.

## FIFTH CLAIM FOR RELIEF

### Violation of Substantive Due Process

142.    Plaintiffs incorporate the paragraphs above.

143.    A zoning regulation violates the due process clause of the United States Constitution and is invalid if the ordinance is arbitrary and capricious, irrational, or fails to serve a legitimate purpose.

144.    As set forth above, the 2015 Resolution and Amendments were not adopted to advance the welfare of the public, but for political purposes. The 2014 Pembina

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

project that was the impetus for the 2015 Resolution and Amendments was unequivocally praised by City officials when first proposed. The City's mayor, Charlie Hales, issued a press release stating: "This is great news[.] * * * We welcome this investment and these jobs in Portland. The city is committed to growing our economy on the land we already have, and holding industry to very high environmental and public safety standards. This proposal meets these goals." To advance the project, the City's planning department developed, proposed, and recommended adoption of a zoning amendment. After multiple months of enthusiastic support, however, City officials and staff arbitrarily reversed their position when the proposal encountered political opposition. City officials and staff did not provide a reason for this reversal other than political pressure.

145.    The purposes for the 2015 Resolution and Amendments identified by the City are not legitimate and/or not advanced by the Amendments.

146.    Based on the legislative proceedings, comments by public officials, and text of the policies and Amendments, the original and primary purpose for the legislation is to restrict the use of combustible fuel in other states and countries, thereby decreasing global emissions. This extraterritorial purpose is illegitimate because it is not within the City's common-law police powers, as well as ultra vires because it is unauthorized by the City's charter (in force at the time of adoption). *See* City Charter § 2-105(a)(1) (authorizing exercise of police powers for benefit of public within the City), § 2-105(a)(35) (authorizing zoning and building regulations in the City for the benefit of residents and the public). Moreover, the categorical prohibition on all new infrastructure for transportation of combustible fuel, including fuel that is transitional, clean, renewable, and/or results in lower emissions does not advance this

Page 69 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

illegitimate goal. Finally, the Amendments do not lower emissions within the City because the

policies intentionally do not limit the distribution and use of fuel within the City and surrounding

areas.

   147. The Amendments also have no rational connection to public safety or

protection of environmental resources within the City. The categorical block on new, modern

terminals and intermodal infrastructure—unquestionably subject to higher safety standards for

withstanding earthquakes and other events compared to older facilities—does not reduce risks

from the storage of fuel within the City, but in fact prevents reductions thereof. Likewise, the

citywide prohibition on new terminals forces the storage of fuel within the City to remain within

a liquefaction zone. Much of the City is not in a liquefaction zone, but under the Amendments,

the fuel terminals must stay in their current location.

   148. Plaintiffs are and will continue to be irreparably harmed by the

Amendments, the 2022 Ordinance, the 2015 Resolution, and Plan Policy 6.48. As set out in

detail above, the Amendments and the binding policies they implement are intended to and will

throttle the transport of fossil fuel to and from other states and countries. Thus, the Amendments

will result in inadequate supply of fuel products for distributors, retailers, and end users outside

the City—including Christensen and other plaintiffs' members—causing higher prices and fuel

product shortages, which is the City's expressly stated goal: to reduce the consumption of fuel in

other areas by cutting off fuel supply. The Amendments will also harm Plaintiffs' members that

produce, transport, or sell/distribute fuel by blocking transportation infrastructure necessary to

ship crude oil and fuel products to and from Washington refineries, sell their products outside the

region or country, and distribute fuel to end users in and outside the region surrounding the City.

Page 70 - **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
1140 SW WASHINGTON ST, STE 700
PORTLAND, OREGON 97205

These harms are significant because of the important port, rail, and road infrastructure within the City. The Amendments harm Christensen and other plaintiffs' members that currently have fuel-transportation terminals within the City subject to the Amendments by blocking their ability to relocate, replace storage tanks, or build new tanks that are necessary to blend and otherwise transition to cleaner fuels as mandated by state and federal law. The Amendments not only interfere with these companies' operations, but are an interference with their property rights, resulting in a reduction of their properties' value. Finally, the Amendments prevent Christensen and other plaintiffs' members from siting new fuel terminals within the City.

149.    Plaintiffs therefore seek a declaration stating that the 2022 Ordinance and Amendments violate the Due Process Clause of the United States Constitution and request an injunction prohibiting the City from taking further action to enforce or implement them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment in their favor and against the City that:

1.    Declares the Amendments, the 2022 Ordinance, the 2015 Resolution, and Plan Policy 6.48 are invalid and unenforceable because they:

   a.    Violate the Dormant Commerce Clause by discriminating against interstate commerce;

   b.    Violate the Dormant Commerce Clause by imposing an undue burden on interstate trade;

   c.    Violate the Foreign Commerce Clause by contravening congressional intent and policies concerning international trade;

Page 71 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

d.      Are preempted by the ICCTA; and/or

e.      Violate the Due Process Clause of the United States Constitution because they are arbitrary and capricious, irrational, or fail to serve a legitimate purpose;

2.      Issues a permanent injunction prohibiting the City from taking further action to enforce or implement the 2022 Ordinance, Amendments, 2015 Resolution, and Plan Policy 6.48;

3.      Awards Plaintiffs their costs, expenses, and disbursements, as well as their reasonable attorney fees pursuant to 42 U.S.C. § 1988; and

4.      Grants such other relief this Court deems just and equitable.

DATED this 8th day of August, 2024.

MILLER NASH LLP


*/s/ Joshua M. Sasaki*
Joshua M. Sasaki, P.C., OSB No. 964182
josh.sasaki@millernash.com
Steven G. Liday, OSB No. 075975
steven.liday@millernash.com
Christopher Riley, OSB No. 211614
christopher.riley@millernash.com
Phone: 503.224.5858
Fax: 503.224.0155

Attorneys for Plaintiffs


Page 72 -  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**