DENIS M. VANNIER, OSB No. 044406
Senior Deputy City Attorney
Denis.Vannier@portlandoregon.gov
NAOMI SHEFFIELD, OSB No. 170601
Senior Deputy City Attorney
Naomi.Sheffield@portlandoregon.gov
Portland City Attorney's Office
1221 SW Fourth Ave., Ste. 430
Portland, OR  97204
Telephone: 503.823.3047
Fax: 503.823.823.3089
*Of Attorneys for Defendant City of Portland*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **STATE OF MONTANA; WESTERN ENERGY ALLIANCE**, a Colorado nonprofit corporation; **PACIFIC PROPANE GAS ASSOCIATION**, a Washington nonprofit corporation; **IDAHO PETROLEUM MARKETERS AND CONVENIENCE STORE ASSOCIATION, INC.**, an Idaho nonprofit corporation; and **CHRISTENSEN, INC.**, a Washington Corporation, | 3:23-cv-00219-YY |
| Plaintiffs, | **DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS** |
| v. | ***Oral Argument Requested*** |
| **CITY OF PORTLAND,** | |
| Defendant. | |

# TABLE OF CONTENTS

CERTIFICATE PURSUANT TO LOCAL RULE 7-1 ................................................................1

MOTION..............................................................................................................................1

MEMORANDUM OF LAW ...................................................................................................1

I.      Introduction ...............................................................................................................1

II.     Legal standard on motion to dismiss .........................................................................4

III.    Factual background ...................................................................................................5

        A.     The City's regulation of hypothetical future new or expanded FFTs .....................5

        B.     The 2022 zoning-code amendments at issue in this case .......................................7

        C.     Plaintiffs' alleged harms .......................................................................................11

        D.     Plaintiffs' amendments in the SAC consist largely of inserting as "allegations of fact" legal arguments this court previously rejected............................................15

IV.    The SAC still fails to state a claim against the City under the dormant Commerce Clause. ..................................................................................................................................16

        A.     The dormant Commerce Clause prohibits laws that discriminate against out-of-state economic actors versus similarly situated in-state competitors in the same market, either facially or in practice. ..................................................................16

        B.     Courts have consistently upheld state and local laws that do not discriminate against out-of-state economic actors to the benefit of substantially similar in-state competitors..................................................................................................21

        C.     Pre-modern dormant Commerce Clause cases .....................................................26

        D.     The City's 2022 land-use amendments do not violate the dormant Commerce Clause.....................................................................................................................32

               1.     To state claims under Section 1983, each plaintiff must plead a plausible, cognizable injury to its own rights under the dormant Commerce Clause. .................................................................................................................. 32

               2.     Even if plaintiffs had alleged a cognizable injury—and they have not—the City's 2022 zoning-code amendments do not facially discriminate against out-of-state economic actors to the benefit of substantially similar in-state actors. ............................................................................................................... 36

               3.     The SAC fails to plead facts plausibly suggesting a "discriminatory effect" on interstate commerce. .......................................................................... 41

               4.     Plaintiffs' allegations still do not plausibly allege an unconstitutional burden on means of interstate transportation under the Supreme Court's pre-modern caselaw. .............................................................................. 45

V.     The third, fourth, and fifth claims in the SAC remain subject to dismissal for the reasons stated in this court's previous orders. .....................................................................47

CONCLUSION....................................................................................................................48

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
526 U.S. 40 (1999) ................................................................................................... 33

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................. 4, 5, 35, 38

*Ass'n des Éleveurs de Canards et d'Oies du Québec v. Harris*,
729 F.3d 937 (9th Cir. 2013) ................................................................................. 41

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................................. 20

*Bibb v. Navajo Freight Lines, Inc.*,
359 U.S. 520 (1959) ................................................................................. 28, 29, 30, 31

*C&A Carbone, Inc. v. Clarkstown*,
511 U.S. 383 (1994) .................................................................................................. 22

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
520 U.S. 564 (1997) .................................................................................................. 17

*City of Los Angeles v. Cnty. of Kern*,
581 F.3d 841 (9th Cir. 2009) ....................................................................... 33, 34, 35

*Coal. For Competitive Elec., Dynegy Inc. v. Zibelman*,
272 F. Supp. 3d 554 (S.D.N.Y. 2017) ................................................................... 33

*Cousins v. Lockyer*,
568 F.3d 1063 (9th Cir. 2009) ................................................................................. 4

*Dahlia v. Rodriguez*,
735 F.3d 1060 (9th Cir. 2013) ...................................................................... 4, 35, 42

*Dep't of Revenue of Ky. v. Davis*,
553 U.S. 328 (2008) .......................................................................................... 17, 26

*Exxon Corp. et al. v. Governor of Maryland et al.*,
437 U.S. 117 (1978) .......................................................................... 23, 24, 41, 44

*FERC v. Mississippi*,
456 U.S. 742 (1982) .................................................................................................. 20

*Gen. Motors Corp. v. Tracy*,
519 U.S. 278 (1997) .......................................................................................... passim

*Gonzaga Univ. v. Doe*,
536 U.S. 273 (2002) .......................................................................................... 32, 34

Page  ii – TABLE OF AUTHORITIES

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

*Hess v. Port Auth. Trans–Hudson Corp.*,
   513 U.S. 30 (1994) ............................................................................... 20

*Hughes v. Oklahoma*,
   441 U.S. 332 (1979) ............................................................................. 18

*In re Finjan Holdings, Inc.*,
   58 F.4th 1048 (9th Cir. 2023) ................................................................ 5

*Individuals for Responsible Gov't, Inc. v. Washoe Cnty.*,
   110 F.3d 699 (9th Cir. 1997) ......................................................... 33, 35

*Iowa Pork Producers Ass'n v. Bonta*,
   No. 22-55336, 2024 WL 3158532 (9th Cir. June 25, 2024) .................. 20

*Kwan v. SanMedica Int'l*,
   854 F.3d 1088 (9th Cir. 2017) ............................................................... 5

*Lazy Y Ranch Ltd. v. Behrens*,
   546 F.3d 580 (9th Cir. 2008) ................................................................. 4

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ....................................................................... 32, 33

*Maine v. Taylor*,
   477 U.S. 131 (1986) ............................................................... 17, 18, 20

*Meland v. Weber*,
   2 F.4th 838 (9th Cir. 2021) ........................................................... 32, 36

*Nat'l Ass'n of Optometrists and Opticians v. Harris*,
   682 F.3d 1144 (9th Cir. 2021) ............................................................. 25

*Nat'l Pork Producers Council v. Ross*,
   6 F.4th 1021 (9th Cir. 2021) .......................................................... passim

*Nat'l Pork Producers Council v. Ross*,
   598 U.S. 356 (2023) ....................................................................... passim

*New Energy Co. of Ind. v. Limbach*,
   486 U.S. 269 (1988) ............................................................................. 17

*Or. Waste Sys., Inc. v. Envtl. Quality Comm. of the State of Or.*,
   511 U.S. 93 (1994) ........................................................................ passim

*Park Pet Shop, Inc. v. City of Chicago*,
   872 F.3d 495 (7th Cir. 2017) ................................................... 19, 41, 42

*Pike v. Bruce Church, Inc.*,
   397 U.S. 137 (1970) ....................................................................... 19, 23

*Raymond Motor Transp., Inc. v. Rice*,
   434 U.S. 429 (1978) ....................................................................... 30, 31

Page  iii – TABLE OF AUTHORITIES

*Rosenblatt v. City of Santa Monica*,
    940 F.3d 439 (9th Cir. 2019) ..................................................................... passim

*Southern Pacific Co. v. Arizona ex rel. Sullivan*,
    325 U.S. 761 (1945) ................................................................................... passim

*Spoklie v. Montana*,
    411 F.3d 1051 (9th Cir. 2005) ..................................................................... 39, 42

*Taylor v. Yee*,
    780 F.3d 928 (9th Cir. 2015) ............................................................................ 4

*Turner v. City and Cnty. of San Francisco*,
    788 F.3d 1206 (9th Cir. 2015) .......................................................................... 4

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
    550 U.S. 330 (2007)................................................................................... passim

*United States v. Carrillo-Lopez*,
    68 F.4th 1133 (9th Cir. 2023) ......................................................................... 10

*Warth v. Seldin*,
    422 U.S. 490 (1975)................................................................................... 20, 45

*Wyoming v. Oklahoma*,
    502 U.S. 437 (1992) ...................................................................................... 22

**State Cases**

*Columbia Pac. Bldg. Trades Council v. City of Portland*,
    412 P.3d 258 (Or. App. 2018)....................................................................... 5, 6, 7

*Columbia Pacific Building Trades Council v. City of Portland*,
    2017 WL 3333014 .......................................................................................... 6

*Columbia Pacific Building Trades Council v. City of Portland*
    2020 WL 6544130 .......................................................................................... 7

*Rowley v. City of Medford*,
    285 P. 1111 (Or. 1930) ................................................................................... 11

**Federal Statutes**

42 U.S.C. § 1983.................................................................................... 32, 33, 34

**Federal Rules**

FRCP 12(b)(6) ..................................................................................... 1, 4, 19

**Constitutional Provision**

U.S. Const., art. I, § 8, cl. 3........................................................................... 16

Page  iv – TABLE OF AUTHORITIES

**City Code Provisions**

PCC 33.140.100 ................................................................................................... 8, 9, 40

PCC 33.910.030 ................................................................................................... 8, 9, 40

PCC 33.920.300 ................................................................................................... 8, 9, 38

**Other Authorities**

*Transporting Oil and Gas: U.S. Infrastructure Challenges*,
    100 Iowa L Rev 947 (2015) ............................................................................. 11

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

## CERTIFICATE PURSUANT TO LOCAL RULE 7-1

As required by Local Rule 7-1(a), counsel for defendant City of Portland ("the City") certify that they conferred with plaintiffs' counsel on September 12, 2024, and made good-faith efforts to resolve the issues presented by this motion but were unable to do so.

## MOTION

The City hereby moves to dismiss plaintiffs' Second Amended Complaint for Declaratory and Injunctive Relief, (Dkt. 59 ("SAC")), in its entirety. Specifically, the City moves to dismiss the SAC under Federal Rule of Civil Procedure 12(b)(6) because plaintiffs fail to state claims for which relief can be granted under the dormant Commerce Clause, Foreign Commerce Clause, Interstate Commerce Commission Termination Act of 1995, and substantive Due Process. The City's motion is based on the following memorandum of law together with the declaration of Naomi Sheffield filed herewith, the supporting exhibits, and the other evidence and records on file in this matter.

## MEMORANDUM OF LAW

### I. INTRODUCTION

In this unusual case, plaintiffs—a heterogeneous congeries of out-of-state entities ranging from the State of Montana to an association of Idaho petroleum merchants—sue to enjoin a local land-use law. Specifically, amendments to the City's land-use code adopted in 2022 maintain the status quo for existing bulk fossil-fuel terminals within the City, but limit hypothetical future new or expanded fossil-fuel terminals ("FFTs") to two million gallons of on-site storage. Those amendments do not affect existing fossil-fuel storage capacity, and the two-million-gallon cap on future storage applies equally regardless of whether the hypothetical future new or expanded FFT is owned or operated by an out-of-state entity or not, or of whether it sells fuel to out-of-state end users or in-state end users. Plaintiffs nevertheless allege that the City's land-use amendments violate their rights under the dormant Commerce Clause, the Foreign Commerce

Page  1 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

Clause, the Interstate Commerce Commission Termination Act of 1995, and the substantive Due Process Clause of the 14th Amendment.

Plaintiffs filed their initial complaint to that effect in February 2023 (Dkt. 1) followed by a First Amended Complaint in May 2023 (Dkt. 11). The City moved to dismiss in July 2023. (Dkt. 17). In February 2024, this court issued findings and recommendations concluding in pertinent part that the City's motion to dismiss for failure to state a claim should be granted as to all plaintiffs and all claims. (Dkt. 53 at 27-28). Specifically, this court concluded that "plaintiffs fail[ed] to state a claim under the dormant Commerce Clause," "failed to state a claim for relief under the Foreign Commerce Clause," failed to state a claim under the Interstate Commerce Commission Termination Act of 1995, and failed to state a substantive Due Process claim. (Dkt. 53 at 18, 23, 24-25, 26-27). Plaintiffs objected to those findings and recommendations but, in a July 2024 order, Judge Hernández agreed that plaintiffs had failed to state any claim against the City. (Dkt. 58). Specifically, Judge Hernández adopted this court's findings and recommendations with respect to plaintiffs' claims under the Foreign Commerce Clause, the Interstate Commerce Commission Termination Act of 1995, and the substantive Due Process Clause of the 14th Amendment, and agreed that "[p]laintiffs have not adequately alleged a dormant Commerce Clause claim." (Dkt. 58 at 4).

Notwithstanding those failures, the court gave plaintiffs leave to replead their dormant Commerce Clause claim. (Dkt. 58 at 5). Specifically, plaintiffs were given leave to attempt to state a claim based on alleged discrimination between substantially similar in-state and out-of-state end users of fuel, causing injury to plaintiffs. (*See* Dkt. 58 at 3) (explaining that plaintiffs' First Amended Complaint failed to state such a claim because it contained "insufficient allegations demonstrating *both* a discriminatory burden on end users or consumers of fuel *and* linking that burden to Plaintiffs' [alleged] injuries." (emphases added)). Plaintiffs were also given leave to attempt to state a claim based on an alleged *nondiscriminatory* burden on

Page  2 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

interstate commerce. (*See* Dkt. 58 at 4) (explaining that the court "cannot conclude at this stage in the litigation that [plaintiffs' dormant Commerce Clause] claim would fail as a matter of law in the absence of a discriminatory burden on commerce," but that "[p]laintiffs face a high bar if they cannot demonstrate that the Amendments are discriminatory."). Plaintiffs have now filed a Second Amended Complaint ("SAC") raising the same claims as previously. (Dkt. 59). But that complaint does not address the problems identified by the court and still fails to state claims against the City.

As an initial matter, the SAC makes no substantive changes to plaintiffs' claims under the Foreign Commerce Clause, the Interstate Commerce Commission Termination Act of 1995, and the substantive Due Process Clause of the 14th Amendment. (*See* Declaration of Naomi Sheffield, ("Sheffield Decl."), ¶ 13, Ex. 11 ("SAC Redline")). Those claims therefore remain subject to dismissal—and should be dismissed—for the reasons previously stated in this court's prior opinions. (*See* Dkt. 53 at 18-27; Dkt. 58 at 5) (dismissing those claims).

Moreover, despite almost twenty additional pages consisting largely of repetitions and legal conclusions, the SAC still fails to state a claim against the City under the dormant Commerce Clause. Plaintiffs still cannot show that preserving the status quo by limiting the size of *hypothetical future* FFTs in the City to two million gallons of on-site storage causes them any cognizable harm under the dormant Commerce Clause. Plaintiffs still cannot show that the 2022 amendments facially discriminate between similar in-state and out-of-state entities in the same market. And plaintiffs still cannot show that the 2022 amendments impose a discriminatory burden between similar in-state and out-of-state entities in the same market—or, indeed, any burden whatsoever that could conceivably be actionable under the dormant Commerce Clause.

At heart, plaintiffs' allegations are nothing more than a request for this court to decide how the City should allocate its limited supply of industrial land in the future—a request that is improper and cannot be shoehorned into a purported federal claim. Plaintiffs and the City may

Page  3 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

disagree on how the City wishes to use its land in the years to come, but that disagreement does not constitute an injury to plaintiffs' legal rights under the dormant Commerce Clause. Indeed, the Supreme Court appears never to have struck down *any* land-use law under the dormant Commerce Clause, and plaintiffs cannot explain why this court nevertheless should take that unprecedented step here. Because plaintiffs do not and cannot state a claim against the City under the dormant Commerce Clause, this court should dismiss this action with prejudice.

## II.   LEGAL STANDARD ON MOTION TO DISMISS

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests whether there is a cognizable legal theory or sufficient facts to support a cognizable legal theory. *Taylor v. Yee*, 780 F.3d 928, 935 (9th Cir. 2015). "To survive a rule 12(b)(6) motion to dismiss, a 'plaintiff must allege enough facts to state a claim to relief that is plausible on its face.'" *Turner v. City and Cnty. of San Francisco*, 788 F.3d 1206, 1210 (9th Cir. 2015) (quoting *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008)). While this court "must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party" in ruling on such a motion, "conclusory allegations of law and unwarranted inferences are insufficient to avoid" dismissal. *Id.* (quoting *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009)).

Thus, this court need not accept as true pleaded inferences that do not flow logically from the facts, or legal conclusions or legal argument couched as factual allegations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (rejecting "unreasonable inferences," "legal conclusions cast in the form of factual allegations," and "mere conclusory statements" unsupported by facts). Similarly, this court may "reject, as implausible, allegations that are too speculative to warrant further factual development." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1076 (9th Cir. 2013). Finally, this court "need not accept as true allegations contradicting documents that are referenced in the complaint or that are properly subject to judicial notice." *Lazy Y Ranch Ltd.*, 546 F.3d at 588 (citations omitted). On the contrary,

Page  4 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

> When a general conclusion in a complaint contradicts specific facts retold in a document attached to the complaint, incorporated by reference in the complaint, or subject to judicial notice, those specific facts are controlling. Similarly, where a complaint incorrectly summarizes or characterizes a legally operative document attached to the complaint, incorporated by reference in the complaint, or subject to judicial notice, the document itself is controlling.

*In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1052 n.1 (9th Cir. 2023).

Here, the allegations in the SAC do not "plausibly give rise to an entitlement to relief." *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017) (quoting *Ashcroft*, 556 U.S. at 679). This court should therefore dismiss this action with prejudice.

## III.    FACTUAL BACKGROUND

The City of Portland "is one of the largest ports on the West Coast, located at the confluence of the Columbia and Willamette Rivers." *Columbia Pac. Bldg. Trades Council v. City of Portland*, 412 P.3d 258, 262 (Or. App. 2018). The City's existing FFTs serve more than 90 percent of Oregon's fossil-fuel market and play an important role in the larger Pacific Northwest region, including Southern Washington and Idaho. (Sheffield Decl., ¶ 3, Ex. 1, Portland City Ordinance 190978 ("Ex. 1, Ordinance 190978") at ¶ 24(B)). At present, those FFTs serve markets in Oregon and Southern Washington. (Sheffield Decl., ¶ 5, Ex. 3, Ordinance 190978 Exhibit B – Remand Report ("Ex. 3, Remand Report") at p. 7). Plaintiffs themselves concede that the existing FFT infrastructure "is dedicated primarily to receiving fuel from outside the region and then distributing it to the Portland metropolitan area, as well as the Oregon and southern Washington markets." (SAC at ¶ 23).

### A.    The City's regulation of hypothetical future new or expanded FFTs

Most of the FFTs in the City use fossil-fuel storage tanks that were built before seismic design requirements in building codes were adopted, yet those tanks are in a moderate to high-risk earthquake liquefaction zone. (Sheffield Decl., Ex. 1, Ordinance 190978 at ¶¶ 5-7; ¶ 4, Ex. 2, Findings of Fact Report at pp. 8-9). The City has experienced numerous earthquakes in the

Page  5 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

past, ranging from magnitude 4.5 to 9.0, and is certain to experience seismic events in the future. (Sheffield Decl., Ex. 1, Ordinance 190978 at ¶ 7). In November 2015, the Portland City Council passed a resolution asking City bureaus to develop recommendations to strengthen public health and safety regarding fossil fuels. (Sheffield Decl., ¶ 7, Ex. 5, City Resolution 37168 ("Ex. 5, Resolution 37168")).

Consistent with the City Council's request, the City's Bureau of Planning and Sustainability ("BPS") prepared the first zoning-code amendments limiting future new or expanded on-site storage capacity at FFTs in Portland. Eventually, in December 2016, the City Council approved zoning code amendments that created a new land-use category for Bulk Fossil Fuel Terminals, which were defined as those FFTs with an on-site storage capacity over two million gallons or that performed direct transloading of fossil fuels from one means of transportation to another without intermediary storage. (Sheffield Decl., ¶ 8, Ex. 6, City Ordinance 188142 Exhibit A - Fossil Fuel Terminal Zoning Amendments ("2016 amendments") at pp. 33-73).[1]

Several industry groups appealed the 2016 amendments to the Oregon Land Use Board of Appeals ("LUBA"). *Columbia Pacific Building Trades Council v. City of Portland*, 2017 WL 3333014, __Or LUBA__ (LUBA No.2017-001, July 19, 2017) ("Columbia Pacific I"). Among other arguments, those industry groups contended that the 2016 amendments violated the dormant Commerce Clause. While LUBA initially agreed, the Oregon Court of Appeals reversed that decision and held that the 2016 amendments did not contravene the dormant Commerce Clause. *Columbia Pacific*, 412 P.3d 258. The Court of Appeals did, however, uphold certain

---

[1] Separately, in June 2016, Council adopted a new comprehensive plan, the *2035 Comprehensive Plan* ("2035 PCP"), which included Plan Policy 6.48. (Sheffield Decl., ¶ 9, Ex. 7, Ordinance 187832). The 2035 PCP was not in effect until January 1, 2018, and was not relevant to Council's decision to amend the Zoning Code in 2016. (*Id.* at p. 5).

Page  6 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

aspects of LUBA's decision under state land-use law, and the 2016 amendments were remanded to the City to address the identified land-use issue. *See id*. at 272.

In November 2019, the City Council held a hearing to address LUBA's remanded order and consider the amendments' compliance with the 2035 PCP. On December 18, 2019, the Council amended the findings and staff report to reflect the testimony submitted and adopted Ordinance No. 189807, which, apart from a prohibition on on-site coal storage, substantially mirrored the zoning-code requirements of the 2016 amendments. (*See* Sheffield Decl., ¶ 10, Ex. 8, City Ordinance 189807 Exhibit B - Fossil Fuel Terminal Zoning Amendments ("2019 amendments") at pp. 9-46).

The 2019 Amendments were again appealed to LUBA. In *Columbia Pacific Building Trades Council v. City of Portland*, 2020 WL 6544130, __Or LUBA__ (LUBA No. 2020-009, October 30, 2020), LUBA remanded the City's decision to address potential future demand for natural gas, the City's comparative economic advantage, any potential shift in transportation modes that could impact the City's multimodal transportation system, the role FFTs play in serving other businesses in the area, and potential adverse impacts of the amendments on the continued viability of Portland as a major center for import and export of industrial products. *Id*.

**B.     The 2022 zoning-code amendments at issue in this case**

In fall 2022, the City Council adopted the Fossil Fuel Terminal Zoning Amendments at issue in this case in response to the 2020 LUBA Decision. (*See* Sheffield Decl., Ex. 3, Remand Report, at pp. 21-60 ("2022 amendments")). The 2022 amendments are generally similar to the 2019 amendments, with minor adjustments to reconcile them with intervening changes to the City's zoning code.

Additionally, the 2022 amendments differed from the 2019 amendments in three ways. First, the 2022 amendments clarified that additional storage tank capacity may be added to an existing BFFT when the new capacity is exclusively for renewable fuel or complies with the

Page  7 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

City's renewable fuel standard. (PCC 33.140.100.B.15). Second, the 2022 amendments added a definition for renewable fuel. (PCC 33.910.030). Third, the 2022 amendments clarified two types of BFFTs: those with on-site storage tanks exceeding two million gallons, and those with direct transloading capacity but no storage tanks. (PCC 33.920.300.A).

In relevant part, the 2022 amendments define the industrial land-use category of "Bulk Fossil Fuels Terminals" as:

> establishments primarily engaged in the transport and bulk storage of fossil fuels. Terminal activities may also include fuel blending, regional distribution, and wholesaling. Terminals have access to marine, railroad, or regional pipeline to transport fuel to or from the site, and either have transloading facilities for transferring a shipment between transport modes, or have transloading facilities and storage tank capacity exceeding 2 million gallons. There is minimal on-site sales activity with the customer present.

(PCC 33.920.300.A). "Fossil Fuels" are defined in pertinent part as:

> petroleum products (such as crude oil and gasoline), coal, methanol, and gaseous fuels (such as natural gas and propane) that are made from decayed plants and animals that lived millions of years ago and are used as a source of energy. Petroleum-based products used primarily for non-fuel uses (such as asphalt, plastics, lubricants, fertilizer, roofing, and paints) are not fossil fuels.

(PCC 33.910.030).  Examples of BFFTs include crude-oil terminals, petroleum-product terminals, natural-gas terminals, propane terminals, and coal terminals. (PCC 33.920.300.C).

Under the 2022 amendments, BFFTs are authorized as a limited use in industrial zones. (PCC 33.140.100.B). The limitations allow existing BFFTs to continue their operations but limits their on-site fossil-fuel storage capacity to that existing on August 31, 2022, the effective date of the amendments. (PCC 33.140.100.B.15). New FFTs may be built, but future *bulk* FFTs—that is, FFTs that "have access to marine, railroad, or regional pipeline to transport fuel to or from the site, and either have transloading facilities for transferring a shipment between transport modes,

///

Page  8 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

or have transloading facilities and storage tank capacity exceeding 2 million gallons"—may not. (PCC 33.140.100.B.15.b; PCC 33.920.300.A).

In sum, the 2022 amendments do not regulate existing FFTs beyond limiting their hypothetical future expansion for additional fossil-fuel storage capacity up to two million gallons. Existing FFTs are not required to cease or alter operations, or to otherwise reduce their capacity. Nor do the 2022 amendments require that FFTs' on-site storage capacity be utilized only for local consumption or to serve any particular market—be it local, regional, national, or international.

The 2022 amendments also do not prohibit the development of new on-site storage capacity or terminals that do not meet the requirements of a "Bulk Fossil Fuel Terminal" under PCC 33.920.300. They do not regulate the storage of substances not defined as fossil fuels, including petroleum-based products that are used for non-fuel uses. (*See* PCC 33.910.030) ("Petroleum-based products used primarily for non-fuel uses (such as asphalt, plastics, lubricants, fertilizer, roofing, and paints) are not fossil fuels."). They do not regulate the storage of products defined as renewable fuel, even if they have a fossil-fuel component. (*See id*. (defining renewable fuels in pertinent part as fuels "produced from non-petroleum, non-natural gas renewable resources and have less than 5 percent fossil fuel content.")). They do not regulate gas stations or other retailers of fossil fuels. (PCC 33.920.300.D.3). And they do not regulate the storage of fossil fuels for exclusive use at an airport, surface passenger terminal, marine, truck or air freight terminal. (PCC 33.920.300.D.4).

The 2022 amendments were not passed to harm out-of-state producers, distributors, or consumers of fuel—they were enacted to further public health and safety in Portland, a standard land-use purpose. In passing the 2022 amendments, the Council expressly found:

> The purpose of this ordinance is to limit the risk of damage from a catastrophic
> Cascadia Subduction Zone earthquake by limiting the expansion of fossil fuel
> storage tank capacity in an area with high susceptibility to liquefaction, while at

Page  9 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

the same time allowing the existing terminals to make safety upgrades; to serve future regional needs; and facilitate a transition to cleaner fuels to reduce carbon emissions.

(Sheffield Decl., Ex. 1, Ordinance 190978, ¶ 24(A)). The Council further clarified its intent by adopting the Findings of Fact Report as "additional findings" and the Remand Report commentary as "legislative intent and further findings." (*Id*. at p. 6). Those findings reiterated:

> The CEI Hub—built before our current understanding of the region's earthquake risk—sits on unstable soil subject to liquefaction and lateral spreading in an earthquake. … Because the CEI Hub is so close to the Willamette River and the dense urban core in the City of Portland, the risk of an accident, spill, or major infrastructure failure is particularly concerning as the region's earthquake[] risks are now well-known and well-documented. There is an estimated 26% likelihood of a major seismic event in the next 50 years.
>
> …..
>
> *The first step in making the current situation better is to ensure that the situation does not get worse*. Continuing to allow the unlimited increase in fossil fuel terminal storage tank within a high-risk area increases the risk to the surrounding industrial district and the Willamette River.
>
> The [2022] amendments are a regulatory approach to limit the size of new fossil fuel terminals and prohibit the expansion of fossil fuel storage tank capacity at existing fossil fuel terminals, with limited exceptions, which is an improvement compared to the current regulations that allow for unlimited growth in fossil fuel terminals.

(Sheffield Decl., Ex. 3, Remand Report at pp. 10, 13) (emphasis added).

The 2022 amendments are the only operable law that imposes restrictions on FFTs. While the 2015 resolution and PCP 2035 Policy Goal 6.48 provided general statements of the City's overall planning goals, they imposed no obligations or restrictions on any outside party.[2] *See*

---

[2] Furthermore, no member of the City Council who voted on the 2015 resolution was part of the City Council that adopted the 2022 amendments at issue in this case. (*See* Sheffield Decl., at ¶¶ 3, 7). The intent of the 2015 Council, whatever it may have been, cannot be imputed to the completely different 2022 Council that actually adopted the law at issue in this case. *See United*

Page  10 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

*Rowley v. City of Medford,* 285 P. 1111, 1114 (Or. 1930) ("A resolution is not a law, but merely the form in which the legislative body expresses an opinion."); (Sheffield Decl., ¶ 11, Ex. 9, How to Use the Plan at p. 5 (explaining how policies from the City's Comprehensive Plan are weighed and balanced, but noting that "Council is not compelled to make a decision just because it would meet Plan policy.")).

C.      **Plaintiffs' alleged harms**

Notably, Plaintiffs have not alleged that existing FFTs in the City are near capacity. Nor is it likely that Portland FFTs will experience capacity concerns anytime soon. (*See* Sheffield Decl., ¶ 4, Ex. 2, Ordinance 190978 Exhibit A – Findings of Fact Report ("Ex. 2, Findings of Fact Report") at pp. 5-6). Plaintiffs do not allege otherwise. (*See generally,* SAC).[3] The SAC has no allegations to support a conclusion that there is any risk of an imminent shortage of storage tank capacity within the CEI Hub in Portland. (*See generally,* SAC). Further, the evidence considered by the City Council expressly found the contrary—that there was "forecasted surplus fossil fuel storage capacity" in Oregon. (Sheffield Decl., Ex. 2, Findings of Fact Report at pp. 5-6).

///

---

*States v. Carrillo-Lopez*, 68 F.4th 1133, 1140 (9th Cir. 2023) (holding, "the views of an earlier legislature are generally not probative of the intent of a later legislature … particularly when the subsequent legislature has a substantially different composition." (citations and quotation marks omitted)).

[3] At most, plaintiffs assert that "existing fuel-transportation infrastructure is operating near maximum capacity." (SAC at ¶¶ 66, 72). Notably, however, one of the cited articles discuss pipeline capacity, and general capacity concerns in the transportation infrastructure system across the United States. Alexandra B. Klass & Danielle Meinhardt, *Transporting Oil and Gas: U.S. Infrastructure Challenges*, 100 Iowa L Rev 947, 965 (2015). Nowhere in that report is there any indication of capacity issues at Portland FFTs. The other cited report similarly does not address any capacity issues related to *Portland FFTs*. (Sheffield Decl., ¶ 12, Ex. 10, 2019 National Petroleum Council ("NPC") Report at pp. 9, 19 (explaining that existing infrastructure capacity *in the United States* generally has been modified or adapted to near-maximum capacity, but not identifying any concerns regarding capacity related to Portland or the Pacific Northwest)).

Page  11 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

The forecasted demand for fossil fuels out to 2050 is not projected to exceed the historic peak consumption handled by the City's FFTs in previous years. (Sheffield Decl., Ex. 2, Findings of Fact Report at p. 41). Moreover, because the City's land-use code regulates only *hypothetical future* new or increased on-site storage—as opposed to reducing existing capacity or regulating throughput, the "direction or flow of petroleum products," or "the ultimate destination or consumer of those products"—FFTs remain free to pump or transload as much fossil fuel as they wish, from wherever they may obtain it, and to ship that fuel anywhere they like. (*Id.* at p. 51).

Furthermore, while plaintiffs allege that the City's FFT infrastructure is used for regional distribution of fuels, there are no allegations that it has historically been used—or that there are any current plans to use it—as a broader hub for significant fuel distribution internationally or to states outside the region. Plaintiffs at most allege that Pembina, a company not a party to this case, ten years ago, announced plans for building a propane-export terminal in Portland. (SAC at ¶ 26). But Pembina never completed the project. And the failure to develop this FFT is entirely unrelated to the 2022 amendments plaintiffs now challenge: The Pembina project was abandoned because it required a zoning amendment, unrelated to the 2022 amendments, which it was unable to obtain. (*Id.* at ¶ 27).

In fact, any time before the City first started regulating BFFTs in 2016, and again for a combined three years before the amendments at issue in this case were adopted in fall 2022, plaintiffs or other interested parties could have applied to build new or expanded BFFTs in the City. Such an application would not have been subject to any cap on on-site storage of fossil fuels whatsoever, since no cap was in effect during those times. Plaintiffs do not allege that there were any applications for new or expanded BFFTs during these years. (*See* also, Ex. 2, Findings of Fact Report at p. 9 (explaining that in the period from 2016 until passage of the 2022 amendments "none of the terminals have applied to build new, safer fossil fuel tanks"). There is,

Page  12 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

quite simply, no *factual* allegations, as opposed to conclusory assertions, that there is a genuine demand for expanded BFFT storage capacity in Portland.

Plaintiffs' SAC attempts to address the absence of such apparent demand for new or expanded BFFTs by suggesting that market factors eventually will drive such demand at some point in the future. Plaintiffs' general allegations of potential future demand for storage important stem from two hypothetical increases—(1) the increased demand for exports of crude oil from the Bakken region; and (2) the increased demand for refined fuel in growing western Idaho. But the new factual allegations are insufficient to demonstrate that either such demand increases have occurred or there is any imminent likelihood of such occurrence.

First, plaintiffs allege that the demand for new export facilities in Portland will grow because domestic production of oil will increase for ten years. (SAC at ¶¶ 24, 66, 72).[4] Plaintiffs allege that "existing fuel-transportation infrastructure is insufficient in the western U.S. and operating at near maximum capacity elsewhere in North America." (*Id*. at ¶ 72). Plaintiffs' allegations cite to general increases in United States fuel production and general concerns with United States fuel-transportation infrastructure. But plaintiffs' allegations do not address any specific increase in fuel expected for storage *in Portland* or any specific inadequacy *in Portland's* existing terminal storage capacity. The SAC includes no allegations regarding the scope of these short-term increases in fuel production or the capacity of existing infrastructure *in Portland* to address any hypothetical future increase in demand.

The City has no refineries—indeed, there are no fossil-fuel refineries at all in Oregon. The alleged impact of the 2022 amendments on plaintiffs hinges on factually unsupported assertions that Portland is the key to efficient transport of crude oil from the Bakken region to

---

[4] Notably, the study cited by the plaintiffs said that "[m]ost projections provided for this study show an increase in production through the early- to mid-2020s[.]" (Sheffield Decl., ¶ 12, Ex. 10, 2019 NPC Report at p. 1-9).

Page  13 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

refineries in Washington, or for export across the Pacific.[5] (SAC at ¶ 7). Plaintiffs allege that the Bakken region seeks to avoid transport over the Cascade Mountains and therefore transports crude oil through the Columbia River Gorge. (*Id*. at ¶ 25). Plaintiffs, therefore, allege that the 2022 amendments restrict transport of crude oil to Washington refineries, resulting in inadequate supply and higher prices, and on information and belief "will cause reduced operations due to inadequate unrefined inputs." (*Id*. at ¶¶ 7, 79-81). But here again, plaintiffs simply allege that this crude oil is transported by rail, through Portland, to reach refineries in Washington. (*Id*.). There are no allegations that this rail transport through the Columbia River Gorge *requires any on-site storage in Portland*—let alone on-site storage that would exceed existing excess tank capacity at Portland BFFTs. (Sheffield Decl., ¶ 6, Ex. 4, 2020 ODOE Biennial Energy Report at pp. 36-46 (showing and discussing rail transport routes from Bakken region to Washington refineries). To the contrary, the NPC Report that plaintiffs repeatedly cite explains that "[m]ost outlooks imply that the era of exceptional production growth is over for the Bakken." (Sheffield Decl., ¶ 12, Ex. 10, NPC Report at p. 1-15). It goes on to say that, with the exception of a single outlier projection, "outlooks imply a transport system with moderate to little growth challenges" regarding takeaway capacity. (*Id*.). Similarly, there are no allegations that Washington refineries have excess capacity.

  Plaintiffs' allegations of harm in the other direction—due to demand for refined fuel in western Idaho and eastern Washington—are similarly conclusory and unspecific. Instead of directly alleging any imminent capacity limits at existing Portland FFTs that could imply a future need for new or expanded BFFTs, plaintiffs speak in generalizations about population growth,

---

[5] Plaintiffs also allege that, as the terminus point of the Olympic Pipeline, the City's 2022 amendments would impact the distribution of fuel by truck and barge to Washington, Idaho, and other parts of Oregon. (SAC at ¶¶ 7, 69 70, 74, 78, 119). However, in crafting the 2022 amendments, the City expressly contemplated the impact on these regional demands for fuel and concluded that existing capacity would continue to satisfy this regional demand, including demand outside of Oregon. (Sheffield Decl., Ex. 2, Findings of Fact Report at pp. 5-6).

Page  14 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

increased demand, and supply chains. (SAC at ¶¶ 74(a) and (c), 75, 77). Notably absent is any factual allegations linking alleged population growth to supply shortages, new capacity requirements, transportation delays, or increased prices. Instead of alleging directly relevant facts, plaintiffs allege conclusory generalities. For example, plaintiffs assert that the 2022 amendments "obstruct the supply of fuel to western Idaho and eastern Washington." (*Id*. at ¶ 7). But this is simply not borne out by the plain language of the 2022 amendments or by any plausible inference from the pleaded facts: The 2022 amendments do not regulate the movement of rail trains or barges, nor do they regulate any transport of fuels. Plaintiffs similarly note that this hypothetical obstruction is "resulting in inadequate supply of some fuel products and higher fuel prices in those areas." (*Id*.). But here again, plaintiffs insert conclusions without factual support. There are no allegations that eastern Washington and western Idaho have experienced any inadequate fuel supply since enactment of the 2022 amendments. There are similarly no allegations that these regions have faced increased fuel prices.

**D.    Plaintiffs' amendments in the SAC consist largely of inserting as "allegations of fact" legal arguments this court previously rejected.**

Plaintiffs were granted leave to amend their complaint to address the factual deficiencies identified by the Court in connection with plaintiffs' dormant Commerce Clause claim. (*See* Dkt. 58 at 3-4). Plaintiffs added dozens of additional paragraphs to the SAC. However, none of these allegations include any material new *facts* that support plaintiffs' dormant Commerce Clause claim. The allegations added to the SAC fall generally into three categories, which largely amount to plaintiffs inserting as "allegations" legal arguments they previously made in response to the City's prior motion to dismiss. First, plaintiffs assert that they face discriminatory harm from the 2022 amendments as end users, producers, distributors, and fuel-terminal owners in the same market or an overlapping market with Portland end users. (*See e.g.*, SAC at ¶¶ 1, 10-13, 86(e), 87(d), 88(d)). Second, plaintiffs assert new legal interpretations of the 2022 amendments

Page  15 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

in support of their contentions that they are discriminatory on their face and purpose. (*See, e.g.*, *id.* at ¶¶ 1, 3, 34, 35, 38, 62, 98, 100, 103). Third, plaintiffs, as discussed above, realleged the importance of Portland's location in the movement of fuel and have added more generalized allegations that the transport of fuel is tied to trains, barges, pipelines, and roads. (*See, e.g.*, *id.* at ¶¶ 7, 21, 63, 78). Plaintiffs' additions are still insufficient to state claims against the City, and this court should dismiss this action with prejudice.

## IV.    THE SAC STILL FAILS TO STATE A CLAIM AGAINST THE CITY UNDER THE DORMANT COMMERCE CLAUSE.

Plaintiffs' first and second claims are dormant Commerce Clause Claims. (*See* SAC at ¶¶ 91-121). The Commerce Clause of the United States Constitution gives Congress the power "[t]o regulate Commerce … among the several States." U.S. Const., art. I, § 8, cl. 3. The "dormant" Commerce Clause is the "negative implication" of that provision and is entirely a creature of caselaw. *See, e.g., Or. Waste Sys., Inc. v. Envtl. Quality Comm. of the State of Or.,* 511 U.S. 93, 98 (1994) (Commerce Clause contains "'negative' aspect that denies the States the power unjustifiably to discriminate against or burden" interstate commerce). As the Ninth Circuit recently noted, however, "While the dormant Commerce Clause is not yet a dead letter, it is moving in that direction." *Nat'l Pork Producers Council v. Ross*, 6 F.4th 1021, 1033 (9th Cir. 2021), *aff'd*, 143 S. Ct. 1142 (2023) (*"National Pork I"*).

## A.    The dormant Commerce Clause prohibits laws that discriminate against out-of-state economic actors versus similarly situated in-state competitors in the same market, either facially or in practice.

Caselaw over the past several decades has significantly narrowed the application of the dormant Commerce Clause. As the Supreme Court has emphasized, the clause is not "a roving license for federal courts to decide what activities are appropriate for state and local government to undertake." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.,* 550 U.S. 330, 343 (2007). While "[t]here was a time when this Court presumed to make such binding

Page  16 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

judgments for society," those days are no more. *Id*. at 347. Rather, "extreme caution is warranted before a court deploys [the] implied authority" of the dormant Commerce Clause—invalidating "a democratically adopted" law "in the name of the dormant Commerce Clause is a matter of extreme delicacy, something courts should do only where the infraction is clear." *Nat'l Pork Producers Council v. Ross,* 598 U.S. 356, 390 (2023) (internal quotation marks and citations omitted) (*National Pork II"*).[6] A plaintiff bringing a dormant Commerce Clause challenge accordingly faces a "high burden," and courts "construe the [law] narrowly and resolve any ambiguities in favor of the interpretation that most clearly supports constitutionality." *Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 444 (9th Cir. 2019).

As the Supreme Court has repeatedly emphasized, "[t]he modern law of what has come to be called the dormant Commerce Clause is driven by concern about 'economic protectionism, that is, *regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors*.'" *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–38 (2008) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273–74 (1988); emphasis added). Indeed, that "antidiscrimination principle lies at the 'very core' of our dormant Commerce Clause jurisprudence." *National Pork II*, 598 U.S. at 369 (citing *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 581 (1997)). The Court has employed two levels of scrutiny to analyze challenges under the dormant Commerce Clause, which depend on the type of law at issue. *Maine v. Taylor*, 477 U.S. 131, 138 (1986).

///

///

---

[6] The controlling portions of the Supreme Court's opinion in *National Pork II*, a fractured decision, are Parts I, II, III, IV-A, and V, which were joined by a majority of the justices on the Court. *See* 598 U.S. at 362 (noting that those sections were joined by Justices Gorsuch, Thomas, Sotomayor, Kagan, and Barrett). The City's Motion to Dismiss accordingly refers to and cites only those controlling portions.

Page 17 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

First, strict scrutiny applies to a law that "discriminate[s] against interstate commerce 'either on its face or in practical effect.'" *Id*. (quoting *Hughes v. Oklahoma*, 441 U.S. 332, 336 (1979)). Under the dormant Commerce Clause, "discrimination" means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys.,* 511 U.S. at 99. Crucially, "any notion of discrimination [under the dormant Commerce Clause] assumes a comparison of *substantially similar entities*" operating in the same market. *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997) (emphasis added).

Therefore, "in the absence of actual or prospective competition *between the supposedly favored and disfavored entities in a single market* there can be no local preference, whether by express discrimination against interstate commerce or undue burden upon it, to which the dormant Commerce Clause may apply." *Id*. (emphasis added). The party challenging the law has the burden of proving such discrimination. *Hughes*, 441 U.S. at 336. A law that discriminates between "substantially similar" in-state and out-of-state businesses to the "benefit[] of the former" and the detriment of "the latter" is unconstitutional unless it "serves a legitimate local purpose [that] could not be served as well by available nondiscriminatory means." *Or. Waste Sys.,* 511 U.S. at 99; *Taylor*, 477 U.S. at 138 (citation omitted).

By contrast, facially "nondiscriminatory regulations that have only incidental effects on interstate commerce" are subjected to a much lower level of scrutiny. *Or. Waste Sys.*, 511 U.S. at 99. Such laws "are valid unless the burden imposed on such commerce is *clearly excessive* in relation to the putative local benefits." *Id*. (emphasis added; citation omitted). The Court has described that balancing test as follows:

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be

Page  18 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

tolerated will of course depend on the nature of the local interest involved, and on
whether it could be promoted as well with a lesser impact on interstate activities.

*Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970) (internal citation omitted). Importantly,
even under this so-called "*Pike* balancing test," the dormant Commerce Clause prohibits only a
specific kind of burden—a *discriminatory* burden: In *General Motors*, the Court explained that a
plaintiff alleging an "undue burden" on interstate commerce still must point to "a local
preference" between "supposedly favored and disfavored entities in a single market[.]" *See* 519
U.S. at 300. That is, the plaintiff must point to "a discriminatory burden" on interstate trade—not
just any burden, however substantial. *Id*. at 299.

Thus, as the Ninth the Ninth Circuit has expressly held in the context of an FRCP
12(b)(6) motion to dismiss, "*Pike* balancing is required only if the challenged law has a
*discriminatory* effect on interstate commerce." *Rosenblatt*, 940 F.3d at 452 (quoting *Park Pet
Shop, Inc. v. City of Chicago*, 872 F.3d 495, 503 (7th Cir. 2017); emphasis added). Moreover,
"conclusory allegations of disparate impact are not sufficient"—rather, "to survive the City's
motion to dismiss, the plaintiffs need[] to plead *specific facts* to support a plausible claim that the
ordinance has a discriminatory effect on interstate commerce." *Id*. (quoting *Park Pet Shop*, 872
F.3d at 503; emphasis added). A complaint that fails to do so is subject to dismissal for failure to
state a claim under the *Pike* balancing test.[7] *Id*.

Moreover, the "clearly excessive" *Pike* test is extremely deferential. *See National Pork I*,
6 F.4th at 1032 (explaining that the court will find "such a significant burden" under *Pike* "only

---

[7] The Supreme Court has endorsed the Ninth Circuit's approach to *Pike* balancing. In *National
Pork II*, the Court reiterated that the "*Pike* test" does not significantly "depart from the
antidiscrimination rule that lies at the core of our dormant Commerce Clause jurisprudence." 598
U.S. at 377 (further noting that "'no clear line' separates the *Pike* line of cases from our core
antidiscrimination precedents." (citing *Tracy*, 519 U.S. at 298, n. 12)). Rather, the *Pike* test is
used primarily to "disclose the presence of a discriminatory purpose" that may not be apparent
on the face of a law. *Id*.

Page  19 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

in rare cases.").[8] And that deference is at its maximum when a party, "under the guise of the Commerce Clause," challenges what "is both typically and traditionally a local government function"—such as zoning or land use. *United Haulers,* 550 U.S. at 344 (citation omitted); *see Warth v. Seldin,* 422 U.S. 490, 508 n. 18 (1975) ("zoning laws and their provisions … are peculiarly within the province of state and local legislative authorities."); *Hess v. Port Auth. Trans–Hudson Corp.,* 513 U.S. 30, 44 (1994) ("regulation of land use [is] a function traditionally performed by local governments"); *FERC v. Mississippi,* 456 U.S. 742, 767 n. 30 (1982) ("regulation of land use is perhaps the quintessential state activity"). Indeed, the Supreme Court appears never to have struck down any zoning or land-use regulation under the dormant Commerce Clause.

In sum, to state a claim under the dormant Commerce Clause, a plaintiff must plead facts plausibly suggesting that a law facially discriminates between substantially similar in-state and out-of-state economic actors in the same market to the benefit of the former and the detriment of the latter. *Or. Waste Sys.,* 511 U.S. at 99; *Taylor*, 477 U.S. at 138; *Gen. Motors Corp*, 519 U.S. at 298. Or, in the alternative, a plaintiff must "plead specific facts to support a plausible claim that" a facially neutral law nevertheless "has a discriminatory effect on interstate commerce"—in other words, that it favors in-state economic actors over substantially similar out-of-state competitors in the same market—and thereby imposes a "burden … on interstate commerce [that] is clearly excessive in relation to the putative local benefits." *Rosenblatt*, 940 F.3d at 452 (citation omitted); *General Motors*, 519 U.S. at 299-300. Pleaded facts that render that outcome a "speculative" possibility are not enough. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007). This is a "high burden." *Rosenblatt*, 940 F.3d at 444. Consequently, "unless a state law

---

[8] Because the Supreme Court in *National Pork II* affirmed the Ninth Circuit's opinion in *National Pork I* without adopting a different controlling rationale, the Ninth Circuit's decision in *National Pork I* remains controlling law in this circuit. *See Iowa Pork Producers Ass'n v. Bonta*, No. 22-55336, 2024 WL 3158532, at *3 (9th Cir. June 25, 2024) (noting as much).

Page  20 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

*facially* discriminates against out-of-state activities, *directly* regulates transactions that are conducted *entirely out of state*, *substantially* impedes the flow of interstate commerce, or interferes with a *national* regime, a plaintiff's complaint is unlikely to survive a motion to dismiss." *National Pork I,* 6 F.4th at 1033 (emphases added).

**B.    Courts have consistently upheld state and local laws that do not discriminate against out-of-state economic actors to the benefit of substantially similar in-state competitors.**

Numerous cases illustrate how the above analysis applies in practice, of which the following are representative. In *United Haulers Association*, two counties "confronted what they could credibly call a solid waste 'crisis.'" 550 U.S. at 334. Many landfills "were operating without permits and in violation of state regulations," resulting in "health and safety concerns." *Id*. at 335. The counties therefore created a joint waste-management authority "to manage all solid waste within the counties." *Id*. Private haulers "would remain free to pick up citizens' trash from the curb, but the Authority would take over the job of processing the trash, sorting it, and sending it off for disposal." *Id*. The Authority accordingly purchased and developed its own facilities for processing and disposing of solid waste—and the counties "enacted 'flow control' ordinances requiring that all solid waste generated within the counties be delivered to the Authority's processing sites." *Id*. at 335−36.

The United Haulers Association sued the counties, "alleging that the flow control laws violate the Commerce Clause by discriminating against interstate commerce." *Id*. at 337. The district court concluded that it did and enjoined the ordinances. *Id*. But the Supreme Court reversed, holding that the "flow control ordinances do not discriminate against interstate commerce for purposes of the dormant Commerce Clause." *Id*. at 342.

As the Court explained, "The flow control ordinances in this case … treat[] all private companies exactly the same," and there was no evidence that the ordinances "favor[ed] particular private businesses over their competitors." *Id*. The Court emphasized that, to "discriminate

Page  21 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

against interstate commerce for purposes of the dormant Commerce Clause," a law must discriminate between "substantially similar" competitors. *Id*. There, the local waste-management Authority was not "substantially similar" to private haulers because it was a "public facility." *Id*. As the Court explained, "government is vested with the responsibility of protecting the health, safety, and welfare of its citizens"—and courts "should be particularly hesitant to interfere" with local laws "under the guise of the Commerce Clause" in areas that are "both typically and traditionally a local government function." *Id*. at 342–44 (internal quotation marks and citation omitted).

As the Court reiterated, the crux of the analysis is whether a local law "favors in-state business" over "substantially similar" out-of-state private competitors. *Id*. at 342–43. In other words, the dormant Commerce Clause prohibits "simple economic protectionism." *Id*. at 343 (quoting *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992)). By contrast, laws "favoring local government"—or designed to "protect[] the health, safety, and welfare of its citizens" without favoring local private competitors against "substantially similar" out-of-state private businesses—"may be  directed toward any number of legitimate goals unrelated to protectionism." *Id*. at 342–43.

Because the counties' flow-control ordinances treated all substantially similar private businesses equally, the Court held that they were not subject to strict scrutiny.[9] The Court therefore went on to apply the *Pike* balancing test to determine whether the ordinances nevertheless imposed burdens on interstate commerce that were "clearly excessive" in relation to

---

[9]  The Court expressly distinguished its prior decision in *C&A Carbone, Inc. v. Clarkstown*, 511 U.S. 383 (1994), which involved fairly similar facts, because that case had "involved discrimination in favor of *private* enterprise"—specifically, "a single local business" engaged in waste processing. *United Haulers Ass'n*, 550 U.S. at 342–44 (emphasis in original).

Page  22 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

the "putative local benefits."[10] *Id*. at 346 (quoting *Pike*, 397 U.S. at 142). On this question, the

Court noted that there was no evidence of any "disparate impact on out of-state as opposed to in-

state businesses." *Id*. And while the district court had noted a "rather abstract" impact on

interstate commerce in that the ordinances "removed the waste generated in [the counties] from

the national marketplace for waste processing services," the Supreme Court held that "any

arguable burden does not exceed the public benefit of the ordinances." *Id*. The ordinances

"confer[ed] significant health and environmental benefits upon the citizens of the counties" by

regulating waste disposal, which is "a typical and traditional concern of local government"

entitled to deference. *Id*. at 347. For those reasons, "any arguable burden the ordinances impose

on interstate commerce does not exceed their public benefits," and the ordinances were

constitutional. *Id*.

  Similarly, in *Exxon Corp. et al. v. Governor of Maryland et al.*, 437 U.S. 117 (1978), the

Court rejected a dormant Commerce Clause challenge brought by oil companies against a

Maryland statute providing that no producers or refiners of petroleum products could operate any

retail gas stations within the state. Notably, "no petroleum products are produced or refined in

Maryland," so the statute, while facially neutral, effectively applied only to out-of-state

businesses. *Id*. at 123. But the Court explained that this also meant that the statute did not benefit

any "substantially similar" in-state businesses and therefore was not discriminatory under the

dormant Commerce Clause:

> Plainly, the Maryland statute does not discriminate against interstate goods, nor
> does it favor local producers and refiners. Since Maryland's entire gasoline supply

---

[10] The *Pike*-balancing portion of the opinion was not joined by a majority of the Court: Justice
Scalia wrote separately that he did not believe the *Pike* balancing test should even exist, *see* 550
U.S. at 348–49 (Scalia, J., concurring), and Justice Thomas stated that he did not believe
dormant Commerce Clause jurisprudence has any constitutional basis, *see* 550 U.S. at 349-55
(Thomas, J., concurring). The *Pike*-balancing portion of the opinion is nevertheless controlling
law because it represents the plurality view of the Court.

Page  23 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

> flows in interstate commerce and since there are no local producers or refiners, such claims of disparate treatment between interstate and local commerce would be meritless.

*Id*. at 125.

Turning to the *Pike* portion of the analysis, the Court concluded that the Maryland law did not "impermissibly burden interstate commerce." *Id*. at 127. As the Court explained, it is irrelevant that "the economic market for petroleum products is nationwide" or that the Maryland law "causes some business to shift from one interstate supplier to another." *Id*. at 127–28. The dormant Commerce Clause "protects the interstate market, not particular interstate firms" or "the particular structure or methods of operation" of a market. *Id*. Here, any burden on the interstate petroleum market was insufficient to outweigh "the State's legitimate purpose in controlling the gasoline retail market" inside its borders. *Id*. at 125, 128–29.

Finally, in *National Pork I*, California had adopted a law banning the in-state sale of certain pork products "unless the meat was produced in compliance with specified sow confinement restrictions." 6 F.4th at 1025 (citations omitted). The plaintiffs, two groups of out-of-state pork producers, filed a lawsuit claiming that the law violated the dormant Commerce Clause because, *inter alia*, "it imposes excessive burdens on interstate commerce" under the *Pike* balancing test. *Id*. The plaintiffs alleged in pertinent part that "the pork industry is highly interconnected" and that a single hog "is butchered into many different cuts which would normally be sold throughout the country." *Id*. at 1028. They alleged that, because of the law, "all pork suppliers will either produce hogs in compliance with California specifications or incur the additional cost of segregating their products." *Id*. To comply with the law, "producers will have to expend millions in upfront capital costs and adopt a more labor-intensive method of production," and consumers nationwide would suffer from "a 9.2 percent increase" in costs passed onto them as a result. *Id*. But the Ninth Circuit concluded that plaintiffs had failed to plead a valid dormant Commerce Clause claim.

Page  24 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

Specifically, the court held that "a non-discriminatory regulation that 'precludes a preferred, more profitable method of operating in a retail market' [does not] place a significant burden on interstate commerce" within the meaning of *Pike*. *Id*. at 1032 (citing *Nat'l Ass'n of Optometrists and Opticians v. Harris*, 682 F.3d 1144, 1154-55 (9th Cir. 2021)). Thus, "even a state law that imposes heavy burdens on some out-of-state sellers does not place an impermissible burden on interstate commerce." *Id*. (further explaining that "cost increases to market participants and customers do not qualify as a substantial burden to interstate commerce for purposes of the dormant Commerce Clause," and "harm to the consuming public [pertains] to the wisdom of the statute, not to a burden on interstate commerce." (citations omitted)).

The Supreme Court affirmed in *National Pork II*, agreeing that the plaintiffs' complaint was correctly dismissed for failing to state a claim. As the Court first noted, the plaintiffs "begin in a tough spot" because there was nothing to show that "California's law seeks to advantage in-state firms [over] out-of-state rivals." 598 U.S. at 370. On its face, the law "imposes the same burdens on in-state pork producers that it imposes on out-of-state ones": California producers must comply with the law to the same extent as out-of-state producers who wish to sell in California. *Id*. Indeed, the plaintiffs conceded as much. *Id*. The California law therefore was not facially discriminatory under the dormant Commerce Clause and was not subject to strict scrutiny.

The Court next rejected the plaintiffs' arguments that they had stated a claim under the *Pike* balancing test. Quite simply, the Court explained, the "*Pike* test" does not significantly "depart from the antidiscrimination rule that lies at the core of our dormant Commerce Clause jurisprudence." 598 U.S. at 377. Rather, the *Pike* test serves primarily to "disclose the presence of a discriminatory purpose" that may not be apparent on the face of a law. *Id*. In *National Pork*, however, the plaintiffs "nowhere suggest that an examination of Proposition 12's practical effects in operation would disclose purposeful discrimination against out-of-state businesses." *Id*.

Page  25 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

at 379. Their burden-on-interstate-commerce claim accordingly fell "well outside *Pike*'s heartland," and the Ninth Circuit correctly dismissed it.[11] *Id*. at 379-80.

## C.    Pre-modern dormant Commerce Clause cases

In *National Pork II*, the Supreme Court noted that, notwithstanding the "modern cases" discussed above, there remains a body of older cases that were never explicitly overruled and that theoretically have "left the courtroom door open to challenges premised on even nondiscriminatory burdens[.]" 598 U.S. at 369, 379 (quoting *Davis*, 553 U.S. at 353; internal quotation marks omitted). As the Court explained, however, that "line of cases … originated before *Pike*" and involved "trucks, trains, and the like." *Id*. at 379 n.2. Aside from being of doubtful continuing validity, those decisions applied "only when a lack of national uniformity" in a means of transportation "would impede *the flow* of interstate goods" across state borders. *Id*. (emphasis in original).

Thus, in *Southern Pacific Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 763 (1945), the state of Arizona had enacted a law providing that no railroad train could enter or operate in Arizona if it was longer than fourteen cars (for passenger trains) or seventy cars (for freight trains). The Southern Pacific railroad operated "two interstate trains" crossing through the state that exceeded those lengths and was sued by Arizona for violating the law. *Id*. In concluding that the Arizona law contravened the dormant Commerce Clause, the Supreme Court first noted that

---

[11] The justices disagreed on the underlying rationale for that conclusion, however. A four-justice plurality would have held that, even if the California law did "threaten to disrupt the existing practices of some industry participants and may lead to higher consumer prices," the "costs [would] ultimately be borne by in-state consumers" along with "out-of-state consumers," and that any unconstitutional burden within the meaning of *Pike* was "nothing more than a speculative possibility." *Id*. at 385-86. (opinion of Gorsuch, Thomas, Sotomayor, and Kagan, JJ.). Justice Barrett, for her part, would have held as a matter of law that "California's interest in eliminating allegedly inhumane products from its markets cannot be weighed on a scale opposite dollars and cents"—that is, in Justice Barrett's opinion, the plaintiffs' alleged "benefits and burdens" simply were not "judicially cognizable and comparable" under the *Pike* balancing test. *Id*.

Page  26 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

the trial-court findings showed that "the operation of … trains of more than fourteen passenger and more than seventy freight cars is standard practice over the main lines of the railroads of the United States," and that Arizona was a clear outlier from that national standard. *Id*. at 771. The evidence further showed that, consequently, the Arizona law required the wholesale "breaking up and remaking [of] long trains upon entering and leaving the state in order to comply with the law":

> The record here shows that the enforcement of the Arizona statute results in freight trains being broken up and reformed at the California border and in New Mexico, some distance from the Arizona line. Frequently it is not feasible to operate a newly assembled train from the New Mexico yard nearest to Arizona, with the result that the Arizona limitation governs the flow of traffic as far east as El Paso, Texas. For similar reasons the Arizona law often controls the length of passenger trains all the way from Los Angeles to El Paso.

*Id*. at 772, 774-75. That practice caused significant "delays," diminished "volume," and large "additional costs" for interstate rail traffic entering or leaving Arizona. *Id*. at 771-72. Those adverse consequences were borne almost entirely by two interstate carriers, since more than 90% of all rail traffic in Arizona was interstate, with minimal in-state rail service. *Id*. The "unchallenged findings" as a whole left "no doubt" that the Arizona law imposed a "serious burden" on the flow of interstate commerce by "materially imped[ing] the movement of … interstate trains" crossing the Arizona border. *Id*. at 773, 774-75.

Significantly, that burden constituted "a substantial obstruction to the national policy proclaimed by Congress, to promote adequate, economical and efficient railway transportation service." *Id*. (citing Interstate Commerce Act of 1887). That congressional policy requires "uniformity" to be effective and would be undermined if interstate trains had "to be broken up and reconstituted as they enter each state":

///

///

///

Page  27 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

Compliance with a state statute limiting train lengths requires interstate trains of a length lawful in other states to be broken up and reconstituted as they enter each state according as it may impose varying limitations upon train lengths. … The serious impediment to the free flow of commerce by the local regulation of train lengths and the practical necessity that such regulation, if any, must be prescribed by a single body having a nation-wide authority are apparent.

*Id*. at 773-75.

Finally, the Court noted that the Arizona law had caused an "increase in the number of accidents" to employees, passengers, and members of the public through more collisions between trains and cars, "more starts and stops, more 'meets' and 'passes,' and more switching movements" of trains entering or leaving Arizona. *Id*. at 775, 777-78 (further noting that "[t]he accident rate in Arizona is much higher than on comparable lines elsewhere"). As such, it was distinguishable from state laws affecting interstate trains that had nevertheless been upheld as reasonable safety measures, such as laws requiring electric lights on locomotives, or full train crews, or cabooses on freight trains. *Id*. at 779 (citations omitted). The Court also contrasted Arizona's law to "local regulations" of facilities such as "harbors, piers, and docks, with respect to which the state has *exceptional scope* for the exercise of its regulatory power, and which, Congress not acting, have been sustained *even though they materially interfere with interstate commerce*." *Id*. at 783 (emphases added; citations omitted).

Based on its "examination of all the relevant factors," the Court concluded that Arizona's interest in the "slight and dubious advantage" of its law as a putative safety measure was "outweighed by the interest of the nation in an adequate, economical and efficient railway transportation service, which must prevail." *Id*. at 779, 783-84. The Arizona law was accordingly held to contravene the dormant Commerce Clause.

Similarly, in *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520 (1959), the state of Illinois had enacted a law requiring a certain type of rear fender and mudguard for all trucks entering or operating in Illinois. Meanwhile, the state of Arkansas mandated a conflicting design, which "rendered the use of the same motor vehicle equipment in both States impossible." *Id*. at 522-23.

Page  28 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

The Illinois law also differed from the standard design "legal in at least 45 states," making it unlawful for interstate trucks so equipped to enter Illinois. *Id*. at 523.

As a result of those conflicting standards, trucks traveling from Arkansas to Illinois would have to swap out mudguards between states, which is a lengthy and sometimes dangerous process requiring welding:

> [I]f a trailer is to be operated in both States, mudguards would have to be interchanged, causing a significant delay in an operation where prompt movement may be of the essence. It was found that from two to four hours of labor are required to install or remove a contour mudguard. Moreover, the contour guard is attached to the trailer by welding and if the trailer is conveying a cargo of explosives (*e.g.,* for the United States Government) it would be exceedingly dangerous to attempt to weld on a contour mudguard without unloading the trailer.

*Id*. at 527. In addition, the conflicting state regulations seriously interfered with "interline" traffic—that is, the interstate hauling of one company's trailers by other companies' trucks across different states:

> Interlining contemplates the physical transfer of the entire trailer; there is no unloading and reloading of the cargo. The interlining process is particularly vital in connection with shipment of perishables, which would spoil if unloaded before reaching their destination…. Since carriers which operate in and through Illinois cannot compel the originating carriers to equip their trailers with contour guards, they may be forced to cease interlining with those who do not meet the Illinois requirements.

*Id*. at 527-28. The Court concluded that the evidence showed a "rather massive … burden on interstate commerce" as a result. *Id*. at 528. Crucially, the state *did not dispute* that its law indeed "severely burdens interstate commerce." *Id*.

Instead, Illinois argued that, as a valid exercise of the state's police power, the Court "must sustain the validity of the statute notwithstanding the extent of the burden it imposes on interstate commerce." *Id*. But the Court rejected that argument, noting that "[t]he conflict between the Arkansas regulation and the Illinois regulation" illustrates that "regulation of mudguards is not one of those matters admitting of diversity of treatment, according to the

Page  29 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

special requirements of local conditions[.]" *Id*. at 529 (citation and internal quotation marks omitted). And, the Court explained, Illinois had not made a showing sufficient to outweigh "the clear burden on commerce" created by its law. *Id*. at 529-30. The Court accordingly concluded that "[t]his is one of those cases—few in number—where local safety measures that are nondiscriminatory place an unconstitutional burden on interstate commerce." *Id*. at 529.

Finally, in *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 432-33 (1978), the state of Wisconsin had adopted a law banning any trailer-truck combination from entering or operating in the state if it exceeded 55 feet in length, or if it pulled more than one trailer absent a special permit from the state. Two interstate trucking companies sued the state after they were, *inter alia*, denied permits "to operate 65-foot doubles … between Illinois and Minnesota" across Wisconsin. *Id*. at 435.

The uncontroverted evidence "demonstrated … that the regulations impose[d] a substantial burden on the interstate movement of goods." *Id*. at 445. In particular, the Wisconsin law "slow[ed] the movement of goods in interstate commerce by forcing appellants to haul doubles across the State separately, to haul doubles around the State altogether, or to incur the delays caused by using singles instead of doubles to pick up and deliver goods." *Id*. (citing *Bibb*, 359 U.S. at 527). It also "prevent appellants from accepting interline transfers of 65-foot doubles for movement through Wisconsin" from out-of-state carriers based "in the 33 States where the doubles are legal." *Id*. (citing *Bibb*, 359 U.S. at 527-28). Moreover, at least one exception to Wisconsin's law "discriminates on its face in favor of Wisconsin industries and against the industries of other States" by allowing Wisconsin businesses to *export* goods out of Wisconsin in trucks over 55 feet long, but denying that right to out-of-state businesses wishing to transport goods from outside the state through Wisconsin. *Id*. at 446-47, 446 n. 24. Similarly, "other exceptions, although neutral on their face, … primarily benefit[ed] important Wisconsin industries." *Id*. at 447.

Page  30 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

Faced with that evidence, the state had "virtually defaulted in its defense of the regulations as a safety measure" and "failed to make even a colorable showing that its regulations contribute to highway safety." *Id*. at 444, 448. The Court eventually concluded that "the challenged regulations violate the Commerce Clause because they place a substantial burden on interstate commerce and they cannot be said to make more than the most speculative contribution to highway safety." *Id*. at 447.

In sum, as the Supreme Court recently explained in *National Pork II*, aside from "originat[ing] before *Pike*" and the Court's "modern cases," this older "line of cases" involved state regulations of specific *means of interstate transportation*—"trucks, trains, and the like."[12] 598 U.S. at 369, 379 n.2. Even then, such laws were invalidated rarely and "*only* when a lack of national uniformity" in those means of transportation—*e.g.,* different maximum lengths for trains or conflicting requirements for truck mudguards across different states—would substantially "impede *the flow* of interstate goods" across state borders. *Id*. at 379 n.2 (first emphasis added, second emphasis in original). Those old cases also went out of their way to emphasize that regulating a *means* of interstate transportation is different from regulating *local facilities* used for interstate commerce, such as "harbors, piers, and docks[.]" *Southern Pacific Co.*, 325 U.S. at 783. As to such facilities, the Court explained, local governments had "exceptional scope for the exercise of [their] regulatory power," and regulations of local facilities used for interstate commerce would be "sustained" even if "they materially interfere with interstate commerce." *Id*. (emphases added; citations omitted).

///

---

[12] The Court referred to these as "instrumentalities" rather than "means" of transportation, but the two terms are synonymous in this context. *See Instrumentality*, Webster's Third New Int'l Dictionary (2002 unabridged ed.) (defining "instrumentality" in pertinent part as "something by which an end is achieved **:** means"); *Means, id*. (noting that "means" is a synonym of "instrumentality" that is "now the common form in all uses [to designate] anything employed in executing some end," such as a "means of transportation").

Page  31 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

**D.   The City's 2022 land-use amendments do not violate the dormant Commerce Clause.**

While the SAC attempts to address the defects that the court identified with respect to plaintiffs' dormant Commerce Clause claims, plaintiffs' additional allegations are largely unresponsive to the court's concerns and irrelevant to such claims. The SAC still fails to state a claim against the City under the dormant Commerce Clause, and this court should therefore dismiss it with prejudice.

*1.     To state claims under Section 1983, each plaintiff must plead a plausible, cognizable injury to its own rights under the dormant Commerce Clause.*

As an initial matter, the allegations in the SAC are insufficient to plausibly allege an injury to each plaintiff's rights under the dormant Commerce Clause. Plaintiffs bring their claims "pursuant to 42 U.S.C. § 1983" ("Section 1983"), a federal statute. (*See* SAC at ¶¶ 8, 17, 91-112, 113-121). But Section 1983 provides a cause of action to plaintiffs only if the City injured *their* constitutional rights—not if it harmed some third party's constitutional rights, or caused plaintiffs some harm untethered from a constitutional right. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002) ("Section 1983 provides a remedy only for the deprivation of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States. Accordingly, it is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of that section." (emphasis in original)); *Meland v. Weber*, 2 F.4th 838, 847-48 (9th Cir. 2021) (holding, in Section 1983 case, that a plaintiff must "allege[] that he has been personally injured by an allegedly unconstitutional law" and "cannot rest his claim to relief on the legal rights or interests of third parties.").

To state a claim under Section 1983, each plaintiff must point to an injury to itself that falls within the relevant "zone of interests" protected by the law—here, an injury to its constitutional rights under the dormant Commerce Clause. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (holding that "a statutory cause of action

Page  32 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked," and the "zone of interests" test "applies to all statutorily created causes of action"); *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999) ("To state a claim for relief in an action brought under § 1983," a plaintiff must plausibly allege that it was "deprived of a right secured by the Constitution or laws of the United States"). A complaint that does not do so fails to state a valid Section 1983 claim. [13]

Thus, in *City of Los Angeles v. County of Kern*, the plaintiffs were California recyclers who challenged a law banning the use of treated solid waste as fertilizer in Kern County. *See* 581 F.3d 841, 843-44 (9th Cir. 2009). The plaintiffs alleged that they "engage in interstate commerce," and that the law violated the dormant Commerce Clause because they would "be forced to pay higher fees to ship their waste to different sites, likely in Arizona," instead of California. *Id*. at 848. But the Ninth Circuit held that the plaintiffs' alleged injury did not "bear more than a marginal relationship to the purposes underlying the dormant Commerce Clause," and that their claim therefore should be dismissed. *Id*. at 847. As the court explained, "the chief purpose underlying [the dormant Commerce] Clause is to limit the power of States to erect barriers against interstate trade." *Id*. (quoting *Individuals for Responsible Gov't, Inc. v. Washoe Cnty.*, 110 F.3d 699, 703 (9th Cir. 1997)). However, "[f]inancial injury, standing alone, does not

---

[13] Until recently, the "zone of interests" test for Section 1983 claims alleging constitutional violations was part of the doctrine of "prudential standing." *See City of Los Angeles v. Cnty. of Kern*, 581 F.3d 841, 848 (9th Cir. 2009). However, in *Lexmark*, the Supreme Court noted that the phrase "prudential standing is a misnomer as applied to the zone-of-interests analysis," because that analysis is separate from the question of Article III standing. *See* 572 U.S. at 127, 127 n.3, 128 n.4. Rather, the zone of interests "is an element of the cause of action under the statute," not a question of "subject-matter jurisdiction." *Id*. at 134 n. 6. Notably, the Court in *Lexmark* did not reject the "zone of interests" test or overrule its precedent applying it—quite the contrary. What the Court did, however, was disavow the *label* that had been attached to that test. *See id*. at 128 n. 4; *see also Coal. For Competitive Elec., Dynegy Inc. v. Zibelman*, 272 F. Supp. 3d 554, 581 (S.D.N.Y. 2017), *aff'd sub nom. Coal. for Competitive Elec., Dynergy Inc. v. Zibelman*, 906 F.3d 41 (2d Cir. 2018) ("The Supreme Court's reasoning that the zone of interests test is more logically a cause of action question applies equally to statutory and constitutional claims, and *Lexmark* did not reject the zone of interests test—it merely reclassified it.").

Page  33 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

implicate the zone of interests protected by the dormant Commerce Clause"—rather, the plaintiffs' alleged "financial injury must somehow be tied to a barrier imposed on interstate commerce." *Id*. at 848. In *City of Los Angeles*, however, the financial impact of the county's ban on recyclers would be similar for in-state or out-of-state entities: both "would suffer the same injury (being forced to pay higher prices for biosolid disposal)" regardless of their state of citizenship or incorporation. *Id*. In short, nothing "links the financial injury [plaintiffs] allege in this case with an impediment to interstate commerce." *Id*. at 848 n. 6.

So to here. The SAC continues to allege generally that all plaintiffs "are and will continue to be irreparably harmed" because the City's land-use rules supposedly eventually "will throttle the transport of fossil fuel to and from other states and countries"; cause "higher prices and fuel product shortages"; interfere with plaintiffs' future "ability to relocate, replace storage tanks, or build new tanks" in the City; "result[] in a reduction of their properties' value"; and prevent plaintiffs "from siting new fuel terminals within the City." (SAC at ¶¶ 83, 111, 120). The State of Montana also alleges that the City's zoning law "reduces the state's severance tax revenue." (*Id*. at ¶ 83). But, without more, those are not injuries to rights *secured by the dormant Commerce Clause*.

Quite simply, there is no constitutional right under the dormant Commerce Clause to a certain amount of fuel, or to a set price for fuel, or to a set level of tax revenues, or to site fuel tanks at a particular location, or to the highest real-property value. *See National Pork I*, 6 F.4th at 1033 (holding that "cost increases to market participants" and "higher costs to consumers," without more, "do not qualify" as unconstitutional burdens under the dormant Commerce Clause); *Gonzaga Univ.* 536 U.S. at 283 (holding that, because "Section 1983 provides a remedy only for the deprivation of 'rights, privileges, or immunities secured by the Constitution … it is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of that section." (emphasis in original)). There *is* a right to engage in interstate

Page  34 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

commerce free from *discriminatory* laws, but plaintiffs' conclusory and generic allegations do not adequately allege that each discrete plaintiff has suffered an injury "implicat[ing] the zone of interests protected by the dormant Commerce Clause" *City of Los Angeles*, 581 F.3d at 848; *see also Individuals for Responsible Gov't, Inc.*, 110 F.3d at 703 (concluding that the plaintiffs' alleged injury—needing "to pay for unnecessary and unwanted garbage services"—was "not even marginally related to the purposes underlying the dormant Commerce Clause.").

Indeed, the absence of a link between a protected interest and plaintiffs' alleged injuries was one of the deficiencies noted by the court in its prior opinion. (*See* Dkt. 58 at 3) (explaining that plaintiffs' First Amended Complaint contained "insufficient allegations demonstrating *both* a discriminatory burden … *and* linking that burden to Plaintiffs' [alleged] injuries." (emphases added)). The SAC appears to try to address that deficiency by now asserting that plaintiffs are each end users of fuel that is transported through Portland or in an "overlapping, interrelated fuel market" that receives some fuel from Portland. (SAC at ¶¶ 1, 9, 10-13, 86(e), 87(d), 88(d)). However, as discussed above, there are simply no allegations that there is insufficient storage capacity in existing Portland BFFTs to meet demand by end users. Plaintiffs' own summary highlights the inadequacy of their allegations: They assert that the 2022 amendments will result in higher fuel prices "because of (a) the lower supply, and (b) the higher wholesale price and transportation costs incurred in obtaining fuel from alternative distant terminals." (*Id.* at ¶ 75). But the 2022 amendments do not lower supply, and this court need not accept plaintiffs' unsupported, conclusory assertion to the contrary.[14] *See Iqbal*, 556 U.S at 678-79 (2009) (on motion to dismiss, courts should reject "unreasonable inferences" and "mere conclusory

///

---

[14] Plaintiffs' unsupported assertion of reduced supply is replete throughout the new amendments. (*See* SAC at ¶¶ 6, 12, 74, 76, 119). But repetition does not equate to plausibility. *See Dahlia* 735 F.3d at 1076 (courts may "reject, as implausible, allegations that are too speculative to warrant further factual development.").

Page 35 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

statements"). Plaintiffs' theory of injury based on increased prices to them as end users relies on conclusory allegations regarding constricted supply that is unbounded by facts.

Nothing in the SAC addresses a key deficiency identified by this court—that plaintiffs have not adequately alleged an injury to each of them that is linked to a discriminatory burden on interstate commerce. Each plaintiff therefore still fails to properly state a claim for denial of its constitutional rights under Section 1983. *See Meland*, 2 F.4th at 847. This court should dismiss plaintiffs' first and second claims on that basis alone.

**2.    *Even if plaintiffs had alleged a cognizable injury—and they have not—the City's 2022 zoning-code amendments do not facially discriminate against out-of-state economic actors to the benefit of substantially similar in-state actors.***

The bulk of plaintiffs' first claim alleges that the 2022 amendments are "facially discriminatory" under the dormant Commerce Clause. (SAC at ¶¶ 91-112). Plaintiffs assert that this facial discrimination can be found in excerpts from non-binding policies and resolutions, commentary, and in codified exceptions in the 2022 amendments. (*See id*. at ¶¶ 95-103). Essentially, plaintiffs contend that contemplating regional consumer needs in connection with a land-use decision is facially discriminatory under the Constitution. This is not so, and holding as much would allow the dormant Commerce Clause to override all local land-use planning.[15] The dormant Commerce Clause question is not whether the City's land-use decision considered only regional needs in evaluating how land in the City should be used. The question is whether the

---

[15] For example, a land-use decision regulating large consumer warehouses may permissibly consider the demand for storage and delivery of consumer goods in the region. But under plaintiffs' theory, a hypothetical increase in demand for storage in Oregon for consumer goods intended for delivery in California would mean that the land-use decision was unconstitutionally discriminatory because it looked only at regional needs. That is not the analysis under the dormant Commerce Clause. On the contrary, in *National Pork I* and *II*, California could permissibly consider only its own interests, including noneconomic interests, when regulating sales of pork, even if doing so would require out-of-state producers to materially change their practices or be banned from the California market. *See National Pork I*, 6 F.4th 1032-33; *National Pork II*, 598 U.S. at 1151-52.

Page  36 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

City's land-use amendments discriminate against out-of-state economic actors in favor of substantially similar in-state actors in their use of land in the City. They do not.

Importantly, the 2022 amendments do not speak to either the origin of fossil fuels stored or transloaded in Portland, or the destination of such fuels. Under the amendments, plaintiffs can buy fuel from anywhere they like and ship it anywhere they like, using BFFTs in Portland. Under the amendments, plaintiffs can purchase fuel from BFFTs in Portland on the same terms as Oregon purchasers. The amendments simply regulate what kinds of *future facilities* any business—whether based in Oregon or out of state—will be allowed to build in Portland. Put differently, plaintiffs do not allege—indeed, they cannot allege—that the 2022 amendments would permit an in-state business to build a facility that a substantially similar out-of-state business would be barred from building. Nor do they allege—and they cannot—that an out-of-state end user buying fuel from a Portland BFFT pays a higher price for the same fuel than a similarly situated Oregon end user because of the 2022 amendments. At bottom, plaintiffs allege that the 2022 amendments are facially discriminatory because the City chose to limit the dedication of additional land to the hypothetical future warehousing of fossil fuels. But doing so does not contravene the dormant Commerce Clause.

In an attempt to manufacture a claim of facial discrimination, plaintiffs now allege *the legal conclusions* that the fuel-storage infrastructure for end users set forth in codified exceptions to the 2022 amendments is not required to be built *on site*, so long the fuel stored therein is used in Portland as opposed to outside the City. (*See* SAC at ¶¶ 36, 98(a)). Plaintiffs similarly assert that the exception for exclusive use at airports or certain other transportation facilities is discriminatory because it applies only if such facilities are in Portland but not elsewhere. (*See id*. at ¶ 98(b)). Finally, for the exception for renewable fuel, plaintiffs now allege that this exception would allow terminals to store only renewable fuel that "will be sold, dispensed, or distributed

///

Page  37 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

in the City," but not "identical fuel to be used elsewhere[.]" (*See id.* at ¶¶ 62, 98(c)). Those legal conclusions are both incorrect and irrelevant.

First, plaintiffs' legal conclusions as to how the 2022 amendments would operate completely invert the presumption in favor of constitutionality of local law. As the Ninth Circuit has held, when faced with a facial dormant Commerce Clause challenge, courts "construe the [challenged law] narrowly and resolve any ambiguities in favor of the interpretation that most clearly supports constitutionality." *Rosenblatt*, 940 F.3d at 444. Plaintiffs cannot avoid that "heavy burden" through the artifice of creating their own, deliberately problematic straw man. *Id.; see also Ashcroft*, 556 U.S. at 678-79 (holding, on review of a motion to dismiss, that courts should reject "legal conclusions cast in the form of factual allegations.").

In any event, plaintiffs' legal conclusions as to how the 2022 amendments would operate are simply incorrect. The 2022 amendments are *a land-use law,* meaning that they regulate the *use of land*, not the operations of businesses. As explained previously, the 2022 amendments merely define the new land-use category of "Bulk Fossil Fuel Terminals" and regulate that type of land use. (PCC 33.920.300). The 2022 amendments also specify that the following land uses "are not Bulk Fossil Fuel Terminals" under that definition:

- Gas stations and other retailers of fossil fuels;

- Distributors and wholesalers that receive and deliver fossil fuels exclusively by truck;

- Industrial, commercial, institutional, and agricultural firms that exclusively store fossil fuel for use as an input;

- Uses that involve the transfer or storage of solid or liquid wastes;

- The storage of fossil fuels for exclusive use at an airport, surface passenger terminal, marine, truck or air freight terminal, drydock, ship or barge servicing facility, rail yard, or as part of a fleet vehicle servicing facility;

- Uses that recover or reprocess used petroleum products.

(PCC 33.920.300(D)). Nothing in any of the above exceptions facially discriminates between

Page  38 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

substantially similar in-state and out-of-state economic actors in the same market, plaintiffs' unsupported legal conclusions to the contrary notwithstanding.

Indeed, plaintiffs' legal conclusion that the 2022 amendments are discriminatory because the exceptions for fuel storage by a marine terminal allegedly would allow off-site fuel storage by the Port of Portland, Oregon, but not by the Port of Longview, Washington, is simply wrong. (SAC at ¶ 98(b)). It is not even a plausible reading of the law: Nothing in the 2022 amendments provides that only an Oregon company can operate a dock, pier, or port facility in Portland; or that an Oregon company operating such a facility could build a fossil-fuel tank farm *off site* while a Washington company could not (recall that the 2022 amendments are a *land-use* law, which means that they regulate the use *of a specific piece of land*). As the Ninth Circuit explained in *Rosenblatt*, "[l]and use regulations are inherently local," and this makes them especially hard to challenge on dormant Commerce Clause grounds. 940 F.3d at 452; *see also Spoklie v. Montana*, 411 F.3d 1051, 1059 (9th Cir. 2005) (holding, "That a particular service … appeals to out-of-staters, however, does not impose on states an obligation to permit it."). The Supreme Court has long held that local governments have "exceptional scope for the exercise of [their] regulatory power" as to "local regulations of rivers, harbors, piers, and docks," and such regulations "have been sustained even though they materially interfere with interstate commerce." *Southern Pacific Co.*, 325 U.S. at 783 (citation omitted). As explained further below, there is no such material interference here, but that quotation highlights the steep hill plaintiffs have to climb. Given that reality and the presumption in favor of constitutionality of local law noted above, plaintiffs cannot show that their unsupported legal conclusions nevertheless state a claim under the dormant Commerce Clause.

Similarly, plaintiffs' legal conclusion that the land-use exception allowing the storage of renewable fuel in excess of two million gallons would apply only if the renewable fuel is used "in the City," and that storage "for *identical* fuel to be used elsewhere … is not allowed," is

Page  39 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

unsupported by any plausible reading of the law. (SAC at ¶ 98(c)) (emphasis added). Under the 2022 amendments' regulation of existing BFFTs, "[a]dding storage tank capacity exclusively for renewable fuels or to comply with the Renewable Fuel Standard … is not considered an increase in capacity." (PCC 33.140.100(15)(a) (emphasis added). The amendments define "renewable fuel" as any "fuels (such as biodiesel, biomethane, and clean hydrogen) [that] are produced from non-petroleum, non-natural gas renewable resources and have less than 5 percent fossil fuel content." (PCC 33.910.030). Nothing in that language requires that such renewable fuels be used only "in the City" or that storage of "identical fuel to be used elsewhere … is not allowed." (SAC at ¶ 98(c)). Plaintiffs' legal conclusion to the contrary has no merit.

At bottom, all of plaintiffs' allegations and legal conclusions suffer from the same fundamental flaw—comparing apples and oranges. It is well established that "any notion of discrimination" under the dormant Commerce Clause must involve "a comparison of substantially similar entities" operating "in a single market." *General Motors*, 519 U.S. 298-300. But a natural-gas power plant is not "substantially similar" to "stand-alone fuel terminals." (*See* SAC at ¶ 98(a)) (comparing those two kinds of facilities). And an integrated airport or marine terminal is not "substantially similar" to a "stand-alone" tank farm. (*See id.* at ¶ 98(b)) (comparing those two kinds of facilities). Here, plaintiffs cannot point to anything in the 2022 amendments that facially discriminates between "substantially similar" in-state and out-of-state economic actors in the same market, let alone in a manner "that benefits the former and burdens the latter." *General Motors*, 519 U.S. at 298-300; *Or. Waste Sys.,* 511 U.S. at 99. Nor do plaintiffs point to any caselaw holding or even suggesting that, because the City allows one type of land use—*e.g.,* airports—it must allow another—*e.g.,* bulk fossil-fuel terminals.

A law that "treat[s] all private companies exactly the same" with respect to the same activity does not discriminate against interstate commerce within the meaning of the dormant

Page  40 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

Commerce Clause. *United Haulers Ass'n*, 550 U.S. at 342.[16] This court previously explained in its order dismissing plaintiffs' First Amended Complaint that plaintiffs had "failed to adequately allege that the law is discriminatory." (Dkt. 58 at 4). Nothing in plaintiffs' additions to the SAC changes that reality. This court should therefore dismiss plaintiffs' first claim with prejudice.

**3.     *The SAC fails to plead facts plausibly suggesting a "discriminatory effect" on interstate commerce.***

Plaintiffs' second claim contends that the 2022 amendments are unconstitutional under the dormant Commerce Clause because they allegedly place an "undue burden on interstate trade" under the *Pike* balancing test. (SAC at ¶¶ 113-21). Portions of plaintiffs' first claim similarly allege that the 2022 amendments "are also discriminatory in their effect." (SAC at ¶ 103). With respect to these claims of discriminatory burdens and effects, this court granted plaintiffs leave to replead after finding "insufficient allegations demonstrating both a discriminatory burden on end users or consumers of fuel and linking that burden to Plaintiffs' injuries." (Dkt. 58 at 3). However, the factual allegations in the SAC still fail to do so.

The Ninth Circuit has explained that "most statutes that impose a substantial burden on interstate commerce do so because they are discriminatory." *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Harris*, 729 F.3d 937, 952 (9th Cir. 2013). Consequently, "*Pike* balancing is required only if the challenged law has a *discriminatory* effect on interstate commerce." *Rosenblatt*, 940 F.3d at 452 (quoting *Park Pet Shop*, 872 F.3d at 503; emphasis added). To state a claim under *Pike*, "conclusory allegations of disparate impact are not sufficient"—rather, "to survive the City's motion to dismiss, the plaintiffs need[] to plead *specific facts* to support a plausible claim that the ordinance has a discriminatory effect on interstate commerce." *Id*.

---

[16] This requirement for discrimination applies "even when only out-of-state businesses are burdened because there are no comparable in-state businesses." *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Harris*, 729 F.3d 937, 948 (9th Cir. 2013) (citing *Exxon Corp.*, 437 U.S. at 119-20).

Page  41 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

(quoting *Park Pet Shop*, 872 F.3d at 503; emphasis added). The complaint "must also plausibly allege the ordinance places a 'significant' burden on interstate commerce," as opposed to any burden. *Id*. Allegations "too speculative to warrant further factual development" are insufficient. *Dahlia*, 735 F.3d at 1076. In reviewing a *Pike* claim, courts "presume the law serves the city's legitimate interests," and it is plaintiffs' "burden to plausibly allege otherwise." *Id*. (citing *Spoklie*, 411 F.3d at 1059). A complaint that fails to meet any of the above requirements is subject to dismissal for failure to state a claim under the *Pike* balancing test. *Id*.

Here, as with their first claim, plaintiffs do not and cannot plausibly allege "specific facts" showing that the 2022 amendments impose a "discriminatory burden" on interstate commerce—let alone a "significant burden" that "is clearly excessive in relation to the putative local benefits" of the 2022 amendments and favors "substantially similar" Oregon economic actors to the detriment of out-of-state actors in the same market. *Gen. Motors Corp.*, 519 U.S. at 299; *Rosenblatt*, 940 F.3d at 452; *Or. Waste Sys.*, 511 U.S. at 99.

As an initial matter, the amendments to the SAC remain insufficient to state a claim that the 2022 amendments have caused a "significant burden on interstate commerce" that "is clearly excessive in relation to the putative local benefits" as a constitutional matter. *National Pork I*, 6 F.4th at 1032 (citation omitted); *Or. Waste Sys.*, 511 U.S. at 99. As the Ninth Circuit has explained, the bar for stating a claim under that theory is extremely high, and the court has "held that a statute imposes such a significant burden only in rare cases." *National Pork I*, 6 F.4th at 1032. Plaintiffs do not meet that high burden here.[17] As explained previously, the 2022 amendments merely maintain the status quo for BFFTs. Under the amendments, no BFFT has

---

[17] Notably, plaintiffs have not addressed the points noted by this court as absent from the First Amended Complaint. Plaintiffs have not alleged "what percentage of the bulk fuel supply stays in Portland or is distributed elsewhere." (Dkt. 58 at 4). Plaintiffs have not alleged that the 2022 amendments require fuel to be allocated in any way. (*Id*.). Plaintiffs have provided "no specific allegations as to the degree of possible fuel shortage or price increases that will be caused by the Amendments." (*Id*.).

been forced to shut down or curtail its operations—on the contrary, new fossil-fuel facilities with up to two million gallons of on-site storage can continue to be built in the future. The allegations in the SAC are insufficient to plausibly allege that maintaining the status quo and allowing limited future expansion creates *an affirmative harm to interstate commerce*, let alone a "significant" harm that outweighs the City's presumptively lawful zoning ordinance as a constitutional matter.

Nor have plaintiffs plausibly alleged that any such purported substantial burden on interstate commerce is discriminatory. The amendments to the SAC reassert plaintiffs' general contention that the goal of the 2022 amendments was to limit storage facilities to those needed to serve the City and "restrict the use of fossil fuels by consumers and businesses in other areas." (SAC at ¶ 2). Plaintiffs similarly allege that the 2022 amendments "target[] terminals that would export fuel to other states and countries while shielding resellers, distributors, consumers, and end users of fuel that are present or operate in the City." (*Id*. at ¶ 1). To support these assertions, plaintiffs contend that existing terminals are primarily dedicated to and needed for the supply of fuel to the City and the rest of Oregon. (*Id*. at ¶¶ 3, 34, 103). The amendments in the SAC also focus significantly on a hypothetical possibility of fuel shortages and increased prices. (*Id.* at ¶ 9-13, 74(d), 75-83).[18] In particular, plaintiffs repeatedly allege that the 2022 amendments will reduce supply of some fuel products to western Idaho. (*Id*.).[19]

---

[18] Notably, while plaintiffs' amendments reassert concerns about fuel shortages and higher prices, these are allegations that existed in the First Amended Complaint and were previously found insufficient to state a claim. (*See* Ex. 11, SAC Redline, at ¶¶ 86, 88, 89, 111, 120, 129, 140, 148).

[19] Plaintiffs' amendments in the SAC allege that this impact arises because of fuel transported by tank barges from Portland to terminals in Pasco, Washington. (SAC at ¶ 70). Plaintiffs allege that approximately 10% of the fuel that Portland terminals received from the Olympic Pipeline and half the fuel delivered by ocean tankers is transported by barge to Pasco. (*Id*.). While plaintiffs' new allegations discuss this existing fuel supply chain, they fail to explain how the 2022 amendments, which do not impact this routing of fuel, would constrict or block fuel to Pasco and thus western Idaho.

Page  43 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

But while plaintiffs allege that existing infrastructure historically has been used for distribution of fuel to Oregon end-users, absent from plaintiffs' allegations is any assertion that this is due to anything other than normal market forces. Put differently, plaintiffs do not allege that the 2022 amendments *require* that storage capacity at BFFTs in Portland be used only to supply Oregon end users. With respect to western Idaho, while plaintiffs have generally alleged population growth in the region (SAC at ¶ 74(a)), they fail to allege how that growth impacts demand for fuel in western Idaho. Nor have they alleged that such demand in western Idaho could not be met by existing storage capacity in Portland or elsewhere. *See Exxon Corp.*, 437 U.S. at 127 (holding that "interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another.")

Moreover, even if plaintiffs had adequately alleged a potential future impact in the form of eventual fuel shortages or increased prices—and they have not—they have failed to allege a *discriminatory* impact. That is, plaintiffs have not alleged any facts from which this court could reasonably infer that any burden from fuel shortages would be experienced differently by out-of-state end users than by Oregon end users. As the Supreme Court explained in *General Motors*, a plaintiff alleging an "undue burden" on interstate commerce must point to "a local preference" between "supposedly favored and disfavored entities in a single market[.]" *See* 519 U.S. at 300 (holding, "in the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market there can be no local preference, whether by express discrimination against interstate commerce *or undue burden upon it*, to which the dormant Commerce Clause may apply." (emphasis added)). Plaintiffs do not do so here.

At most, plaintiffs' allegations are analogous to the pork producers' allegations in *National Pork I*, where the court explained that "alleged cost increases to market participants and customers do not qualify as a substantial burden to interstate commerce for purposes of the

Page  44 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

dormant Commerce Clause." 6 F.4th at 1033. In short, plaintiffs' SAC still contains "insufficient allegations demonstrating *both* a discriminatory burden on end users or consumers of fuel *and* linking that burden to Plaintiffs' [alleged] injuries." (Dkt. 58 at 3) (emphases added).

4.      ***Plaintiffs' allegations still do not plausibly allege an unconstitutional burden on means of interstate transportation under the Supreme Court's pre-modern caselaw.***

       Finally, the court granted plaintiffs leave to replead facts necessary to attempt to meet the "high bar" of demonstrating a significant burden on interstate commerce in the absence of discrimination. (Dkt. 58 at 4). However, the new allegations in the SAC do not plausibly allege a dormant Commerce Clause claim based on an alleged *nondiscriminatory* burden on interstate commerce. As explained above, the pre-modern "line of cases [that] originated before *Pike*" and sometimes "left the courtroom door open to challenges premised on even nondiscriminatory burdens," involved "trucks, trains, and the like." *National Pork II*, 598 U.S. at 379, 379 n.2 (citations and internal quotation marks omitted). Moreover, those decisions invalidated state laws regulating such means of transportation "only when a lack of national uniformity" therein "would impede *the flow* of interstate goods" across state borders. *Id*. at 379 n.2 (emphasis in original). Even assuming those cases are still good law, they do not help plaintiffs.

       Quite simply, as the Ninth Circuit has held, "[l]and use regulations are inherently local." *Rosenblatt*, 940 F.3d at 452. Unlike trucks or trains, land use is *not* "inherently national" and does *not* "require a uniform system of regulation" in order to function. *National Pork I*, 6 F.4th at 1031 (citations omitted). On the contrary, "zoning laws and their provisions … are peculiarly within the province of state and local legislative authorities." *Warth,* 422 U.S. at 508 n.18. As the Ninth Circuit has put it, land-use regulations do not violate the dormant Commerce Clause "merely because they disappoint [entities] from out of state." *Rosenblatt*, 940 F.3d at 452; *see also Southern Pacific Co.*, 325 U.S. at 783 (explaining that local governments have "exceptional scope for the exercise of [their] regulatory power" as to "local regulations" of facilities such as

Page  45 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

"harbors, piers, and docks," and that such regulations "have been sustained even though they materially interfere with interstate commerce.").

This case in unlike *Southern Pacific*, in which a state law forced interstate trains to stop and be broken up at its border. It is unlike *Bibb*, in which a state law forced interstate trucks to stop so they could weld or un-weld a particular type of fender or mudguard at its border. And it is unlike *Raymond*, in which a state law forced interstate trailer-truck combinations over a certain length to stop and be broken up at its border—but spared in-state exporters from that same requirement. Here, the 2022 amendments do not require interstate oil trains to stop to be broken up at Oregon's or the City's borders. They do not require interstate natural-gas trucks to weld a particular type of fender before they can enter Oregon or the City. They do not require interstate fossil-fuel trucks to unhook trailers over a certain length before they can enter Oregon or the City. Indeed, the 2022 amendments do not regulate throughput at all—they simply limit the on-site fossil-fuel *storage* capacity of BFFTs in the City. This is classic land use, and plaintiffs cannot show otherwise.

In an apparent attempt to shoehorn this land-use statute into cases addressing means of interstate transportation, plaintiffs focus on the role of the City as "one of the largest ports on the West Coast" and "a critical hub for the transportation of crude oil and refined fuels." (SAC at ¶ 7). Plaintiffs further allege that oil and gas are transported to and from Portland on freeways and railways that go through Portland, and that the City's geography and freight infrastructure make it a hub of goods distribution. (*See id.* at ¶ 21). Plaintiffs also generally allege that fossil fuel is interdependent with transportation. (*See id.* at ¶ 63). But these are simply generalized allegations that are true of all products in commerce—all are transported on railways, freeways, and barges, and they often move through transportation hubs. To accept this truism would be to ignore the

///

///

Page  46 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

Supreme Court's instruction—fuel, like pigs, is "not trucks or trains." *National Pork II*, 598 U.S. at 379 n.2.[20]

In sum, the SAC does not plausibly allege that the 2022 amendments impose a significant and discriminatory burden on interstate commerce that favors Oregon economic interests to the detriment of substantially similar out-of-sate interests. Nor does the SAC plausibly allege that the 2022 amendments—a local land-use law regulating the storage of fossil fuels at BFFTs in Portland—impermissibly regulate a means of interstate transportation that is inherently national, requires a uniform of system of regulation in order to function, and does so in a manner that "would impede the flow of interstate goods" across state borders. *National Pork II*, 598 U.S. at 379 n.2 (emphasis in original). This court should therefore dismiss plaintiffs' second claim with prejudice.

## V.    THE THIRD, FOURTH, AND FIFTH CLAIMS IN THE SAC REMAIN SUBJECT TO DISMISSAL FOR THE REASONS STATED IN THIS COURT'S PREVIOUS ORDERS.

The SAC also realleges the same Foreign Commerce Clause, Preemption, and substantive Due Process claims raised in plaintiffs' First Amended Complaint. (*Compare* Dkt. 11 at ¶¶ 83-118 *with* SAC at ¶¶ 122-49; *see also* Ex. 11, SAC Redline at pp. 66-75). This court previously dismissed those claims without express leave to replead. (*See* Dkt. 53 at 18-28 (findings and recommendations); Dkt. 58 at 5 (order adopting on findings and recommendations)). The SAC does not alter the allegations pertaining to those claims, and opposing counsel confirmed during conferral on the present motion that the additions to the SAC pertained only to plaintiffs' dormant Commerce Clause claims. Plaintiffs' third, fourth, and fifth claims therefore remain

---

[20] This court also previously noted with respect to a plausible claim of a substantial, non-discriminatory burden, that plaintiffs had failed to include "specific allegations as to the degree of a possible fuel shortage or price increase that will be caused by the Amendments." (Dkt. 58 at 4). Plaintiffs' amendments in the SAC do not attempt to address this inadequacy, but instead reiterate the generalized possibility of fuel shortages or price increases. But importantly, the 2022 amendments do not lower supply and plaintiffs have failed to allege facts that would support the conclusion that existing FFT capacity is not adequate to meet demand.

Page  47 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS

subject to dismissal, and should be dismissed with prejudice, for the reasons previously stated in the City's motion to dismiss plaintiffs' First Amended Complaint (Dkt. 17), the reply in support of that motion (Dkt. 41), and this court's orders dismissing whose claims (Dkt. 53; Dkt. 58), which are incorporated herein by reference.

## CONCLUSION

For the foregoing reasons, the SAC fails to state claims for which relief can be granted. The allegations in the SAC are insufficient as a matter of law to make out valid claims that the 2022 amendments violate the dormant Commerce Clause. To conclude otherwise would require this court to expand the applicability of the dormant Commerce Clause to a situation to which it was never applied even in its heyday—a local land-use law that preserves the existing status quo—and to do so at a time when the Ninth Circuit has cautioned that "the dormant Commerce Clause" is "moving in [the] direction" of becoming a "dead letter." *National Pork I*, 6 F.4th at 1033. This court should decline plaintiffs' invitation to swim against the current and expand the dormant Commerce Clause doctrine to this new, unprecedented area.

Because the SAC fails to state claims under the dormant Commerce Clause, Foreign Commerce Clause, federal preemption, and substantive Due Process, this court should dismiss this action with prejudice.

DATED: September 18, 2024.

Respectfully submitted,

/s/ Denis M. Vannier
DENIS M. VANNIER, OSB No. 044406
Senior Deputy City Attorney
Denis.Vannier@portlandoregon.gov
NAOMI SHEFFIELD, OSB No. 170601
Senior Deputy City Attorney
Naomi.Sheffield@portlandoregon.gov

*Of Attorneys for Defendant*

Page  48 – DEFENDANT'S FRCP 12(b)(6) MOTION TO DISMISS