UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

STATE OF MONTANA; WESTERN
ENERGY ALLIANCE, a Colorado
nonprofit corporation; PACIFIC
PROPANE GAS ASSOCIATION, a
Washington nonprofit corporation;
IDAHO PETROLEUM MARKETERS
AND CONVENIENCE STORE
ASSOCIATION, INC., an Idaho nonprofit
corporation; and CHRISTENSEN, INC., a
Washington Corporation,

                Plaintiffs,

    v.

CITY OF PORTLAND,

                Defendant.

Case No. 3:23-cv-00219-YY

FINDINGS AND
RECOMMENDATIONS

YOU, Magistrate Judge.

**FINDINGS**

       In 2022, defendant City of Portland enacted the latest version of amendments, first

adopted in 2016, to the City's land use code, imposing certain limits on the construction of new

or expanded bulk fossil fuel terminals. The "BFFT Amendments," as they are referred to here,

created a new land-use category for "Bulk Fossil Fuel Terminals," which were defined as

facilities with "access to marine, railroad, or regional pipeline to transport fuel to or from the

site" and have either "transloading facilities for transferring a shipment between transport modes,

or have transloading facilities and storage tank capacity exceeding 2 million gallons." Portland

1 – FINDINGS AND RECOMMENDATIONS

City Code ("P.C.C.") 33.920.300(A).[1] The BFFT Amendments did not, however, apply to existing fuel terminals in the City; those facilities were allowed to continue operating as they had before the BFFT Amendments, though their on-site fossil fuel storage capacity was limited to that existing in August of 2022 when the most recent version of the amendments became effective. P.C.C. 33.140.100(B)(15). Plaintiffs, which include the State of Montana and entities representing fossil fuel producers, distributors, and retailers, have brought suit challenging the BFFT Amendments on a number of grounds, including that they violate plaintiffs' rights under the dormant Commerce Clause, the Foreign Commerce Clause, and the Due Process Clause, and that the amendments are otherwise preempted by federal law regulating railroads.

Previously, the court granted the City's motion to dismiss all of plaintiffs' claims but gave plaintiffs leave to file an amended complaint. Order (July 5, 2024) 5, ECF 58. In doing so, the court found that plaintiffs had failed to state a claim under the dormant Commerce Clause because plaintiffs did not "adequately allege that the law is discriminatory" and did not allege "the degree of the burden the Amendments have on the interstate fuel supply." In particular, the court explained that plaintiffs failed to allege facts "demonstrating both a discriminatory burden on end users or consumers of fuel and linking that burden to [p]laintiffs' injuries," in part because plaintiffs did "not allege what percentage of the bulk fuel supply stays in Portland or is distributed elsewhere" and the BFFT Amendments "do not require fuel to be allocated in any particular way, local or otherwise." *Id.* at 3–4, ECF 58. Furthermore, the court noted that the complaint did not specifically allege "the degree of a possible fuel shortage or price increase that will be caused by the Amendments." *Id.* at 4.

---

[1] A more detailed description of the relevant background facts regarding the BFFT Amendments can be found on pages 2 through 7 in the court's previous Findings and Recommendation (Feb. 26, 2024), ECF 53.

Plaintiffs subsequently filed a Second Amended Complaint, ECF 59, and the City has again moved to dismiss. ECF 65. In response, plaintiffs concede the dismissal of their Foreign Commerce Clause, Due Process, and preemption claims, and focus instead on the sufficiency of new allegations in support of their dormant Commerce Clause claims. *See* Resp. 43–44, ECF 71. As explained below, plaintiffs have again failed to state a claim under the dormant Commerce Clause because the allegations in the Second Amendment Complaint still fail to show that the BFFT Amendments discriminate against or impose an undue burden on interstate commerce. The amended allegations do not establish that the BFFT Amendments facially discriminate against similarly situated in-state or out-of-state entities, no matter how plaintiffs have variously described those entities. The amendments do not, for example, expressly allow an Oregon-based "end user" to access fuel at Portland's existing terminals while prohibiting an out-of-state end user from doing the same. Nor does the Second Amended Complaint allege facts sufficient to show that the City's stated purpose in passing the BFFT Amendments—i.e., reducing the risk of damage from an earthquake by restricting the expansion of fossil fuel storage tank capacity in an area highly susceptible to catastrophic destruction in such an event—could not possibly have been the City's true purpose, and was instead merely a façade to disguise an attempt to protect the economic interests of in-state actors at the expense of their out-of-state counterparts. And, perhaps most significantly, plaintiffs have still failed to allege specific facts showing that maintaining the current capacity of the City's fossil fuel transportation infrastructure, which the BFFT Amendments indisputably allow, has had any actual impact—whether that be a discriminatory effect, an excessive or undue burden, or otherwise—on the interstate market for fossil fuel or on the ability of out-of-state end users to acquire fossil fuel stored in or transported through the City.

I.      **Motion to Dismiss Standard**

A motion to dismiss under Rule 12(b)(6) requires the court to examine whether the complaint contains sufficient factual allegations to show that the pleader is entitled to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing Fed. R. Civ. P. 8(a)(2)). While a complaint need not contain detailed factual allegations, "formulaic recitation[s] of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement" are not sufficient. *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)). In the absence of a cognizable legal theory or sufficient facts to support a cognizable legal theory, the claim should be dismissed. *Taylor v. Yee*, 780 F.3d 928, 935 (9th Cir. 2015). To survive a motion to dismiss, the plaintiff must plead facts sufficient for the "court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663.

In evaluating a motion to dismiss, the court must accept the allegations of material fact as true and construe those allegations in the light most favorable to the non-moving party. *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). In addition to the factual allegations in the complaint, the court may consider documents that are attached to or incorporated by reference in the complaint, where the parties do not contest the authenticity of those documents, as well as matters capable of judicial notice. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

II.     **Discussion**

The Constitution grants Congress the power to "regulate Commerce . . .  among the several States." U.S. Const. art. I., § 8, cl. 3. The Supreme Court has interpreted the Commerce Clause "not only as an authorization for congressional action, but also, even in the absence of a conflicting federal statute, as a restriction on permissible state regulation." *Hughes v. Oklahoma*,

441 U.S. 322, 326 (1979). The so-called dormant Commerce Clause "implicitly preempt[s] state laws that regulate commerce in a manner that is disruptive to economic activities in the nation as a whole." *Nat'l Pork Producers Council v. Ross*, 6 F.4th 1021, 1026 (9th Cir. 2021).[2] Modern dormant Commerce Clause jurisprudence is "driven by concern about economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013) (quoting *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–38 (2008)).

There are "two primary principles that mark the boundaries of a State's authority to regulate interstate commerce." *Nat'l Pork*, 6 F.4th at 1026 (quoting *South Dakota v. Wayfair*, 585 U.S. 162, 173 (2018)). "First, state regulations may not discriminate against interstate commerce; and second, States may not impose undue burdens on interstate commerce." *Id.* (quoting *Wayfair*, 585 U.S. at 173). "If a statute discriminates against out-of-state entities on its face, in its purpose, or in its practical effect, it is unconstitutional unless it 'serves a legitimate local purpose, and this purpose could not be served as well by available nondiscriminatory means.' " *Rocky Mountain Farmers*, 730 F.3d at 1087 (quoting *Maine v. Taylor*, 477 U.S. 131, 138 (1986)). This form of heightened scrutiny results in "a virtually *per se* rule of invalidity." *Nat'l Pork*, 6 F.4th at 1026 (simplified); *see also Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1157 (9th Cir. 2012) (explaining that "heightened scrutiny" applies to "discriminatory laws"). Discrimination in the context of the dormant Commerce Clause means

---

[2] The Supreme Court affirmed the Ninth Circuit's decision in *National Pork* "in a fractured decision," and as a result the Ninth Circuit's decision "remains controlling in this circuit because a majority of the Justices . . . did not agree upon a single rationale and there is no opinion in that case that can reasonably be described as a logical subset of the other." *Iowa Pork Producers Ass'n v. Bonta*, No. 22-55336, 2024 WL 3158532, at *2 (9th Cir. June 25, 2024) (simplified) (citing *Nat'l Pork Producers Council v. Ross (NPPC II)*, 598 U.S. 356 (2023)).

"differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*, 511 U.S. 93, 99 (1994). "Of course, the 'differential treatment' must be as between persons or entities who are similarly situated." *Black Star Farms LLC v. Oliver*, 600 F.3d 1225, 1230 (9th Cir. 2010) (citations omitted); *see also Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 451 (9th Cir. 2019) ("A fundamental element of dormant Commerce Clause jurisprudence is the principle that any notion of discrimination assumes a comparison of substantially similar entities.") (simplified).

If a local ordinance is not discriminatory in that it "regulates evenhandedly with only incidental effects on interstate commerce, then the second step of the dormant Commerce Clause analysis—the *Pike* test—applies." *Rosenblatt*, 940 F.3d at 451 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970)). Under *Pike*, a local regulation will be upheld if it "effectuates a legitimate local public interest unless the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits." *Id.* (simplified) (emphasis omitted). "[A]t the motion to dismiss stage a complaint must, at a minimum, plausibly allege the ordinance places a significant burden on interstate commerce." *Nat'l Pork*, 6 F.4th at 1032 (simplified). A statute "imposes such a significant burden only in rare cases," and "[m]ost statutes that impose a substantial burden on interstate commerce do so because they are discriminatory." *Id.*

### A.    Facial Discrimination

Previously, plaintiffs' facial discrimination claims failed because the BFFT Amendments do not discriminate on its face "between out-of-state entities that wish to operate a bulk fossil fuel terminal and in-state entities that wish to do the same thing," or based on the "origin of the fuel[.]" Findings and Recommendations (Feb. 26, 2024) 15, ECF 53; *adopted in part by* Order 5

(July 5, 2024), ECF 58. Now, plaintiffs emphasize that the "discrimination at issue in this case is not directed against sellers, but downstream distributors, retail, and end users." Resp. 10, ECF 71. This shift in focus does not change the fate of plaintiffs' challenge to the BFFT Amendments based on facial discrimination. The BFFT Amendments are land-use and zoning regulations that restrict the way in which an owner of a parcel of land in Portland may put that land to use. On their face, the BFFT Amendments do not even apply to "end users" of fuel, much less make any facial distinction between in-state and out-of-state end users in their access to fuel that is stored or transported through the City's fuel terminals. *See Rosenblatt*, 940 F.3d at 449 ("Santa Monica's ban on vacation rentals applies in the same manner to persons nationwide, including Santa Monica residents who may be interested in renting a vacation home from another resident. Thus, it visits its effects equally upon both interstate and local business" and did not violate the dormant Commerce Clause.) (simplified); *Pharm. Rsch. & Mfrs. of Am. v. Cnty. of Alameda*, 768 F.3d 1037, 1042 (9th Cir. 2014) ("The Ordinance, both on its face and in effect, applies to all manufacturers that make their drugs available in Alameda County—without respect to the geographic location of the manufacturer."); *see also  Energy Michigan, Inc. v. Michigan Pub. Serv. Comm'n*, 126 F.4th 476, 487 (6th Cir. 2025) (explaining that "facial discrimination" under dormant Commerce Clause "occurs when a law expressly differentiates to favor in-state commerce or entities at the expense of out-of-state comparators," for example, "laws whose benefits or burdens are explicitly territorially based—that is, those concerned with city, county, or state lines") (internal citation and quotation marks omitted). At bottom, plaintiffs' arguments are better framed as asserting that the effects of the BFFT Amendments are discriminatory despite their facial neutrality, as the lengthy discussion below about that issue demonstrates.

The same analysis applies to the various "exceptions" to the BFFT Amendments—such as those for "the storage and transportation of fossil fuels that will be used as an input at an 'industrial, commercial, institutional, or agricultural firm,' " and for the "storage of fossil fuels for exclusive use at an airport, surface passenger terminal, marine, truck or air freight terminal, drydock, ship or barge servicing facility, rail yard, or as part of a fleet vehicle servicing facility"—that plaintiffs assert show facial discrimination. Resp. 22–23, ECF 71 (quoting P.C.C. 33.920.300(D)(5); P.C.C. 33.920.300(D)(7)) (alterations omitted). Again, there is nothing on the face of these exceptions that draws any distinction between similarly situated in-state or out-of-state entities, whether that is an entity that wants to build a storage tank to hold fuel for use at an "agricultural firm" or "rail yard," nor do the Amendments facially discriminate in some way against an out-of-state end user in its use of, for example, fossil fuel stored at an "airport." The exceptions related to renewable fuel similarly do not make any distinctions based on where the fuel is ultimately used or sold or the location of any particular end user, but instead apply based on the composition of the fuel itself. *See* Resp. 24, ECF 71 (citing P.C.C. 33.920.100(B)(15); P.C.C. 16.60.020).

The BFFT Amendments are not comparable to the state or local laws at issue in the cases cited by plaintiffs in support of their arguments regarding facial discrimination because in those cases, the challenged law drew distinctions based on territorial boundaries or their functional equivalent. *See* Resp. 22–24, ECF 71 (citing *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997) (dormant Commerce Clause challenge to Ohio statute that taxed sales of natural gas but included an exemption from taxation for any natural gas sales by Ohio monopoly utilities); *Or. Waste Sys.*, 511 U.S. at 96 (challenge to Oregon statute that imposed a "surcharge" on "every person who disposes of solid waste generated out-of-state in a disposal site or regional disposal

site"); *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 188 (1994) ("A Massachusetts pricing order imposes an assessment on all fluid milk sold by dealers to Massachusetts retailers. About two-thirds of that milk is produced out of State. The entire assessment, however, is distributed to Massachusetts dairy farmers."). In sum, plaintiffs have failed to allege that the BFFT Amendments facially discriminate against interstate commerce.

### B.    Discriminatory Purpose

When evaluating whether a state or local law has a discriminatory purpose under the dormant Commerce Clause, the Ninth Circuit has directed courts to "assume that the objectives articulated by the legislature are actual purposes of the statute, unless an examination of the circumstances forces [the conclusion] that they could not have been a goal of the legislation." *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 400 (9th Cir. 2015) (quoting *Rocky Mountain Farmers*, 730 F.3d at 1097–98).

The City Council declared that the "purpose" of the BFFT Amendments was "to limit the risk of damage from a catastrophic Cascadia Subduction Zone earthquake by limiting the expansion of fossil fuel storage tank capacity in an area with high susceptibility to liquefaction, while at the same time allowing the existing terminals to make safety upgrades; to serve future regional needs; and facilitate a transition to cleaner fuels to reduce carbon emissions."[3] In particular, the City Council explained that Portland's "primary liquid fuel storage facilities" are located in the Critical Energy Infrastructure ("CEI") hub, located in northwest Portland along the banks of the Willamette River, and geologic and other factors affecting the land upon which the CEI is located make the area "vulnerable to failure in the event of a subduction zone

---

[3] Sheffield Decl., Ex. 1 at 4, ECF 66-1.

9 – FINDINGS AND RECOMMENDATIONS

earthquake."[4] The City Council found "that large fossil fuel terminals represent risk to people, property and the natural environments" and that "[c]ontinuing to allow the unlimited increase in fossil fuel terminal storage tank capacity within a high-risk area increases the risk to the surrounding industrial district and the Willamette River."[5] The BFFT Amendments were designed to "ensure that the situation does not get worse" by creating a "new land use category with development standards that limit the size of new terminals and prohibit the expansion of fossil fuel storage tank capacity, with some exceptions, at existing terminals, but allow for their continued operation as a limited use."[6]

Plaintiffs have not identified any circumstances from which it could be determined that these stated public health and safety, emergency response management, or environmental concerns "could not have been the goal" of adopting the BFFT Amendments. *Int'l Franchise*, 803 F.3d at 400. The BFFT Amendments do not contain "language promoting local industry or seeking to level the playing field." *Id.* at 401. Nor have plaintiffs identified anything in the City Council's statements that suggest the purpose was to protect Oregon commercial entities or end users "from competition from out-of-state interests[.]" *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 525 (9th Cir. 2009). Plaintiffs repeatedly cite to portions of the City Council's findings that reference the "regional market," for example the finding that the BFFT Amendments "properly limi[t] storage to what is necessary to serve the

---

[4] *Id.* at 1–2; *see also id.*, Ex. 2 at 8, ECF 66-2. Although neither party specifically requested that the court take judicial notice of the legislative history materials related to the BFFT Amendments, such documents are appropriately subject to judicial notice and are accordingly referenced here where appropriate. *See* FED. R. EVID. 201(c); *Harbers v. Eddie Bauer, LLC*, 415 F. Supp. 3d 999, 1007 (W.D. Wash. 2019) ("Information published on government websites, including legislative history, is a proper subject of judicial notice.") (citing *Sonoma Cty. Ass'n of Retired Employees v. Sonoma Cty.*, 708 F.3d 1109, 1120 n.8 (9th Cir. 2013)).
[5] Sheffield Decl., Ex. 1 at 3, 6, ECF 66-1.
[6] *Id.* at 3–4.

regional market," as evidence of a discriminatory motive. Resp. 29, ECF 71; Second Am.

Compl. ¶ 31, ECF 59 ("Plan Policy 6.48 states that the City will '[l]imit fossil fuel distribution

and storage facilities to those necessary to serve the regional market.' ").[7] But nowhere do

plaintiffs allege that the City's reference to the "regional market" was necessarily limited to the

Portland "region" or to the State of Oregon as a whole. In fact, the City Council expressly

recognized that Portland's fuel terminals "handle 90 percent of fossil fuel for the State of

Oregon, as well as serving Southwest and Eastern Washington and Idaho, and will continue to do

so for the foreseeable future[.]"[8] It defies explanation how the City Council's recognition of the

regional needs of multiple states and specifically crafting the BFFT Amendments in light of

those needs could somehow evince an improper purpose to discriminate against interstate

commerce.

 To the extent plaintiffs cite past resolutions or policies whereby the City indicated that it

"oppose[d] expansion of infrastructure whose primary purpose is transporting or storing fossil

fuels in or through Portland or adjacent waterways," Compl. ¶ 31, ECF 59, those allegations are

not sufficient to demonstrate that the City's intent was to discriminate against interstate

commerce. As explained in more detail below, plaintiffs do not allege any facts establishing that

the current state of Portland's fuel transportation infrastructure is discriminatory or that any of

the limits on the "expansion" of such infrastructure would unfairly burden out-of-state interests

and benefit those in-state. For example, plaintiffs do not allege any facts showing that the current

distribution of fuel stored or transported through Portland is designed to distinguish between in-

state or out-of-state fuel or in practice somehow limits fuel destined for out-of-state users. *See*

---

[7] *See also id.*, Ex. 2 at 6, ECF 66-2.
[8] *Id.*, Ex. 1 at 5, ECF 66-1.

Order (July 5, 2024) 4, ECF 58 (explaining that plaintiffs "allege that the bulk fuel terminals receive 90% of the fuel used in Oregon, but they do not allege what percentage of the bulk fuel supply stays in Portland or is distributed elsewhere" and that the BFFT Amendments "do not require fuel to be allocated in any particular way, local or otherwise").

    **C.**    **Discriminatory Effect**

"The most common form of discrimination against interstate commerce is disparate impact: the 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.' " *Rosenblatt*, 940 F.3d at 448 (quoting *Or. Waste Sys.*, 511 U.S. at 99). "The Supreme Court has also found discrimination when a law imposes costs on out-of-staters that in-state residents would not have to bear." *Id.* (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 350–51, (1977)).

As for discriminatory effect, plaintiffs emphasize that, as mentioned above, the alleged discrimination at the heart of their claims "is not directed against sellers, but downstream distributors, retailers, and end users" and "[t]hus, the proper focus of the inquiry is not the impact of the proportion of goods coming into the City, but the proportion of goods leaving it." Resp. 10, ECF 71. Presumably, when plaintiffs refer to "downstream distributors, retailers, and end users," they are attempting to compare how the BFFT Amendments affect distributors, retailers, and end users located in other states with those located in Oregon. Essentially, plaintiffs' theory is that the BFFT Amendments "selectively targeted" fuel infrastructure that would be used for exporting fuel to users in other states while attempting to protect the supply of fuel available for local users. *See id.* The practical effect, according to plaintiffs, is to "block the flow of interstate commerce" and create a "chokepoint" of fossil fuel supply to other states by limiting the development of fossil fuel infrastructure, thus potentially driving up the price for these out-of-

state consumers. *See* Second Am. Compl. ¶¶ 82–83, ECF 59; Resp. 11, ECF 71 ("[T]hese artificially created 'chokepoints' will lead to decreased production and increased costs on interstate fuel because of reduced supply as well as increased procurement costs when fuel is shipped through less efficient means.").

But plaintiffs fail to allege that the BFFT Amendments have actually caused any such "blockage" or that local users of fuel have benefitted while out-of-state end-users have been burdened as a result of the amendments' restrictions on the future expansion of fossil fuel terminals in the City. For one thing, the BFFT Amendments do not, as plaintiffs assert, "block the interstate transportation and foreign export of fuel." Resp. 1, ECF 71. Under the BFFT Amendments, fuel terminals are allowed to maintain their existing capacity, and the BFFT Amendments do not require existing terminals to stop or change their operation in any way. They do not ban the storage of fossil fuel in, or the transportation of fuel through Portland, nor do they ban the construction of new or expanded terminals; for example, a new terminal with "transloading facilities and storage tank capacity" of less than 2 million gallons could be built. P.C.C. 33.920.300(A). Instead, as the City repeatedly emphasizes, the BFFT Amendments maintain the "status quo" for fuel terminals in Portland and limit certain types of "hypothetical future new or expanded terminals." *E.g.*, Mot. Dismiss 1, 3, 5–11, ECF 65. In fact, the BFFT Amendments have been in place in some form for nearly a decade; the City Council passed the first version of the amendments in 2016. Second Am. Compl. ¶ 32, ECF 59; *see also* Findings and Recommendations (Feb. 26, 2024) 3–4, ECF 53 (describing procedural history of the BFFT Amendments). Yet plaintiffs' Second Amended Complaint, as was true of their initial complaint, fails to allege any facts showing that the BFFT Amendments have had an actual effect, whether discriminatory or otherwise, on the interstate market for fossil fuel.

Plaintiffs do not allege any facts showing that the current fuel terminal capacity results in discrimination against out-of-state users of fuel when compared to in-state users. For example, the Second Amendment Complaint, just like plaintiffs' initial complaint, alleges that the existing "fuel terminals supply 90 percent of the fuel used in Oregon and southwest Washington." Second Am. Compl. ¶¶ 23, 69, ECF 59. But apart from establishing that the majority of fuel for Oregon comes from existing terminals, this allegation does not say anything about the overall capacity at existing terminals, or what proportion of that existing capacity is dedicated to serving out-of-state distributors, retailers, or other end users. *See* Order (July 9, 2024) 4, ECF 58 (explaining that plaintiffs' initial complaint did "not allege what percentage of the bulk fuel supply stays in Portland or is distributed elsewhere"). The complaint does not have any specific allegations demonstrating that the BFFT Amendments "increase[e] the relative market share of local business" or end-users. *Rosenblatt*, 940 F.3d at 450 (citing *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 126 & n.16 (1978)). If anything, the above allegation tends to show that the limits on the hypothetical future expansion of fossil fuel terminals imposed by the BFFT Amendments will affect the vast majority of fuel used in Oregon—90 percent of which is transported through the City's existing fuel terminals—in the same way as any out-of-state end user of fuel that seeks to access fuel transported through that same infrastructure. *See id.* at 449 (noting that "Santa Monica's ban on vacation rentals applies in the same manner to persons nationwide, including Santa Monica residents who may be interested in renting a vacation home from another resident"). At a minimum, it fails to establish that the BFFT Amendments, or their "exceptions" for various local uses like airports or gas stations, have a discriminatory effect on the distribution of fuel through Portland's existing terminals whereby local end users have allegedly benefitted at the expense of out-of-state users of that same fuel in any concrete way.

Plaintiffs assert generally that "existing fuel-transportation infrastructure is operating near maximum capacity," but neither the complaint nor the sources that plaintiffs cite in it have any specific information about the capacity of "existing fuel-transportation infrastructure" in Portland. *See* Second Am. Compl. ¶ 66, ECF 59 (citing Report by the National Petroleum Council (a federal advisory to the Secretary of Energy) to the Secretary of Energy, *Dynamic Delivery, America's Evolving Oil and Natural Gas Transportation Infrastructure* (Dec. 12, 2019) (the "2019 NPC Report")[9]; Alexandra B. Klass & Danielle Meinhardt, *Transporting Oil and Gas: U.S. Infrastructure Challenges*, 100 Iowa L Rev 947, 965 (2015)). In passing the BFFT Amendments, the City Council found that, based on a 2022 memo regarding the regional demand for liquid fossil fuel from the City's Bureau of Planning and Sustainability, "future total petroleum consumption" through the year 2050 was expected to be "less than the historic peak consumption" and thus the City "expected surplus capacity in Oregon" to meet regional demand.[10] Plaintiffs' generic allegations regarding the existing fuel transportation infrastructure in the "western U.S." or North America more generally, the projected increase in domestic fossil fuel production, and "growing demand" in other states do not create a plausible inference that the current state of fossil fuel infrastructure in Portland causes any discriminatory effect on out-of-state end users of fuel. *See* Resp. 11, 18, ECF 71; Second Am. Compl. ¶¶ 72, 74(a), (c), ECF 59 (alleging among other things that "existing fuel-transportation infrastructure is insufficient in the western U.S. and operating at near maximum capacity elsewhere in North America"). Rather than demonstrating a harmful effect on out-of-state users, the complaint itself seems to reflect that the status quo is adequate to serve the interstate market for fossil fuels. *See Exxon*, 437 U.S.

_____

[9] The 2019 NPC Report is attached as Exhibit 10 to the Sheffield Declaration, ECF 66-10.
[10] Sheffield Decl., Ex. 2 at 5, 41, ECF 66-2.

at 127–28 (explaining that the dormant Commerce Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations"). Plaintiffs allege that "[e]ven temporary obstructions of supply can cause shortages of refined product throughout the Northwest," yet there is no allegation that any such specific shortages have occurred as a result of any "temporary" disruption in supply from Portland, much less one caused by a lack of fuel terminal capacity under the current scheme and its limitations on future fuel terminal expansion that have been in place since 2016. *See* Second Am. Compl. ¶ 74(b), ECF 59.

Plaintiffs also assert that the BFFT Amendments "block the flow of interstate commerce by limiting the amount of fuel that can be transported through the city to terminals in Pas[c]o, Washington." Resp. 11, ECF 71 (citing Second Am. Compl. ¶ 70, ECF 59). But again, the complaint does not allege facts showing that any such "blockage" or "limitation" has actually occurred or, if it had, that the current capacity in Portland's fuel terminal is to blame. According to the complaint, barges that each hold up to 2.52 million gallons of fuel travel from Portland to Pasco at least 240 times a year, and carry an average of 1.7 million gallons per trip. Second Am. Compl. ¶ 70, ECF 59. Plaintiffs allege this is "around 10 percent of the fuel that the Portland terminals receive via the Olympic Pipeline or half of the fuel delivered by ocean tankers." *Id.* But the complaint says nothing at all about how the current fuel terminal capacity in Portland is some kind of limiting factor here or, for example, that any entity in Pasco or another out-of-state end user has at some point in the last ten years wanted more fuel but could not get it because of Portland's lack of capacity. *See id.* Plaintiffs' allegations regarding the "rail transport of crude oil from the Bakken region through Portland" similarly fail to demonstrate why the current state of fuel terminals is insufficient or has caused some harmful effect on out-of-state users that depend on the Bakken crude. *See id.* ¶ 74(b). And plaintiffs' reliance on the propane export terminal

project proposed by non-party Pembina in 2014 is even further afield. *See id.* ¶ 73; Resp. 11,

ECF 71. That project was abandoned before the BFFT Amendments were initially enacted in

2016 and thus does not support or suggest any conclusion about the practical effects or burdens

caused by subsequent adoption of the BFFT Amendments. *See* Second Am. Compl. ¶ 26–27,

ECF 59.

      Nor do plaintiffs allege any facts showing that the BFFT Amendments "selective

targeting of export facilities" has had any discriminatory effect on interstate commerce. Resp.

26–27, ECF 71. The BFFT Amendments only regulate the potential future construction of new or

expanded fuel terminals; existing terminals are, in the City's apt description, "free to pump or

transload as much fossil fuel as they wish, from wherever they may obtain it, and to ship that fuel

anywhere they like." Mot. Dismiss 12, ECF 65. Again, there is simply nothing in the complaint

that explains how the "targeting" of future fossil fuel terminal expansion has actually limited or

effected the interstate distribution of fossil fuel or has harmed any "downstream" end user.

      In this way, the BFFT Amendments are different than the local laws struck down in

*Island Silver & Spice, Inc. v. Islamorada*, 542 F.3d 844 (11th Cir. 2008), and *Waste Management

Holdings, Inc. v. Gilmore*, 252 F.3d 316 (4th Cir. 2001), the two cases plaintiffs highlight

regarding "selective targeting" as evidence of discriminatory effect. *See* Resp. 27, ECF 71. In

*Island Silver*, the plaintiffs owned a piece of real property with a 12,000 square-foot retail

building, and attempted to sell the property to a buyer who wanted to establish a Walgreens Drug

Store in the building. *Island Silver & Spice, Inc. v. Islamorada, Vill. of Islands*, 475 F. Supp. 2d

1281, 1283–84 (S.D. Fla. 2007) ("*Island Silver I*"), *aff'd sub nom. Island Silver & Spice, Inc. v.

Islamorada*, 542 F.3d 844 (11th Cir. 2008) ("*Island Silver II*"). The sale fell through after the

municipality denied the buyer the permit needed to change the property to a pharmacy, based on

a zoning ordinance that limited "formula retail establishments" to only those that had less than

50 feet of street frontage and were less than 2,000 square feet in total. *Id.* at 1284–85. The

plaintiffs tried but failed to find another buyer for the property, only garnering interest from

"formula retail operators, ready willing and able to purchase the property for its market value."

*Id.* at 1285. Although the ordinance was facially neutral in that it "treated all stores with

standardized features the same," it "ha[d] kept prospective national retail stores from operating . .

. , including Walgreens and Publix." *Id.* at 1291. The parties stipulated that the ordinance

"effectively prevente[d] the establishment of new formula retail stores," because "nationally and

regionally branded formula retail stores" could not operate in the limited space allowed under the

ordinance. *Island Silver II*, 542 F.3d at 846 (alterations omitted). Accordingly, the Sixth Circuit

affirmed the district court's ruling that the ordinance had the "practical effect of discriminating

against interstate commerce," and was therefore subject to (and subsequently could not

withstand) heightened scrutiny under the first prong of the dormant Commerce Clause analysis.

*Id.* at 847–48.

In the other case cited by plaintiffs, *Waste Management Holdings*, the Fourth Circuit

found there was a question of fact as to whether a facially neutral Virginia statute that restricted

the shipment of municipal solid waste ("MSW") to Virginia landfills in vehicles with four or

more axles had a discriminatory effect on interstate commerce because the record reflected that

"virtually all MSW generated outside Virginia is delivered to landfills in vehicles with four or

more axles, while the majority of MSW generated inside Virginia is delivered to landfills in

vehicles with less than four axles." 252 F.3d at 335; *see also* Resp. 27, ECF 71 (citing *Waste

Management*). Thus, not only are these out-of-circuit cases not controlling, plaintiffs' case here

is distinguishable because there are no allegations that a fuel terminal owned by an out-of-state

interest is effectively prevented from operating in Portland, that any out-of-state end user is actually prevented from obtaining fuel from Portland's existing terminals, or that fuel either received from or destined for other states is effectively excluded from the fuel transportation infrastructure in Portland.

The lack of any allegations that the BFFT Amendments have an actual, practical effect on the interstate distribution of fossil fuel through Portland is just one of many distinctions between this and other dormant Commerce Clause cases that plaintiffs cite regarding "preferred local access" or "unwanted commerce." *See* Resp. 33–36, ECF 71. For instance, in *New England Power*, the Supreme Court struck down an order from the New Hampshire Utility Commission "prohibiting New England Power from selling its hydroelectric energy outside the State of New Hampshire" because it "is precisely the sort of protectionist regulation that the Commerce Clause declares off-limits to the states" and the order's "exportation ban place[d] direct and substantial burdens on transactions in interstate commerce." *New England Power Co. v. New Hampshire*, 455 U.S. 331, 339 (1982); *see also* Resp. 34, ECF 71 (citing *New England Power*). In *City of Philadelphia v. New Jersey*, the Supreme Court ruled that a New Jersey statute that prohibited "any solid or liquid waste which originated or was collected outside the territorial limits of the State" from entering the state without the approval of the state's Department of Environmental protection violated the dormant Commerce Clause. 437 U.S. 617, 618–19, 629 (1978); *see also* Second Am. Compl. ¶ 105, ECF 59 (citing *City of Philadelphia*). The BFFT Amendments do not contain any such overt discrimination, and plaintiffs do not allege facts showing that the Amendments act as any similar kind of ban against fuel coming from or going to a different state. Similarly, the Supreme Court in *Pennsylvania v. West Virginia*, 262 U.S. 553 (1923), struck down, in plaintiffs' words, "a West Virginia law that required pipeline operators within

the state to give priority to West Virginia citizens in purchasing natural gas obtained from wells within the state." Resp. 34, ECF 71. Plaintiffs have not sufficiently alleged that the BFFT Amendments require or create any "priority access" for local users in part because the complaint is devoid of any specifics regarding the proportion of fossil fuel from existing fuel terminals that is used out of state in comparison to the fuel from existing terminals that is used by locals. *See* Resp. 10, ECF 71 (asserting that the "proper focus" is the "proportion of goods leaving" the City).

Instead, plaintiffs' alleged injuries are based on little more than the "stacking of hypothetical on hypothetical," as the City has fittingly characterized it. Reply 32, ECF 75. Portland might someday run out of fossil fuel transportation capacity; more fossil fuel transportation infrastructure might be needed; those facilities might, for example, need more than 2 million gallons of capacity allowed under the BFFT Amendments; and if those new large facilities are not built in Portland, the price of fuel might rise. But as detailed throughout here, plaintiffs have not alleged facts showing that the BFFT Amendments have had any practical effect on interstate commerce, and thus have not corrected the weaknesses identified in their prior complaint. Plaintiffs still do not allege any facts about the adequacy of Portland's existing capacity, or "what percentage of the bulk fuel supply stays in Portland or is distributed elsewhere." *See* Order (July 5, 2024) 4, ECF 58. Nor do plaintiffs allege that any hypothetical price increase (which itself depends on an innumerable list of unpredictable factors, both market-driven and otherwise) would be unfairly borne by out-of-state end users to the benefit of any Portland end user, or any facts necessarily linking that hypothetical price increase to the capacity of Portland's fossil fuel transportation infrastructure. *See id.* ("There are no specific allegations as to the degree of a possible fuel shortage or price increase that will be caused by the

Amendments."). These allegations are necessary to show that the BFFT Amendments have a discriminatory effect on similarly situated in-state and out-of-state entities, including end users. *See Exxon*, 437 U.S. at 126 (explaining that a state statute that "does not prohibit the flow of interstate goods, place added costs upon them, or distinguish between in-state and out-of-state companies in the retail market" does not discriminate against interstate commerce); *Rosenblatt*, 940 F.3d at 450 (dismissing dormant Commerce Clause claim in part because the complaint did not "plausibly allege a net negative effect on commerce outside of [the state]").

### D.    Excessive or Undue Burden on Interstate Commerce

The analysis next turns to plaintiffs' assertion that, even if the BFFT Amendments are not discriminatory, they still violate the dormant Commerce Clause because "the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits." Second Am. Compl. ¶ 114, ECF 59 (quoting *Pike*, 397 U.S. at 142) (alteration omitted). By and large, plaintiffs' arguments regarding the alleged excessive or undue burden on interstate commerce are the same ones they advance in an attempt to allege a discriminatory effect. Plaintiffs assert that the BFFT Amendments will "specifically burden end users in Idaho and Washington, which receive fuel via Portland, in the form of reduced supply of petroleum and higher wholesale prices and transportation costs." Second Am. Compl. ¶ 119, ECF 59. The BFFT Amendments, plaintiffs allege, "will interfere with the supply of crude oil to Washington refineries, which receive over 30 percent of their oil from the Bakken region, by forcing those refineries to pay increased transportation costs to receive that oil through less-efficient means." *Id.* And again, plaintiffs say the BFFT Amendments will "throttle the transport of fossil fuel products to and from other states . . . [and] will result in inadequate supply of fuel products for distributors,

retailers and end users outside the City . . . causing higher prices and fuel product shortages," *id.* ¶ 120, and thus the BFFT Amendments' "impact on interstate is substantial," *id.* ¶ 118.

But as explained above, plaintiffs do not allege any facts demonstrating that the actual impact of the BFFT Amendments—that is, maintaining the status quo for fuel transportation infrastructure in Portland—is the cause of any burden whatsoever to the interstate market in fossil fuel. *See Rosenblatt*, 940 F.3d at 453 (finding allegation that local ordinance had "resulted in a decrease in tourism" was not sufficient to sustain a dormant Commerce Clause claim based on undue burden because "the complaint fails to allege the magnitude of this decrease"). The allegations regarding the potential limits on future storage that might be necessary if fuel demand in other states cannot be met by Portland's existing fuel terminals is hypothetical at best and is not sufficient to "plausibly allege the ordinance places a significant burden on interstate commerce." *Nat'l Pork I*, 6 F.4th at 1032 (simplified). Moreover, even if plaintiffs' allegations about the future market and supply for fossil fuels are credited as true, the primary alleged effect of the BFFT Amendment on "end users" of fuel is that the cost of fuel may go up, and the Ninth Circuit in *National Pork I* held that "alleged cost increases to market participants and customers" and "higher costs to consumers" do not constitute a substantial burden on interstate commerce. *Id.* at 1033; *see also Harris*, 682 F.3d at 1152 ("[I]f the statute caused the loss [to some sellers] and therefore caused harm to the consuming public, such a result would be related to the wisdom of the statute, not to a burden on interstate commerce.") (citing *Exxon*, 437 U.S. at 127–28).

Plaintiffs' claim here does not fall into the "rare" subset of cases, most typically involving taxation or interstate transportation, in which non-discriminatory laws were found to "impose significant burdens on interstate commerce as a consequence of inconsistent regulation of activities that are inherently national or require a uniform system of regulation." *Nat'l Pork*, 6

F.4th at 1032, 1033. While this case may arguably "touch on" the interstate distribution of fuel, *see* Order (July 5, 2024) 4, ECF 58; Resp. 42–43, ECF 71, as mentioned throughout here, the BFFT Amendments regulate local land use for the storage or transfer of fossil fuels, and such "[l]and use regulations are inherently local. They are not a significant burden on interstate commerce merely because they disappoint would-be visitors from out of state." *Rosenblatt*, 940 F.3d at 452 (citing *Spoklie v. Montana*, 411 F.3d 1051, 1059 (9th Cir. 2005) ("That a particular service or recreation appeals to out-of-staters . . . does not impose on states an obligation to permit it.")). This case is readily distinguishable from cases such as *Southern Pacific*, where the Supreme Court struck down an Arizona law limiting the length of trains and thus requiring train operators passing through the state to break up and remake trains at the state's borders. *See* Resp. 43, ECF 71 (citing *S. Pac. Co. v. State of Ariz.*, 325 U.S. 761, 783 (1945)). The BFFT Amendments do not require any truck, train, or similar "interstate carrier" to comply with some special provision of local law that is "different and incompatible with" other state laws. *See Bernstein v. Virgin Am., Inc.*, 3 F.4th 1127, 1135–36 (9th Cir. 2021) (explaining that *Southern Pacific* and other similar "cases stand for the principle that state regulations can violate the dormant Commerce Clause in the rare case where an interstate carrier must comply with different and incompatible state requirements, and where that compliance is substantially burdensome"); *see also Raymond Motor Transp., Inc. v. Rice,* 434 U.S. 429, 431–33, 447–48 (1978) (ruling that Wisconsin law limiting trucks to 55 feet long, which effectively banned 65-foot double trailer semi-trucks from traveling through the state when all surrounding states and those west of Wisconsin allowed double-trailer trucks, imposed a substantial burden on interstate commerce).

Plaintiffs' suggestion that "local facilities used for interstate commerce" is a category for which local regulation must be subordinated to the dormant Commerce Clause takes too broad a view. *See* Resp. 43, ECF 71. Essentially any good in the marketplace relies on some kind of "storage" or "transfer" infrastructure comparable to the fuel terminals at issue here to reach other parts of the country, and plaintiffs do not allege or otherwise explain that there is something so unique about fossil fuel, and the City's regulation of how it may be stored in Portland in the future, that any "national uniformity" is required such that local governments should be prevented as a constitutional matter from crafting their own rules. *Exxon*, 437 U.S. at 128 (rejecting the "suggestion that because the economic market for petroleum products is nationwide, no State has the power to regulate the retail marketing of gas"); *Nat'l Pork I*, 6 F.4th at 1031 (ruling that the plaintiffs failed to allege "that the pork production industry is of such national concern that it is analogous to taxation or interstate travel, where uniform rules are crucial").

In sum, plaintiffs' Second Amended Complaint fails to sufficiently allege that the BFFT Amendments have a substantial effect on interstate commerce, and thus "it would be inappropriate . . . to determine the constitutionality of the challenged laws based on [an] assessment of the benefits of those laws and the [the City's] wisdom in adopting them." *Harris*, 682 F.3d at 1156.

### E.     Dismissal With Prejudice

The City requests that the dismissal of plaintiffs' claims should be with prejudice. Mot. Dismiss 4, ECF 65. Plaintiffs did not request leave to amend, or specifically indicate in their briefing what additional facts they could allege to support their claims. Given that plaintiffs' Second Amended Complaint did not address the specific deficiencies identified by the court in

its previous order, and in particular because plaintiffs still do not allege any actual effect on interstate commerce that has been caused by the BFFT Amendments over the nearly ten years that have passed since they were first enacted, dismissal with prejudice is appropriate here. *City of Los Angeles v. San Pedro Boat Works*, 635 F.3d 440, 454 (9th Cir. 2011) ("[T]he district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint."); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1072 (9th Cir. 2008) (finding district court did not abuse discretion in denying leave to amend where the plaintiff "point[ed] to no additional facts that it might allege to cure [the identified] deficiencies, which persisted in every prior iteration of the [complaint]").

## RECOMMENDATIONS

Defendant's Motion to Dismiss (ECF 65) should be granted and plaintiffs' claims should be dismissed with prejudice.

## SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge. Objections, if any, are due Tuesday, April 22, 2025. If no objections are filed, then the Findings and Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

//

//

//

//

## NOTICE

These Findings and Recommendations are not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of a judgment.

DATED April 8, 2025.

/s/ Youlee Yim You
Youlee Yim You
United States Magistrate Judge